**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

MARK ADAMS, AV SELECT INVESTMENTS,
LLC, DR. GREGORY SIMONIAN, WADE
HARTMAN, and FRANK EDWARD SMITH,

               Plaintiffs,

    v.

JOHN H. KLEIN and CAMBRIDGE
THERAPEUTIC TECHNOLOGIES, LLC,

             Defendant.

:
:
:
:
:
:
:
:
:
:
:
:
:

C.A. No. 18-01330-RGA

**JURY TRIAL DEMANDED**

<u>**FIRST AMENDED COMPLAINT**</u>

## I.   INTRODUCTION

1.      This action arises out of a fraudulent Ponzi scheme by defendant John H. Klein, to solicit investments for his company, Cambridge Therapeutic Technologies ("**CTT**").  Klein and CTT solicited investments from plaintiffs Mark Adams, AV Select Investments, LLC ("**AV Select**"), Dr. Gregory Simonian, and collectively from Wade Hartman and Frank Edward Smith ("**Hartman/Smith**") (collectively, the "**Plaintiffs**"), as well as various other investors who are not parties to this action.   Instead of using Plaintiffs' investments for CTT, Klein misappropriated their funds to support his lavish lifestyle and pay back undisclosed earlier CTT investors.

2.      Defendants Klein and CTT solicited the following investments from Plaintiffs with a promise that each would become an initial investor, "insider" or "founder" of CTT along with Klein:

(1)  $581,250 from Mr. Adams in October 2014;

(2)  $450,000 from AV Select in January 2015;

(3)  $600,000 from Dr. Simonian in August 2015; and

(4)  $400,000 from Hartman/Smith in November and December 2015.

3.     Klein's and CTT's pursuit of Plaintiffs followed the exact same playbook.  They represented to each Plaintiff that Klein was the sole shareholder of CTT and he was offering a unique opportunity to be the initial outside investor in his company that would revolutionize patient prescription medication adherence.  These representations were false when made.

4.     Klein and CTT actively solicited each Plaintiff for months over the telephone, through email, and by text message.  Klein personally sent (or presented in person) to each Plaintiff detailed CTT investor presentations and other information that described the current state of CTT's business and its projected near-term business and financial outlook.  The representations about CTT's then-current business were false when made, and the projections were not supported by any reasonable basis and were wildly false.

5.     Each Plaintiff invested in CTT in reasonable reliance on Klein's and CTT's material misrepresentations and omissions of critical facts.

6.     Klein and CTT then kept Plaintiffs as outsiders, failing to provide them with updated financial information about CTT or his efforts to solicit additional investors.  Klein and CTT repeatedly refused to provide standard accounting and operational information to the Plaintiffs.  Moreover, as much as possible, Klein and CTT kept each Plaintiff in the dark about the existence of the other Plaintiffs.  This went on for some time.

7.     In early-2017, Mr. Adams, then Executive Vice President of Sales and Marketing (and who later became a member of CTT's Board of Managers and the company's acting Chief Executive Officer), began an accounting and internal investigation into CTT and Klein's finances.  His findings were astonishing.  Mr. Adams would later share this information with the other Plaintiffs.

8.     *First*, the investigation showed that Klein had immediately misappropriated Plaintiffs' investments and other CTT funds to pay for his lavish lifestyle.  He used Plaintiffs'

investments to pay personal expenses, including, but not limited to, real estate taxes on his $30 million Alpine, New Jersey mansion, personal income taxes, personal American Express bills, school tuition for his children, a Sagaponack, New York summer rental, and season tickets for the Chicago Bears, among others. He also repeatedly withdrew cash from CTT's bank account in amounts of just under $10,000 (the federal reporting requirement) totaling approximately $125,000 and made improper and unexplained payments in excess of $1.1 million to his brother, friends, and other associates who have no connection to CTT's business. Klein's and CTT's failure to disclose to Plaintiffs that Klein would immediately use their investments to pay personal expenses was a material omission that altered the total mix of information available to Plaintiffs.

9.      **Second**, the investigation showed that Klein had previously solicited other outside investments in CTT before Plaintiffs, and he reimbursed millions of dollars to these earlier investors using Plaintiffs' (and other later investors') funds. This was a classic Ponzi scheme. Klein's and CTT's failure to disclose to Plaintiffs that he would use CTT as a vehicle for his Ponzi scheme was a material omission that altered the total mix of information available to Plaintiffs.

10.     **Third**, the investigation showed an alarming pattern of financial misdeeds. Klein and CTT never provided Plaintiffs with individual K-1s or CTT financial statements or tax returns. In addition, Klein solicited a $12.5 million investment in CTT from the Breslow family of Chicago in June 2016 without disclosing the Plaintiffs' prior investments, and vice-versa—*i.e.*, Klein and CTT did not disclose to the Plaintiffs that they had sought or secured a major investment. Instead, Klein surreptitiously merged the New Jersey limited liability company ("**CTT-NJ**"), in which Plaintiffs held their membership units, into a Delaware limited liability company ("**CTT-DE**"), which became the active CTT operating company. CTT-DE is the

successor-in-interest to CTT-NJ.  To this day, however, CTT-DE has never formally recognized any of Plaintiffs' ownership interests.

11.     It also became clear that the company Klein had represented to each Plaintiff was a fiction.  CTT did not have any developed products before Plaintiffs' investments, and it was not even close to having a product ready for mass consumption.  In fact, CTT did not develop its first commercialized product until June 2016.

12.     Plaintiffs have never received a return on their investments, whether in the form of a share of profits or tax losses.  Klein has misappropriated millions of dollars from CTT, using Plaintiffs' investments (along with other investments and company funds) as his own personal piggybank.  Klein also continues to abuse his position as a purported manager and majority shareholder of CTT to insulate himself even after he was terminated for cause in December 2017.  Accordingly, Plaintiffs' investments in CTT are worthless.

13.     Plaintiffs bring claims against Klein and CTT-DE for federal securities fraud, securities fraud under the New Jersey Uniform Securities Act, intentional misrepresentation/fraud, negligent misrepresentation, unjust enrichment, and breach of contract.

## II.    PARTIES

14.     Plaintiff Mark Adams, a citizen of Massachusetts, is an investor in CTT-NJ and currently the acting CEO of CTT.  Mr. Adams was also a member of CTT's Board of Managers until Klein wrongly terminated him from this position in January 2018.

15.     Plaintiff AV Select, a Florida limited liability company, is an investor in CTT-NJ. AV Select was managed by Dr. Robert Ashton, until he passed away in February 2017, and Gregory Vorbach.  AV Select is now managed by Mr. Vorbach and Dr. Ashton's widow, Dr. Jennifer Ashton.  The current members of AV Select are Dr. Jennifer Ashton (a citizen of New York), the Estate of Dr. Robert Ashton (a citizen of New Jersey), Mr. Vorbach (a citizen of

Florida), Bryan Vorbach (a citizen of South Carolina), Ian Vorbach (a citizen of New Jersey), and Nancy Lee Vorbach (a citizen of Florida).

16.     Plaintiff Dr. Gregory Simonian, a citizen of New Jersey, is an investor in CTT-NJ and currently consults for CTT on clinical matters.

17.     Plaintiff Wade Everett Williams-Hartman, a citizen of New Jersey, is an investor in CTT-NJ.  Hartman is the President of Keystone Folding Box Co. ("**Keystone**"), which manufactured its proprietary Ecoslide-RX Compliance Packs ("**Keystone Packs**") for CTT in 2016.

18.     Plaintiff Frank Edward Smith, a citizen of Ohio, is an investor in CTT-NJ.  Mr. Smith is the Director of Marketing & Business Development for Keystone.

19.     Defendant John H. Klein, a citizen of New Jersey, is the majority shareholder and a member of CTT's Board of Managers.  Klein was the CEO of CTT until he was terminated for cause on December 14, 2017.

20.     Defendant CTT-DE, Cambridge Therapeutic Technologies, LLC, is a Delaware limited liability company formed on May 4, 2011.  The principal address of CTT-DE was Glenpointe Center West, 500 Frank W. Burr Blvd., 4th Floor, Teaneck, New Jersey 07666, but the company no longer operates out of this office.  At all times relevant to the First Amended Complaint, CTT-DE was controlled by Klein by virtue of his status as CTT-DE's majority shareholder, his seat on CTT's Board of Managers, and his ability to appoint a second seat (of three) on CTT's Board of Managers.  Klein also controlled CTT-DE as the company's CEO before he was terminated for cause in December 2017.  Since then, he has exercised control of CTT-DE by improperly terminating Mr. Adams from the Board of Managers and replacing him with a yes-man—a board member who has abdicated his fiduciary duties to the company in order to protect Klein.  Since the merger, CTT-DE is the successor-in-interest to CTT-NJ.

21.

## III.    RELEVANT NON-PARTIES

22.    CTT-NJ, Cambridge TT Limited Liability Company, was a New Jersey limited liability company formed on June 7, 2011.  CTT-NJ was controlled by Klein at all times relevant to the First Amended Complaint.  CTT-NJ was merged into CTT-DE.

23.    Collectively, CTT-NJ and CTT-DE are referred to as "**CTT**."  CTT develops and markets medication adherence solutions, *i.e.*, drug packaging designed to help patients properly take their prescription medications.  CTT's business plan was to sell proprietary calendarized dosing packs for individual combinations of generic prescription medications that are typically prescribed together ("**Compliance PACs**").  CTT's key market would be physicians and physician groups, who would be able to realize new revenue streams by dispensing Compliance PACs directly to patients from their offices.  CTT would also sell Compliance PACs to pharmacies.  CTT also engaged, and continues to engage, in the business of wholesaling prescription gels and creams.

24.    Klein had also incorporated additional entities in the name of CTT and he held out CTT-NJ, CTT-DE and these other entities as a single enterprise, CTT.  During the period when each Plaintiff was defrauded by Klein and CTT, and at least until the CTT-NJ/CTT-DE merger, Klein, CTT-NJ, CTT-DE and the other entities were alter egos.

25.    Fundamentally, the CTT entities were a façade for Klein's Ponzi scheme and he used them interchangeably to defraud Plaintiffs and the other undisclosed early investors.  Klein controlled each of these CTT entities and did not observe corporate formalities.  The entities used the same bank account (under the name of a different entity, Cambridge TT LLC), did not hold board meetings, and did not maintain separate books and records.  None of the entities filed tax returns.  As a result of Klein misappropriating funds, the entities were insolvent and none

was adequately capitalized for its supposed business purpose, which was to develop and manufacture Compliance PACs.

26.     Robert and Monica Breslow ("**Breslow Investors**"), citizens of Illinois, are members of CTT-DE.  The Breslow Investors invested $12.5 million in CTT-DE in June 2016, and are presently suing Klein for, *inter alia*, securities fraud relating to this investment, *Breslow, et al. v. Klein*, 1:18-cv-00908-RGA (D. Del.).

27.     Alois Rupp and Kirsten Ferrara ("**Rupp Investors**") are citizens of Florida.  The Rupp Investors allege that they invested $1 million with Klein for the development of two drugs in November 2011, and are presently suing Klein and CTT for, *inter alia*, fraud relating to this investment, *Rupp, et al. v. Klein, et al.*, 2:17-cv-10055-JMV-SCM (D.N.J.).  The Rupp Investors, however, did not invest in CTT.

28.     Blue Valley, LLC ("**Blue Valley Investors**"), a citizen of Delaware, invested $7.5 million in CTT-DE in September 2016.

29.     "**SS**," "**OB**," "**TE LLC**," "**JD/WC**," "**JL**," "**MR**," "**JK**," and "**JT**," as discussed further herein, are additional, undisclosed early investors in CTT uncovered by Mr. Adams.  Mr. Adams has notified these investors of his findings, but they have not yet come forward publicly.  Accordingly, Plaintiffs have not disclosed their names at pleading stage of this proceeding in order to protect their privacy.  "**TSG LLC**" is an additional, undisclosed later investor in CTT.

## IV.     JURISDICTION AND VENUE

30.     The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because Plaintiffs assert a claim for violation of the federal securities laws (Count I).

31.     The Court has supplemental jurisdiction over Counts II – VI pursuant to 28 U.S.C. § 1367 because these claims are part of the same case or controversy as Count I.

32.     The Court has personal jurisdiction over Defendant Klein because, among other reasons, by signing CTT's September 2016 Amended Operating Agreement ("**Operating**

**Agreement**") and agreeing to its forum-selection clause, Klein consented to personal jurisdiction in the United States District Court for the District of Delaware for resolution of any suit, action, or other proceeding arising out of or based upon the Operating Agreement.  The United States District Court for the District of New Jersey has held that the Operating Agreement's forum-selection clause covers the related lawsuit, *Breslow, et al. v. Klein*, 1:18-cv-00908-RGA (D. Del.) (D.I. 16.)  Klein also represented that Delaware is the appropriate forum for that lawsuit (*id*., D.I. 9-1) and his attorneys have appeared in that action.  Additionally, Klein was personally involved with merging CTT-NJ into CTT-DE, a Delaware entity, in furtherance of his fraudulent scheme.

33.     The Court has personal jurisdiction over Defendant CTT-DE because the company is incorporated in Delaware and by virtue of the Operating Agreement.

34.     Venue is proper in this Court because, among other reasons, Klein and CTT-DE consented to it by agreeing to the forum-selection clause in the Operating Agreement.

## V.     STATEMENT OF FACTS

### A.     Plaintiffs Invest in CTT in Reasonable Reliance on Klein's Material Misrepresentations and Omissions

#### (i)     Mark Adams

35.     Defendants Klein and CTT began soliciting Mr. Adams's investment in CTT from their first meeting in late-June 2014 after they were introduced by a mutual acquaintance at their sons' hockey camp in Chicago.

36.     Klein and CTT represented Klein to be a recognized leader in the United States generic pharmaceuticals industry.  That same week, he said he had just closed the $610 million sale of DAVA Pharmaceuticals, Inc. ("**DAVA**"), a manufacturer of generic drugs he founded in 2004 and served as Chairman and CEO of, to Endo International plc ("**Endo**").  Klein and CTT further represented that for 24 years Klein held senior positions at three other generic

pharmaceuticals companies, and, since 1995 had returned over $3.3 billion to investors through companies in which he had been directly involved.

37.     Klein and CTT, however, misrepresented Klein's background from the outset. Plaintiffs later learned that Klein had been fired from DAVA for cause before the Endo sale and stripped of the majority of his shares due to misconduct at DAVA.

38.     Klein and CTT represented to Mr. Adams that CTT was going to be Klein's "final act."  Klein founded the company with the intention that its proprietary Compliance PACs would fill the underserved medicine compliance space.  He had already formed relationships with generic drug manufacturers and set up an exclusive packaging arrangement.  Klein also claimed that due to his stature in the industry CTT could get competitive generic drug pricing unavailable to anyone else.  CTT, Klein claimed, was a "billion dollar idea."

39.     At this very first meeting, Klein and CTT made a number of material misrepresentations to and omitted critical facts from Mr. Adams.

40.     Klein and CTT represented that Klein was the sole shareholder of CTT.  This representation was false when made, as Plaintiffs later learned that Klein had previously solicited various other investors prior to Mr. Adams's October 2014 investment.

41.     Klein and CTT also represented that Klein had already received, and turned down, a $30 million offer to sell CTT.  Upon information and belief, this representation was false when made.

42.     Over the next four months, Klein and CTT doggedly pursued Mr. Adams's investment through telephone calls, emails, and text messages, and at in-person meetings in New Jersey and Massachusetts requested by Mr. Adams.

43.     At an in-person meeting in August 2014, Klein provided Mr. Adams with a presentation titled "Cambridge Technologies, Second Quarter 2013."  This presentation made

9

two specific misrepresentations, among other material misstatements, omissions, and financial projections that were not supported by a reasonable basis.

44.     First, the presentation represented that CTT had an approved New Drug Application ("**NDA**") for, and had already launched, a peptic ulcer product called the Omeclamox-Pak.  The presentation further represented that CTT had generated $1.1 million in revenue from this product in 2013 and would bring in $2 million in 2014.  These representations were false when made, as Plaintiffs later learned that CTT did not own an NDA and did not derive any revenue from the product.

45.     Second, the presentation represented that CTT held a 10 year license to patent a veterinary product that would minimize cataracts in dogs after funding a study regarding the same for the University of Pennsylvania.  This representation was false when made, as Plaintiffs also later learned that CTT never held this license and the University of Pennsylvania confirmed to Mr. Adams that the study was abandoned and Klein was not responsible for it anyway.

46.     Klein also emailed Mr. Adams three successive versions of the investor presentation and business plan for CTT, on September 10, September 29, and October 6, 2014.  He also emailed Mr. Adams informal updates on the company.  This information was replete with material misstatements, omissions, and financial projections that were not supported by a reasonable basis.

47.     For example, the "Cambridge Therapeutic Technologies Corporate Overview, September 2014," sent to Mr. Adams on October 6, 2014 (the "**September 2014 Deck**") represented that "Cambridge has developed and is poised to begin commercializing a proprietary solution that enables doctors to dispense safely and directly a variety of pre-packaged generic drugs and drug combinations directly to patients from their offices."

48.     Among other things, CTT had "66 Generic Compliance PACs currently in product configuration," "55 additional Generic Compliance PACs in [the] product pipeline," access to "Four IND [Investigational New Drug Application] Combination Compliance PACs approved and ready for commercialization," and "21 additional Combination Compliance PACs in Cambridge's product pipeline."

49.     Based on this purported pipeline, Klein and CTT projected gross revenues for CTT of over $134 million and $347 million and net profits of over $34 million and $136 million in 2015 and 2016, respectively.

50.     Moreover, the investor presentation claimed that "in reality, these forecasts are inherently conservative and defensible."

51.     Klein and CTT knew that these representations, among others, were false when made and the financial projections were not supported by a reasonable basis.  CTT did not have any developed products in October 2014, and it was not even close to having a product ready for mass consumption.  In fact, CTT did not develop its first commercialized Compliance PAC until June 2016.

52.     Later, in an October 17, 2014 text message, Klein reiterated to Mr. Adams that he would be CTT's first outside investor.  Klein's text message said that he was "not sending [a] balance sheet to [other potential] funders until you transfer [your investment] but they wanted [it] this week.  Don't mean to push but want you as an insider."

53.     In reasonable reliance on Klein's and CTT's various material misrepresentations and omissions, Mr. Adams negotiated the terms of his CTT investment with Klein.  Mr. Adams initially rejected Klein's first two offers, 3% of CTT (3 of 100 shares) for $1 million and then 3% of CTT (3 of 100 shares) for $600,000.  Instead, Mr. Adams countered the second offer with

a proposal that he purchase 6% of CTT (6 of 100 shares) for $581,250 (which he had readily available to invest at that time).  Klein accepted on October 16, 2016.

54.     The same day, Mr. Adams wired $581,250 to CTT's account XX-XXX-5094 at PNC Bank ("**PNC Account 5904**").

55.     Mr. Adams did not receive an operating agreement or subscription agreement with his investment.  However, Klein represented and repeatedly confirmed that Mr. Adams purchased six units (6%) of CTT-NJ in exchange for his $581,250 investment.

### (ii)     AV Select

56.     Upon information and belief, Defendants Klein's and CTT's solicitation of Dr. Ashton's investment followed the same pattern as Mr. Adams and the other Plaintiffs—with Klein touting his background and plan for CTT at their very first meeting.  Klein and CTT made a number of material misrepresentations to and omitted critical facts from Dr. Ashton.

57.     Klein emailed Dr. Ashton an investor presentation and business plan for CTT on January 22, 2015.  This presentation was replete with material misstatements, omissions, and financial projections that were not supported by a reasonable basis.

58.     The "Cambridge Therapeutic Technologies Corporate Overview, October 2014" (the "**October 2014 Deck**") is substantially similar to the September 2014 Deck and other presentations that Klein had sent to Mr. Adams.  It makes the same misrepresentations, among others, enumerated in paragraphs 47-49 herein.  The October 2014 Deck projected gross revenues for CTT of over $119 million and $326 million and net profits of over $23 million and $124 million in 2015 and 2016, respectively.

59.     Klein and CTT knew that these representations, among others, were false when made and the financial projections were not supported by a reasonable basis.  CTT did not have any fully developed products in January 2015, and it was not even close to having a product

ready for mass consumption.  In fact, CTT did not develop its first commercialized Compliance PAC until June 2016.

60.     On January 25, 2015, Dr. Ashton and his wife, Dr. Jennifer Ashton, discussed the CTT opportunity with their longtime friends Gregory and Nancy Vorbach over dinner.  Dr. Ashton shared the October 2014 Deck with the Vorbachs and relayed his various conversations with Klein about the company.

61.     Dr. Ashton offered the Vorbachs the opportunity to co-invest in CTT with the Ashtons, but he stressed that the Vorbachs needed to make a decision and fund the investment immediately.  The investment was time-sensitive because Klein misrepresented to Dr. Ashton that he was CTT's sole shareholder and that Dr. Ashton needed to move fast if he was to be CTT's first outside investor.

62.     The Vorbachs were impressed by the projections in the October 2014 Deck and felt comfortable with the investment opportunity because they understood that Dr. Ashton would become a CTT insider with Klein.

63.     In reasonable reliance on Klein's and CTT's various material misrepresentations and omissions, the Ashtons and Vorbachs agreed to purchase 3% of CTT-NJ (3 of 100 shares) for $450,000, with the Ashtons investing $275,000 and the Vorbachs investing $175,000.

64.     On January 26, 2015, the Vorbachs wired $450,000 from four different accounts to PNC Account 5904.

65.     The next day, Mr. Vorbach organized AV Select, a Florida limited liability company, as the vehicle for this co-investment.  The members of AV Select—Dr. Robert Ashton, Dr. Jennifer Ashton, Gregory Vorbach, Nancy Vorbach, Bryan Vorbach, and Ian Vorbach—agreed to the operating agreement as of February 12, 2015.

13

66.     Klein repeatedly promised Dr. Ashton that he would provide AV Select with a subscription agreement and stock certificates for its CTT investment, but he never did.  He did, however, memorialize the terms of the AV Select investment in various emails and a letter.

### (iii)    Dr. Simonian

67.     Defendants Klein and CTT began soliciting Dr. Simonian's investment from their first meeting at a June 2014 fundraiser for Hackensack University Medical Center.

68.     Klein was a hospital Trustee, and Dr. Simonian, by virtue of his role as Chairman of the Medical Executive Committee for the hospital, sat on the Board of Trustees.

69.     Unbeknownst to Dr. Simonian, Klein gave him the very same sales pitch—about his background, success returning billions of dollars to investors, and his vision for CTT—that he gave to Mr. Adams and Dr. Ashton, and upon information and belief, various other undisclosed early CTT investors.

70.     Klein and CTT represented that Klein was the sole shareholder of CTT and he was looking for an active minority investor to assist him with growing the business.  These representations were false when made, as Plaintiffs later learned that Klein had previously solicited various other investors prior to Dr. Simonian's August 2015 investment.

71.     Klein and CTT also represented that Klein had already received, and turned down, a $30 million offer to sell CTT.  Upon information and belief, this representation was false when made.

72.     Dr. Simonian took Klein's card and they kept in touch intermittently over the next year.

73.     Beginning in or around May 2015, Klein and CTT began pursing Dr. Simonian's investment in earnest through emails, text messages, and telephone calls.

74.     Klein emailed Dr. Simonian an investor presentation and business plan for CTT on May 7, 2015, and informal updates on the company thereafter.  This information was replete with material misstatements, omissions, and financial projections that were not supported by a reasonable basis.

75.     The "Cambridge Therapeutic Technologies Corporate Overview, March 2015" (the "**March 2015 Deck**") is substantially similar to the September and October 2014 Decks that Klein had sent to Mr. Adams and Dr. Ashton.  It makes the same representations, among others, enumerated in paragraphs 47-49 herein.  The March 2015 Deck projected gross revenues for CTT of over $78 million and $262 million and net profits of over $4 million and $84 million in 2015 and 2016, respectively.

76.     Klein and CTT knew that these representations, among others, were false when made and the financial projections were not supported by a reasonable basis.  CTT did not have any fully developed products in May 2015, and it was not even close to having a product ready for mass consumption.  In fact, CTT did not develop its first commercialized Compliance PAC until June 2016.

77.     Klein and Dr. Simonian exchanged various emails in late-May and early-June 2015 regarding the CTT investment.  On June 10, 2015, Klein emailed Dr. Simonian lists of over 80 CTT products that he represented would be commercialized in the near-term.  And, on June 19 and 22, 2015, Klein emailed Dr. Simonian "updated" pro-forma revenues and company valuations for 2015 to 2018, which were based on the assumption that "direct doctor dispensing with a mail order initiative [would be] in place [by] 1st qtr 2016."  He then revised the projections due to "moving up some very profitable products into 2016 along with recanted commissions and royalties [sic] and reductions in ongoing SG&A."

78.     Klein and CTT knew that the representations about CTT's products were false when made and the financial projections were not supported by a reasonable basis, as CTT did not have any developed products and was not close to having commercialized operations ready for the first quarter of 2016.

79.     In the same June 19, 2015 email, Klein gave Dr. Simonian the hard sell:

> At this point I am very open to your desire;if [sic] you could give me some idea of you range Iwill [sic] quickly come back to you as to how I could accommodate it.

> I know you would be a huge contributor to future favorable valuations and I am willing to bring you in confidentially as a founder with me.That [sic] being said anything we did would have to be done before anyone else participated or your value would have to be at theirs.

> As a side bar I was offered $26.5 million for the company Oct 2012 but I said no; it was just to [sic] early.

> So please think about what you would like to do and lets talk over the weekend.

> As to your role,you [sic] would be very favorably compensated for all activities trips white papers expenses and salary as income achieved and you would be on executive committee of company with me.

> Await you thoughts;however [sic] some urgency because of conversations for final funding partner.

80.     These representations were false when made.  Klein did not disclose that CTT had various other early investors, including Mr. Adams, AV Select, and others.

81.     In reasonable reliance on Klein's and CTT's various material misrepresentations and omissions, Dr. Simonian agreed to purchase 3% of CTT-NJ (3 of 100 shares) for $600,000, with an option to purchase an additional 3% of CTT-NJ and a right of first refusal to purchase additional shares if Klein solicited further investments.

82.     The terms of Dr. Simonian's investment are set forth in the "Membership Unit Purchase and Option Agreement" ("**Simonian Membership Agreement**") and "Operating Agreement of Cambridge TT Limited Liability Company (a New Jersey limited liability company)" ("**Simonian Operating Agreement**"), copies of which are attached as **Exhibit A** and **Exhibit B**, respectively.  Dr. Simonian and Klein executed these documents on August 10, 2015.

83.     The Simonian Membership Agreement represents that "Seller [Klein] owns One Hundred (100) units of membership interests in Cambridge TT Limited Liability Company" and that "Seller is the sole owners [sic] of the Units" and "No other person or entity has any legal or equitable claim to ownership of the Units."  (Exhibit A, at pgs. 1, 2.)  These representations were false when made.

84.     The Simonian Operating Agreement represents that "As of the date hereof, the Company has issued 100 Units to the Members as set forth on Exhibit A," and Exhibit A represents that Klein owns 97 Units and Dr. Simonian owns 3 Units of CTT-NJ.  (Exhibit B, at pgs. 4, 31.)  These representations were false when made.

85.     That same day, Dr. Simonian wired $600,000 to PNC Account 5904.

(iv)   **Hartman/Smith**

86.     Messrs. Hartman and Smith's investments in CTT grew out of the business relationship between Keystone and CTT.

87.     Defendants Klein and CTT contacted Keystone in the fall of 2014 after hearing about the success that Walmart's pharmacy had dispensing prescription drugs packaged in Keystone Packs.

88.     Klein and Keystone's executives, Messrs. Hartman and Smith, mutually recognized the potential of doing business together.  Klein represented that he could access cheap generic drugs given his stature in the industry and that he had a network of 1,500 salespeople ready to sell CTT's proposed Compliance PACs to physician groups and

pharmacies.   Keystone would provide its patient-friendly proprietary Keystone Packs for the Compliance PACs.

89.     Keystone and CTT formalized their business relationship in October 2014.  Over the next year and a half, the companies worked together to design a Compliance PAC prototype, explore automation of drug packaging fulfilment, identify an FDA registered prescription drug packager to fill and ship the Compliance PACs, and launch the product.

90.     During this period, Klein and Mr. Smith spoke at least three times a week.  In addition to discussing Compliance PACs, Klein told Mr. Smith about CTT's success wholesaling prescription gels and creams and CTT's growing pipeline for this business.  Klein and CTT were always soliciting Messrs. Hartman and Smith's investments.

91.     In a meeting at Keystone's New Jersey office on July 14, 2015, Klein showed Messrs. Hartman and Smith an investor presentation that was similar to the September and October 2014 and March 2015 Decks he sent to the other Plaintiffs.  As discussed, these presentations were replete with material misstatements, omissions, and financial projections that were not supported by a reasonable basis.

92.     Klein and CTT picked up the solicitation efforts in October 2015, making largely the same pitch that successfully landed the other Plaintiffs.  Over the next two months, Klein communicated with them regularly through telephone calls, emails, text messages, and at an in-person meeting in New Jersey.

93.     Klein and CTT represented that Klein was the sole shareholder of CTT and he was offering Messrs. Hartman and Smith the opportunity to get in on the ground floor as CTT's first outside investors.  These representations were false when made, as Klein had previously solicited various other investors, including Mr. Adams, AV Select, Dr. Simonian and others.

94.     Klein and CTT represented that Klein had already received, and turned down, a $27 million offer to sell CTT.  Upon information and belief, this representation was false when made.

95.     Klein and CTT represented that Klein had already invested over $1 million each in three NDAs for drug combinations to be sold in Compliance PACs.  Upon information and belief, this representation was false when made.

96.     Klein and CTT also made specific representations about CTT's current business model and near-term prospects that were false and not supported by a reasonable basis.

97.     For example, Klein and CTT represented that CTT was poised for immediate success selling Compliance PACs to physician groups because, among other things, CTT could offer the groups software that would quickly adjudicate patient insurance claims, *i.e.*, approve and facilitate insurance payments.  Up to this point, physician dispensing was not common because most groups did not have the infrastructure in place to efficiently adjudicate claims. Klein and CTT, however, represented that he had invested over $1 million in now fully developed software that, along with the convenient Compliance PACs, would immediately create a market for physician dispensing.  These representations were false when made, as CTT did not have fully developed claims adjudication software and, upon information and belief, Klein had not invested over $1 million in the same.

98.     Klein and CTT represented that CTT's network of 1,500 salespeople were getting a lot of interest from physician groups, including a cardiology group in Miami, Florida that was ready to work with CTT as soon as it had commercialized Compliance PACs and would yield $4 million in annual revenue.  Klein and CTT presented this group as validating CTT's business model.

99.     Also, on November 17, 2015, Klein emailed Messrs. Hartman and Smith three documents, "CTT Product Protocols," "CTT Compliance PAC Suppliers," and "CTT Compliance PAC Marketing Launch Strategy," identifying over 30 Compliance PACs that he represented CTT would begin selling between January and April 2016.

100.    Klein and CTT knew that these documents and the representations about the same were false and not supported by a reasonable basis, as CTT did not have any fully developed Compliance PACs in November 2015 and was not even close to having a product ready for mass consumption.  In fact, CTT did not develop its first commercialized Compliance PAC until June 2016.

101.    In reasonable reliance on Klein's and CTT's various misrepresentations and omissions, Messrs. Hartman and Smith agreed to purchase 2% of CTT-NJ (2 of 100 shares) for $400,000.   Mr. Hartman purchased 1.5% for $300,000 and Mr. Smith purchased 0.5% for $100,000.

102.    The terms of Mr. Hartman's investment are set forth in the "Unit Purchase Agreement by and between John H. Klein and Wade Everett Williams-Hartman" ("**Hartman Agreement**"), which is attached as **Exhibit C**.  Mr. Hartman executed the Hartman Agreement on November 23, 2015, and wired $300,000 to PNC Account 5904 the same day.

103.    The terms of Mr. Smith's investment are set forth in the "Unit Purchase Agreement by and between John H. Klein and NuViewis IRA Inc. FBO Frank Edward Smith" ("**Smith Agreement**"), which is attached as **Exhibit D**.   Mr. Smith executed the Smith Agreement on or about December 10, 2015, and wired $100,000 to PNC Account 5904 on December 11, 2015.

20

104.    The Hartman and Smith Agreements each represented that Defendant Klein owned 100 of 100 shares of CTT-NJ.  (Exhibits C and D, at § 2.)  These representations were false.

### B.    The Breslow Investment and Undisclosed Merger

105.    After Plaintiffs' investments, Klein and CTT kept each apart from CTT's finances and Klein's pursuits of additional outside investment.  Klein and CTT did not provide Plaintiffs with financial statements, formal or informal, or tax returns.  They also did not provide Plaintiffs with access to PNC Account 5904 or any other CTT bank account.

106.    At the same time, Klein and CTT were aggressively soliciting additional investors for CTT.  Unbeknownst to any of the Plaintiffs, Klein identified the Breslow Investors in the spring of 2016 and they invested $12.5 million in CTT-DE in June 2016.

107.    Upon information and belief, Klein and CTT gave the Breslow Investors the same fraudulent investment pitch that they gave the Plaintiffs, as well as access to information that the Breslow Investors now allege was materially misleading.

108.    In connection with the Breslow Investors' investment, Klein purportedly merged CTT-NJ into CTT-DE on June 2, 2016.  The merger, however, was not effective at this time, as Klein reported to the Breslow Investors.  Instead, Klein actually completed the merger in March 2017 and backdated the documents to make it appear as if it had occurred then.  CTT-DE is the successor-in-interest to CTT-NJ.

109.    Klein and CTT did not disclose the merger to Plaintiffs.  He did not give Plaintiffs, and particularly Dr. Simonian who had contractual notice, right of refusal, and drag-along rights, an opportunity to purchase additional shares in CTT (whether it be CTT-NJ or CTT-DE).  And, most egregiously, he did not recognize Plaintiffs' CTT-NJ interests in the surviving CTT-DE entity.

110.    The Breslow Investors' investment, followed by a $7.5 million investment from the Blue Valley Investors in September 2016, marked a major shift for the company.

111.    First, Klein and the Breslow Investors prepared and executed an operating agreement for CTT-DE in June 2016.  That operating agreement was amended in September 2016 and became CTT-DE's operative Operating Agreement.

112.    The Operating Agreement did not recognize Plaintiffs' CTT-NJ interests in CTT-DE.

113.    Second, CTT executives signed employment agreements with the company, including Mr. Adams as Executive Vice President of Sales and Marketing and Dr. Ashton as Executive Vice President of Clinical and Formulary Affairs.  Mr. Adams also later became a member of CTT's Board of Managers.

114.    Mr. Adams and Dr. Ashton signed the Operating Agreement in connection with their employment contracts, but Klein withheld the misleading capital tables that omitted their CTT-NJ investments.  Dr. Simonian and Messrs. Hartman and Smith never signed the Operating Agreement (and they were not even told that it existed).

115.    Third, CTT opened its office in Teaneck, New Jersey, and hired a number of new executives and employees.

### C.       Defendant Klein's Reckoning

116.    By February 2017, it was becoming apparent to Mr. Adams that Defendant Klein was not who he said he was.

117.    After some pressure, Klein finally disclosed Mr. Adams and AV Select's investments to the Breslow Investors and Blue Valley Investors (but not Dr. Simonian or Messrs. Hartman and Smith's investments), and he proposed a corporate reorganization to recognize their

interests in CTT-DE.  CTT-DE, however, never completed a reorganization and Plaintiffs still do not have recognized interests in CTT.

118.    CTT also entered a formal consulting agreement with Dr. Simonian—who Klein could no longer keep away from the company after CTT opened its office and launched a website—in March 2017.

119.    And, despite Klein's continued best efforts to obfuscate, Mr. Adams began an accounting and internal investigation into Klein and CTT's finances.

120.    The accounting and internal investigation, which is still ongoing, has included a detailed review of, among other things, PNC Account 5904, Klein's CTT email account, CTT's 2016 general ledger prepared by the company's former Chief Financial Officer, and interviews with the other Plaintiffs, third-party recipients of material funds transfers from CTT (some of which turned out to be undisclosed early CTT investors), and other people connected to Mr. Klein.

121.    The accounting and investigation findings to date include, but are not limited to:
    **(i) Defendants Klein and CTT Failed to Disclose Early CTT Investors to Plaintiffs**

122.    Defendants Klein and CTT solicited at least nine early investors before or around the time of Plaintiffs' investments.  They did not disclose these investors to Plaintiffs.  Klein directed many of these investors to wire funds into a personal bank account, account number XX-XXX-0373 at PNC Bank ("**PNC Account 0373**").  Klein has not permitted Mr. Adams or CTT to access this account despite repeated requests.  Upon information and belief, PNC Account 5904, along with Klein's personal PNC Account 0373, were the operating bank accounts for CTT-NJ, CTT-DE, and Klein's related CTT entities prior to the merger.

123.    Some of these investors have been repaid by Klein, in full or in part, out of later CTT investments in a Ponzi scheme.  Klein did not disclose these reimbursements to Plaintiffs.

124.    The uncovered early investors are:

(1)  SS – Upon information and belief, invested as much as $2.95 million between June 2011 and January 2015.  SS executed a release in favor of CTT-NJ on April 2, 2015.  Klein has repaid SS at least $2.1 million from CTT funds, including funds from Mr. Adams's investment.

(2)  OB – Upon information and belief, invested $600,000 in CTT in March 2012.  CTT repaid at least this amount to companies that are affiliated with OB.

(3)  TE LLC – Invested $500,000 for 5% of CTT-NJ on or around January 1, 2014.  On March 24, 2016, TE LLC demanded repayment of its investment.  Klein repaid TE LLC in full using CTT funds on May 13, 2016.

(4)  JL – Upon information and belief, invested $500,000 in November 2014.  Klein repaid JL in full using CTT funds on June 7, 2016.

(5)  JT – Upon information and belief, JT invested $150,000 in May 2011.  Klein repaid JT in full using CTT funds on June 24, 2016.

(6)  MR – Upon information and belief, MR invested $125,000 in May 2011.  Klein repaid MR in full using CTT funds on January 4 and April 5, 2016.

(7)  JK – Upon information and belief, JK invested $125,000.  Klein repaid JK in full using CTT funds on January 4 and April 4, 2016.

(8)  JD/WC – Upon information and belief, JD and WC invested approximately $400,000 collectively in or around 2011.

125.    Mr. Adams also uncovered TSG LLC, a later investor that invested $435,000 into CTT-DE on or around March 10, 2016.  TSG LLC's investment is also not formally recognized by CTT-DE.

126.    There are likely additional early investors, but Klein has withheld this information from Mr. Adams and CTT.[1]

127.    Klein's and CTT's failure to disclose these early investors (and each other) to Plaintiffs, and that he would repay some in full or in part using later CTT investments, is a material omission that significantly altered the total mix of information available to Plaintiffs.

---

[1] Upon information and belief, the Rupp Investors invested $1 million with Klein in November 2011 for the development of two drugs.  The Rupp Investors are currently suing Klein and CTT for fraud in United States District Court for the District of New Jersey.  The Rupp Investors, however, did not invest in CTT.

### (ii) Defendant Klein Immediately Misappropriated Each Plaintiffs' CTT Investment for Personal Use, and Klein and CTT Did Not Disclose This to Plaintiffs

128.     Mr. Adams wired $581,250 to PNC Account 5904 on October 16, 2014, and over the next month Defendant Klein disbursed that entire amount to pay personal expenses and reimburse undisclosed earlier investors.

| | |
|---|---|
| 10/16/2014 | Wrote himself a check for $100,000 |
| | Wrote a $134,733.29 check to American Express to pay his personal credit card bill |
| | Wrote a $50,000 check to Pat Dapuzzo ("**Dapuzzo**"), an individual who, upon information and belief, may be another undisclosed early CTT investor |
| 10/17/2014 | Wired $124,000 to SS toward reimbursement of his investment |
| | Wired $8,000 to a relative with no known affiliation to CTT |
| | Wired $10,000 to a Florida LLC with no known affiliation to CTT |
| 11/3/2014 | Wrote himself a check for $100,000 |
| 11/5/2014 | Wrote a $10,000 check to Dapuzzo |
| 11/9/2014 | Wrote a check for $39,718 to the Borough of Alpine, New Jersey to pay his personal property taxes |
| 11/12/2014 | Wrote a check for $5,000 to his brother James Klein, a person who had no affiliation with CTT |

129.     The members of AV Select wired $450,000 to PNC Account 5904 on January 26, 2015, and over the next three weeks Defendant Klein disbursed much of that amount to pay personal expenses.

| | |
|---|---|
| 1/22/2015 | Wrote a $20,000 check to Dapuzzo |
| 1/26/2015 | Wrote checks to American Express for $127,174.63 and $13,429.99 to pay his personal credit card bill |
| 1/27/2015 | Wrote himself a check for $100,000 |
| 1/30/2015 | Withdrew $8,500 cash |
| 2/3/2015 | Wrote a check for $39,348.31 to the Borough of Alpine to pay his personal property taxes |
| 2/6/2015 | Wrote a $10,000 check to Dapuzzo |
| 2/13/2015 | Withdrew $6,000 cash |

130.    Dr. Simonian wired $600,000 to PNC Account 5904 on August 10, 2015, and over the next six weeks Defendant Klein disbursed much of that amount to pay personal expenses.

| | |
|---|---|
| 8/7/2015 | Wrote a $15,000 check to Dapuzzo |
| 8/10/2015 | Wrote himself a check for $300,000 |
| 8/14/2015 | Wired $46,000 to an individual in Sagaponack, New York for a summer rental home |
| 9/1/2015 | Wrote a $25,000 check to Dapuzzo |
| 9/4-6/2015 | Wrote three checks totaling $15,000 to early investor MR toward a rental property which had no affiliation to CTT |
| 9/10/2015 | Wrote himself a check for $100,000 |
| 9/21/2015 | Wrote himself a check for $22,000 |

131.    Messrs. Hartman and Smith wired $300,000 and $100,000 to PNC Account 5904 on November 23, 2015 and December 11, 2015, respectively, and Defendant Klein disbursed much of that amount to pay personal expenses and reimburse undisclosed earlier investors.

| | |
|---|---|
| 11/22/2015 | Wrote himself a check for $50,000 |
| | Wrote a check for $42,460.98 to the Borough of Alpine to pay his personal property taxes |
| 11/23/2015 | Wrote a check to American Express for $42,319.28 to pay his personal credit card bill |
| 12/29/2015 | Wrote a check for $45,000 to MR toward reimbursement of his investment |
| | Wrote a check for $45,000 to JK toward reimbursement of his investment |
| 1/2/2016 | Wrote himself a check for $100,000 |

132.    Klein's and CTT's failure to disclose to Plaintiffs that Klein would immediately use their investments to pay personal expenses was a material omission that altered the total mix of information available to Plaintiffs.

### (iii)   Other Defalcations and Improper Acts

133.    Mr. Adams also uncovered various other defalcations and improper acts by Defendants Klein and CTT.

134.    Initially, Klein and CTT misrepresented Klein's background to Plaintiffs.  Around the time that CTT terminated Klein as CEO in December 2017, Mr. Adams learned from two longtime Klein employees—CTT's Vice President for Sales Operations and Vice President for Supply Chain Operations, who had previously worked at DAVA—that he had also been fired from DAVA under similar circumstances.  DAVA terminated Klein for cause and stripped him of the majority of his shares due to misconduct at that company.  Klein also did not participate in the sale of DAVA to Endo.  Mr. Adams and the other Plaintiffs did not know and could not have known that Klein and CTT misrepresented Klein's background because this information was not public and these two employees did not begin working at CTT until the spring of 2016, well after Plaintiffs invested.

135.    Klein and CTT also made various specific misrepresentations about CTT to the Plaintiffs during his solicitations of their investments.  For example:

(1)   CTT did not own a NDA for a peptic ulcer drug, had not launched this product, called the Omeclamox-Pak, and did not earn current revenues from this product.  Mr. Adams learned from the Breslow Investors in the fall of 2017, and Klein has since admitted, that this NDA is owned or licensed by a Cayman Islands company called Gastro-Entero Logic, LLC, with no affiliation to CTT.  Klein, but not CTT, purportedly holds a personal interest in this company.  CTT has also never received any revenues from this product.

(2)   CTT did not hold a 10 year license to patent a veterinary product that would minimize cataracts in dogs after funding a study regarding the same for the University of Pennsylvania.  Mr. Adams learned this in the fall of 2017 when he was investigating the circumstances surrounding TE LLC's investment.  He subsequently confirmed with the University of Pennsylvania that the study was abandoned and Klein did not own a license to patent this product.

(3)   Klein did not own any NDAs, and he had not invested $1 million each into three NDAs.

(4)   CTT did not possess fully developed claims adjudication software to allow for physician dispensing and Klein had not invested over $1 million in the same.

(5) CTT did not have a network of 1,500 salespeople who were getting a lot of interest from physician groups, including a cardiology group in Miami that was ready to work with CTT as soon as it had commercialized Compliance PACs and would yield $4 million in annual revenue.

136.    More fundamentally, the company that Klein and CTT had represented to each Plaintiff before its investment was a fiction.  In reality, CTT was not close to having to a product ready for mass consumption prior to these investments.

137.    As discussed, Klein also caused CTT-NJ to be fraudulently merged into CTT-DE (and backdated documents relating to this merger) and CTT-DE has never recognized Plaintiffs' CTT-NJ investments.

138.    Moreover, Klein failed to file tax returns for CTT and issue individual K-1s for many years, despite representing to Plaintiffs and the Breslow Investors that he had.  Klein is currently obstructing Mr. Adams's efforts to remedy this issue by withholding necessary information about early investors and CTT disbursements.

139.    In total, Mr. Adams understands that Klein has misappropriated over $5.5 million from CTT.  This amount includes the funds he misappropriated from investors, including Plaintiffs, and proceeds from CTT's business operations.

140.    For example, Mr. Adams uncovered that since just June 2016 Klein caused CTT to pay himself over $2.9 million in excessive salary and personal expenses, such as real estate taxes on his $30 million Alpine mansion, personal income taxes, personal American Express bills, school tuition, a Sagaponack summer rental, and season tickets for the Chicago Bears, among others.  He made repeated cash withdrawals from CTT's bank account in amounts of just under $10,000 (the federal reporting requirement) totaling approximately $125,000.  He also made numerous unexplained payments totaling in excess of $1.1 million to his brother, friends and other associates, none of whom have an affiliation with CTT.

141.    Klein also torpedoed CTT's profitable business wholesaling prescription gels and creams.

142.    CTT derived millions of dollars in revenue from this business until Klein refused to pay for the product and caused the drug manufacturer to end the relationship.

143.    In August 2016, Klein demanded that CTT's CFO write-down millions of dollars in receivables for this product as uncollectable, including a $3.9 million receivable from CTT customer Med Creations.   Klein had previously reported this receivable on CTT's financial statements, including those provided to the Breslow Investors and CTT's outside accounting firm.

144.    Klein, however, lied to the CFO about the status of the Med Creations account. Med Creations had already paid this receivable into PNC Account 5904, a bank account in which only Klein had visibility and access at that time.

145.    Klein never paid for the drugs or transferred these funds to CTT's primary bank account to allow for the same.   Instead, he misappropriated the funds for personal use.

146.    As a result, CTT has been unable to pay its vendors and is now a defendant in multiple lawsuits.

### D.    CTT Terminates Defendant Klein as CEO, but Nothing Changes

147.    CTT's Board of Managers, through Mr. Adams and the Breslow Investors' representative, terminated Defendant Klein as CEO for cause in December 2017.

148.    Klein, however, has continued to abuse his position as a purported manager and majority shareholder to insulate himself to the detriment of the company.

149.    In or around January 2018, Klein improperly terminated Mr. Adams from the Board of Managers in an effort to obstruct his  investigation.

150.    Klein replaced Mr. Adams with a yes-man—a board member who has abdicated his fiduciary duties to the company in favor of Klein.   This board member has refused to hold

Klein accountable for his fraud even in the face of uncontroverted evidence that Klein used CTT to facilitate a Ponzi scheme.

151.    Klein has not reimbursed CTT any of the millions of dollars he misappropriated from the company, and due to Klein and his captive board member CTT has not yet been able to hold Klein accountable.

152.    Klein also continues to obstruct Mr. Adams's accounting and internal investigation, as well as Mr. Adams's efforts as acting CEO to save CTT.

153.    As a result of Klein's, and accordingly CTT's, misconduct, Plaintiffs have never received a return on their investments, whether it be a share of profits or tax losses, and their investments in CTT are worthless.

## <u>COUNT I – VIOLATION OF § 10(b) of the<br>SECURITIES EXCHANGE ACT OF 1934 and RULE 10b-5 THEREUNDER</u>

154.    Plaintiffs repeat and reallege all prior allegations as if fully set forth herein.

155.    Defendants Klein and CTT made material misrepresentations of fact to and omitted material information from Plaintiffs with the intention of inducing Plaintiffs to invest in CTT.

156.    During the period when each Plaintiff was defrauded by Klein and CTT, and at least until the CTT-NJ/CTT-DE merger, Klein, CTT-NJ, CTT-DE and the other entities were alter egos.  Fundamentally, the CTT entities were a façade for Klein's Ponzi scheme and he used them interchangeably to defraud Plaintiffs and the other undisclosed early investors.  Klein controlled each of these CTT entities and did not observe corporate formalities.  The entities used the same bank account (under the name of a different entity, Cambridge TT LLC), did not hold board meetings, and did not maintain separate books and records.  None of the entities filed tax returns.  As a result of Klein misappropriating funds, the entities were insolvent and none

was adequately capitalized for its supposed business purpose, which was to develop and manufacture Compliance PACs.

157.    Following the merger of CTT-NJ into CTT-DE, CTT-DE is the successor-in-interest to CTT-NJ and is responsible for CTT-NJ's liabilities, including material misstatements and omissions by this entity.

158.    Mr. Adams purchased 6% of CTT-NJ (6 of 100 shares) for $581,250 in October 2014.

159.    AV Select purchased 3% of CTT-NJ (3 of 100 shares) for $450,000 in January 2015.

160.    Dr. Simonian purchased 3% of CTT-NJ (3 of 100 shares) for $600,000 in August 2015.

161.    Hartman/Smith purchased 2% of CTT-NJ (2 of 100 shares) for $400,000 in November and December 2015, with Mr. Hartman investing $300,000 and Mr. Smith investing $100,000.

162.    The company that Klein represented to each Plaintiff before its investment was a fiction.  Klein's true intention was to misappropriate Plaintiffs' investments to support his lavish lifestyle and pay back undisclosed early investors as a Ponzi scheme.

163.    To do this, Klein misrepresented to each Plaintiff:

- His background, including that he sold DAVA to Endo, when he had actually been fired from DAVA for cause and stripped of the majority of his shares due to misconduct;
- He was the sole shareholder of CTT; and
- He previously received and turned down offers in excess of $25 million for CTT.

164.    Klein and CTT misrepresented to Plaintiffs in investor presentations the current state of CTT's business, including the company's specific developed products and a timeline for commercialization, and near-term financial projections based on the current state of the business.

165.    Among others, in the September 2014, October 2014 and March 2015 Decks Klein and CTT misrepresented that:

- "Cambridge has developed and is poised to begin commercializing a proprietary solution that enables doctors to dispense safely and directly a variety of pre-packaged generic drugs and drug combinations directly to patients from their offices";
- CTT already had "66 Generic Compliance PACs currently in product configuration," "55 additional Generic Compliance PACs in [the] product pipeline," access to "Four IND Combination Compliance PACs approved and ready for commercialization," and "21 additional Combination Compliance PACs in Cambridge's product pipeline"; and
- Gross revenue and net profit projections for 2015 and 2016 (in each presentation, respectively) that were based on this supposed current state of the business.

166.    Klein and CTT misrepresented to Mr. Adams in a presentation titled "Cambridge Technologies, Second Quarter 2013" that:

- CTT had an approved NDA for, and had already launched, a peptic ulcer product called the Omeclamox-Pak.  This product had generated $1.1 million in revenue in 2013 and would bring in $2 million in 2014; and
- CTT held a 10 year license to patent a veterinary product and funded a study regarding the same for the University of Pennsylvania.

167.    Klein and CTT misrepresented to Dr. Simonian that:

- CTT had over 80 products that would be commercialized in the near-term; and
- CTT would have "direct doctor dispensing with a mail order initiative … in place [by] 1st qtr 2016" and revenue projections based on the same.

168.    Klein and CTT misrepresented to Messrs. Hartman and Smith that:

- He had invested over $1 million each in three NDAs for drug combinations to be sold in Compliance PACs;
- CTT possessed fully developed claims adjudication software that allowed for physician dispensing and he had invested over $1 million in the same;
- CTT had a network of 1,500 salespeople who were getting a lot of interest from physician groups, including a cardiology group in Miami that was ready to work with CTT as soon as it had commercialized Compliance PACs and would yield $4 million in annual revenue; and
- CTT had developed over 30 Compliance PACs that the company would begin selling between January and April 2016.

169.    Klein's and CTT's misrepresentations were material.

170.    Klein and CTT made these material misrepresentations knowing that they were false, and that the financial projections were not supported by a reasonable basis given the actual state of the business.

171.    In reality, CTT did not have any developed products prior to Plaintiffs' investments, and the company was not even close to having a product ready for mass consumption.  CTT did not develop its first commercialized Compliance PAC until June 2016.

172.    Instead, Klein and CTT omitted material information from Plaintiffs that Klein's true intent was to use their investments to support his lavish lifestyle and pay back undisclosed early investors as a Ponzi scheme.  Klein's and CTT's material omissions included that:

- On the day of and in the days and weeks following Plaintiffs' investments Klein would use Plaintiffs' funds to pay personal expenses, including, but not limited to, real estate taxes on his $30 million Alpine mansion, personal income taxes, personal American Express bills, school tuition for his children, a Sagaponack summer rental, and season tickets for the Chicago Bears, among others.  He would also repeatedly withdraw cash from CTT's bank account in amounts of just under $10,000 (the federal reporting requirement) totaling approximately $125,000 and make improper and unexplained payments in excess of $1.1 million to his brother, friends, and other associates who had no connection to CTT's business; and
- Klein used CTT as a vehicle for his Ponzi scheme.  Klein had previously solicited other outside investments in CTT before Plaintiffs, and he would reimburse millions of dollars to these earlier investors using Plaintiffs' (and other later investors') funds.

173.    These material omissions altered the total mix of information available to Plaintiffs.  Klein and CTT had a duty to disclose this information because it rendered his affirmative statements about the purpose for Plaintiffs' investments (*i.e.*, investment in the company) and their status as initial outside investors misleading.

174.    Klein and CTT acted with scienter and knew that (or was reckless in not knowing that) these representations and omissions were false when made.

175.    Klein and CTT had a motive to commit fraud.  Klein needed Plaintiffs' investments to fund his lavish lifestyle and pay back undisclosed early investors as a Ponzi scheme.

176.    As a CTT insider, Klein had the opportunity to commit fraud.

177.    Plaintiffs reasonably and justifiably relied on Klein's and CTT's misrepresentations and omissions.

178.    Had Plaintiffs been told the truth by Klein and CTT they would never have invested in CTT-NJ.

179.    The losses sustained were a direct result of Klein's and CTT's misrepresentations, which went directly to the viability of CTT as a company and the Plaintiffs' ability to receive a return on their investments.  Moreover, Klein immediately misappropriated all or most all of Plaintiffs' investments for his personal use.

180.    Plaintiffs' investments in CTT-NJ have not been recognized by CTT-DE and are now worthless.  Plaintiffs have never received a return on their investments, whether it be a share of profits or tax losses.

181.    As a result of Defendants Klein's and CTT's material misrepresentations, Plaintiffs have each suffered a loss in the amount of their respective investments in CTT-NJ.

### COUNT II – VIOLATION of the NEW JERSEY UNIFORM SECURITIES ACT (N.J.S.A. 49:3-52)

182.    Plaintiffs repeat and reallege all prior allegations as if fully set forth herein.

183.    Defendants Klein and CTT made material misrepresentations of fact to and omitted material information from Plaintiffs with the intention of inducing Plaintiffs to invest in CTT-NJ, a New Jersey company.

184.    During the period when each Plaintiff was defrauded by Klein and CTT, and at least until the CTT-NJ/CTT-DE merger, Klein, CTT-NJ, CTT-DE and the other entities were

alter egos.  Fundamentally, the CTT entities were a façade for Klein's Ponzi scheme and he used them interchangeably to defraud Plaintiffs and the other undisclosed early investors.  Klein controlled each of these CTT entities and did not observe corporate formalities.  The entities used the same bank account (under the name of a different entity, Cambridge TT LLC), did not hold board meetings, and did not maintain separate books and records.  None of the entities filed tax returns.  As a result of Klein misappropriating funds, the entities were insolvent and none was adequately capitalized for its supposed business purpose, which was to develop and manufacture Compliance PACs.

185.    Following the merger of CTT-NJ into CTT-DE, CTT-DE is the successor-in-interest to CTT-NJ and is responsible for CTT-NJ's liabilities, including material misstatements and omissions by this entity.

186.    Mr. Adams purchased 6% of CTT-NJ (6 of 100 shares) for $581,250 in October 2014.

187.    AV Select purchased 3% of CTT-NJ (3 of 100 shares) for $450,000 in January 2015.

188.    Dr. Simonian purchased 3% of CTT-NJ (3 of 100 shares) for $600,000 in August 2015.

189.    Hartman/Smith purchased 2% of CTT-NJ (2 of 100 shares) for $400,000 in November and December 2015, with Mr. Hartman investing $300,000 and Mr. Smith investing $100,000.

190.    The company that Klein represented to each Plaintiff before its investment was a fiction.  Klein's true intention was to misappropriate Plaintiffs' investments to support his lavish lifestyle and pay back undisclosed early investors as a Ponzi scheme.

191.    To do this, Klein misrepresented to each Plaintiff:

- His background, including that he sold DAVA to Endo, when he had actually been fired from DAVA for cause and stripped of the majority of his shares due to misconduct;
- He was the sole shareholder of CTT; and
- He previously received and turned down offers in excess of $25 million for CTT.

192.   Klein and CTT misrepresented to Plaintiffs in investor presentations the current state of CTT's business, including the company's specific developed products and a timeline for commercialization, and near-term financial projections based on the current state of the business.

193.   Among others, in the September 2014, October 2014 and March 2015 Decks Klein and CTT misrepresented that:

- "Cambridge has developed and is poised to begin commercializing a proprietary solution that enables doctors to dispense safely and directly a variety of pre-packaged generic drugs and drug combinations directly to patients from their offices";
- CTT already had "66 Generic Compliance PACs currently in product configuration," "55 additional Generic Compliance PACs in [the] product pipeline," access to "Four IND Combination Compliance PACs approved and ready for commercialization," and "21 additional Combination Compliance PACs in Cambridge's product pipeline"; and
- Gross revenue and net profit projections for 2015 and 2016 (in each presentation, respectively) that were based on this supposed current state of the business.

194.   Klein and CTT misrepresented to Mr. Adams in a presentation titled "Cambridge Technologies, Second Quarter 2013" that:

- CTT had an approved NDA for, and had already launched, a peptic ulcer product called the Omeclamox-Pak.  This product had generated $1.1 million in revenue in 2013 and would bring in $2 million in 2014; and
- CTT held a 10 year license to patent a veterinary product and funded a study regarding the same for the University of Pennsylvania.

195.   Klein and CTT misrepresented to Dr. Simonian that:

- CTT had over 80 products that would be commercialized in the near-term; and
- CTT would have "direct doctor dispensing with a mail order initiative … in place [by] 1st qtr 2016" and revenue projections based on the same.

196.   Klein and CTT misrepresented to Messrs. Hartman and Smith that:

- He had invested over $1 million each in three NDAs for drug combinations to be sold in Compliance PACs;
- CTT possessed fully developed claims adjudication software that allowed for physician dispensing and he had invested over $1 million in the same;
- CTT had a network of 1,500 salespeople who were getting a lot of interest from physician groups, including a cardiology group in Miami that was ready to work with CTT as soon as it had commercialized Compliance PACs and would yield $4 million in annual revenue; and
- CTT had developed over 30 Compliance PACs that the company would begin selling between January and April 2016.

197.    Klein's and CTT's misrepresentations were material.

198.    Klein and CTT made these material misrepresentations knowing that they were false, and that the financial projections were not supported by a reasonable basis given the actual state of the business.

199.    In reality, CTT did not have any developed products prior to Plaintiffs' investments, and the company was not even close to having a product ready for mass consumption.  CTT did not develop its first commercialized Compliance PAC until June 2016.

200.    Instead, Klein and CTT omitted material information from Plaintiffs that Klein's true intent was to use their investments to support his lavish lifestyle and pay back undisclosed early investors as a Ponzi scheme.  Klein's and CTT's material omissions included that:

- On the day of and in the days and weeks following Plaintiffs' investments Klein would use Plaintiffs' funds to pay personal expenses, including, but not limited to, real estate taxes on his $30 million Alpine mansion, personal income taxes, personal American Express bills, school tuition for his children, a Sagaponack summer rental, and season tickets for the Chicago Bears, among others.  He would also repeatedly withdraw cash from CTT's bank account in amounts of just under $10,000 (the federal reporting requirement) totaling approximately $125,000 and make improper and unexplained payments in excess of $1.1 million to his brother, friends, and other associates who had no connection to CTT's business; and
- Klein used CTT as a vehicle for his Ponzi scheme.  Klein had previously solicited other outside investments in CTT before Plaintiffs, and he would reimburse millions of dollars to these earlier investors using Plaintiffs' (and other later investors') funds.

201.    These material omissions altered the total mix of information available to Plaintiffs.  Klein and CTT had a duty to disclose this information because it rendered his affirmative statements about the purpose for Plaintiffs' investments (*i.e.*, investment in the company) and their status as initial outside investors misleading.

202.    Klein and CTT acted with scienter and knew that (or was reckless in not knowing that) these representations and omissions were false when made.

203.    Klein and CTT had a motive to commit fraud.  Klein needed Plaintiffs' investments to fund his lavish lifestyle and pay back undisclosed early investors as a Ponzi scheme.

204.    As a CTT insider, Klein had the opportunity to commit fraud.

205.    Plaintiffs reasonably and justifiably relied on Klein's and CTT's misrepresentations and omissions.

206.    Had Plaintiffs been told the truth by Klein and CTT they would never have invested in CTT-NJ.

207.    The losses sustained were a direct result of Klein's and CTT's misrepresentations, which went directly to the viability of CTT as a company and the Plaintiffs' ability to receive a return on their investments.  Moreover, Klein immediately misappropriated all or most all of Plaintiffs' investments for his personal use.

208.    Plaintiffs' investments in CTT-NJ have not been recognized by CTT-DE and are now worthless.  Plaintiffs have never received a return on their investments, whether it be a share of profits or tax losses.

209.    As a result of Defendants Klein's and CTT's material misrepresentations, Plaintiffs have each suffered a loss in the amount of their respective investments in CTT-NJ.

## COUNT III – FRAUD/INTENTIONAL MISREPRESENTATION

210.    Plaintiffs repeat and reallege all prior allegations as if fully set forth herein.

211.    Defendants Klein and CTT made material misrepresentations of fact to and omitted material information from Plaintiffs with the intention of inducing Plaintiffs to invest in CTT.

212.    During the period when each Plaintiff was defrauded by Klein and CTT, and at least until the CTT-NJ/CTT-DE merger, Klein, CTT-NJ, CTT-DE and the other entities were alter egos.  Fundamentally, the CTT entities were a façade for Klein's Ponzi scheme and he used them interchangeably to defraud Plaintiffs and the other undisclosed early investors.  Klein controlled each of these CTT entities and did not observe corporate formalities.  The entities used the same bank account (under the name of a different entity, Cambridge TT LLC), did not hold board meetings, and did not maintain separate books and records.  None of the entities filed tax returns.  As a result of Klein misappropriating funds, the entities were insolvent and none was adequately capitalized for its supposed business purpose, which was to develop and manufacture Compliance PACs.

213.    Following the merger of CTT-NJ into CTT-DE, CTT-DE is the successor-in-interest to CTT-NJ and is responsible for CTT-NJ's liabilities, including material misstatements and omissions by this entity.

214.    Mr. Adams purchased 6% of CTT-NJ (6 of 100 shares) for $581,250 in October 2014.

215.    AV Select purchased 3% of CTT-NJ (3 of 100 shares) for $450,000 in January 2015.

216.    Dr. Simonian purchased 3% of CTT-NJ (3 of 100 shares) for $600,000 in August 2015.

217.   Hartman/Smith purchased 2% of CTT-NJ (2 of 100 shares) for $400,000 in November and December 2015, with Mr. Hartman investing $300,000 and Mr. Smith investing $100,000.

218.   The company that Klein represented to each Plaintiff before its investment was a fiction.  Klein's true intention was to misappropriate Plaintiffs' investments to support his lavish lifestyle and pay back undisclosed early investors as a Ponzi scheme.

219.   To do this, Klein misrepresented to each Plaintiff:

- His background, including that he sold DAVA to Endo, when he had actually been fired from DAVA for cause and stripped of the majority of his shares due to misconduct;
- He was the sole shareholder of CTT; and
- He previously received and turned down offers in excess of $25 million for CTT.

220.   Klein and CTT misrepresented to Plaintiffs in investor presentations the current state of CTT's business, including the company's specific developed products and a timeline for commercialization, and near-term financial projections based on the current state of the business.

221.   Among others, in the September 2014, October 2014 and March 2015 Decks Klein and CTT misrepresented that:

- "Cambridge has developed and is poised to begin commercializing a proprietary solution that enables doctors to dispense safely and directly a variety of pre-packaged generic drugs and drug combinations directly to patients from their offices";
- CTT already had "66 Generic Compliance PACs currently in product configuration," "55 additional Generic Compliance PACs in [the] product pipeline," access to "Four IND Combination Compliance PACs approved and ready for commercialization," and "21 additional Combination Compliance PACs in Cambridge's product pipeline"; and
- Gross revenue and net profit projections for 2015 and 2016 (in each presentation, respectively) that were based on this supposed current state of the business.

222.   Klein and CTT misrepresented to Mr. Adams in a presentation titled "Cambridge Technologies, Second Quarter 2013" that:

- CTT had an approved NDA for, and had already launched, a peptic ulcer product called the Omeclamox-Pak. This product had generated $1.1 million in revenue in 2013 and would bring in $2 million in 2014; and
- CTT held a 10 year license to patent a veterinary product and funded a study regarding the same for the University of Pennsylvania.

223. Klein and CTT misrepresented to Dr. Simonian that:

- CTT had over 80 products that would be commercialized in the near-term; and
- CTT would have "direct doctor dispensing with a mail order initiative … in place [by] 1st qtr 2016" and revenue projections based on the same.

224. Klein and CTT misrepresented to Messrs. Hartman and Smith that:

- He had invested over $1 million each in three NDAs for drug combinations to be sold in Compliance PACs;
- CTT possessed fully developed claims adjudication software that allowed for physician dispensing and he had invested over $1 million in the same;
- CTT had a network of 1,500 salespeople who were getting a lot of interest from physician groups, including a cardiology group in Miami that was ready to work with CTT as soon as it had commercialized Compliance PACs and would yield $4 million in annual revenue; and
- CTT had developed over 30 Compliance PACs that the company would begin selling between January and April 2016.

225. Klein's and CTT's misrepresentations were material.

226. Klein and CTT made these material misrepresentations knowing that they were false, and that the financial projections were not supported by a reasonable basis given the actual state of the business.

227. In reality, CTT did not have any developed products prior to Plaintiffs' investments, and the company was not even close to having a product ready for mass consumption. CTT did not develop its first commercialized Compliance PAC until June 2016.

228. Instead, Klein and CTT omitted material information from Plaintiffs that Klein's true intent was to use their investments to support his lavish lifestyle and pay back undisclosed early investors as a Ponzi scheme. Klein's and CTT's material omissions included that:

- On the day of and in the days and weeks following Plaintiffs' investments Klein would use Plaintiffs' funds to pay personal expenses, including, but not limited to, real estate taxes on his $30 million Alpine mansion, personal

41

income taxes, personal American Express bills, school tuition for his children, a Sagaponack summer rental, and season tickets for the Chicago Bears, among others.  He would also repeatedly withdraw cash from CTT's bank account in amounts of just under $10,000 (the federal reporting requirement) totaling approximately $125,000 and make improper and unexplained payments in excess of $1.1 million to his brother, friends, and other associates who had no connection to CTT's business; and

- Klein used CTT as a vehicle for his Ponzi scheme.  Klein had previously solicited other outside investments in CTT before Plaintiffs, and he would reimburse millions of dollars to these earlier investors using Plaintiffs' (and other later investors') funds.

229.    These material omissions altered the total mix of information available to Plaintiffs.  Klein and CTT had a duty to disclose this information because it rendered his affirmative statements about the purpose for Plaintiffs' investments (*i.e.*, investment in the company) and their status as initial outside investors misleading.

230.    Klein and CTT acted with scienter and knew that (or was reckless in not knowing that) these representations and omissions were false when made.

231.    Klein and CTT had a motive to commit fraud.  He needed Plaintiffs' investments to fund his lavish lifestyle and pay back undisclosed early investors as a Ponzi scheme.

232.    As a CTT insider, Klein had the opportunity to commit fraud.

233.    Plaintiffs reasonably and justifiably relied on Klein's and CTT's misrepresentations and omissions.

234.    Had Plaintiffs been told the truth by Klein they would never have invested in CTT-NJ.

235.    The losses sustained were a direct result of Klein's and CTT's misrepresentations, which went directly to the viability of CTT as a company and the Plaintiffs' ability to receive a return on their investments.  Moreover, Klein immediately misappropriated all or most all of Plaintiffs' investments for his personal use.

236.    Plaintiffs' investments in CTT-NJ have not been recognized by CTT-DE and are now worthless.  Plaintiffs have never received a return on their investments, whether it be a share of profits or tax losses.

237.    As a result of Defendants Klein's and CTT's material misrepresentations, Plaintiffs have each suffered a loss in the amount of their respective investments in CTT-NJ.

## COUNT IV – NEGLIGENT MISREPRESENTATION

238.    Plaintiffs repeat and reallege all prior allegations as if fully set forth herein.

239.    Defendants Klein and CTT made material misrepresentations of fact to and omitted material information from Plaintiffs with the intention of inducing Plaintiffs to invest in CTT.  While Plaintiffs submit that Klein's misrepresentations were intentional and/or reckless, as an alternative, Plaintiffs allege that Klein was at least negligent in making these misrepresentations.

240.    During the period when each Plaintiff was defrauded by Klein and CTT, and at least until the CTT-NJ/CTT-DE merger, Klein, CTT-NJ, CTT-DE and the other entities were alter egos.  Fundamentally, the CTT entities were a façade for Klein's Ponzi scheme and he used them interchangeably to defraud Plaintiffs and the other undisclosed early investors.  Klein controlled each of these CTT entities and did not observe corporate formalities.  The entities used the same bank account (under the name of a different entity, Cambridge TT LLC), did not hold board meetings, and did not maintain separate books and records.  None of the entities filed tax returns.  As a result of Klein misappropriating funds, the entities were insolvent and none was adequately capitalized for its supposed business purpose, which was to develop and manufacture Compliance PACs.

241.     Following the merger of CTT-NJ into CTT-DE, CTT-DE is the successor-in-interest to CTT-NJ and is responsible for CTT-NJ's liabilities, including material misstatements and omissions by this entity.

242.     Mr. Adams purchased 6% of CTT-NJ (6 of 100 shares) for $581,250 in October 2014.

243.     AV Select purchased 3% of CTT-NJ (3 of 100 shares) for $450,000 in January 2015.

244.     Dr. Simonian purchased 3% of CTT-NJ (3 of 100 shares) for $600,000 in August 2015.

245.     Hartman/Smith purchased 2% of CTT-NJ (2 of 100 shares) for $400,000 in November and December 2015, with Mr. Hartman investing $300,000 and Mr. Smith investing $100,000.

246.     The company that Klein represented to each Plaintiff before its investment was a fiction.  Klein's true intention was to misappropriate Plaintiffs' investments to support his lavish lifestyle and pay back undisclosed early investors as a Ponzi scheme.

247.     To do this, Klein misrepresented to each Plaintiff:

- His background, including that he sold DAVA to Endo, when he had actually been fired from DAVA for cause and stripped of the majority of his shares due to misconduct;
- He was the sole shareholder of CTT; and
- He previously received and turned down offers in excess of $25 million for CTT.

248.     Klein and CTT misrepresented to Plaintiffs in investor presentations the current state of CTT's business, including the company's specific developed products and a timeline for commercialization, and near-term financial projections based on the current state of the business.

249.     Among others, in the September 2014, October 2014 and March 2015 Decks Klein and CTT misrepresented that:

- "Cambridge has developed and is poised to begin commercializing a proprietary solution that enables doctors to dispense safely and directly a variety of pre-packaged generic drugs and drug combinations directly to patients from their offices";
- CTT already had "66 Generic Compliance PACs currently in product configuration," "55 additional Generic Compliance PACs in [the] product pipeline," access to "Four IND Combination Compliance PACs approved and ready for commercialization," and "21 additional Combination Compliance PACs in Cambridge's product pipeline"; and
- Gross revenue and net profit projections for 2015 and 2016 (in each presentation, respectively) that were based on this supposed current state of the business.

250. Klein and CTT misrepresented to Mr. Adams in a presentation titled "Cambridge Technologies, Second Quarter 2013" that:

- CTT had an approved NDA for, and had already launched, a peptic ulcer product called the Omeclamox-Pak. This product had generated $1.1 million in revenue in 2013 and would bring in $2 million in 2014; and
- CTT held a 10 year license to patent a veterinary product and funded a study regarding the same for the University of Pennsylvania.

251. Klein and CTT misrepresented to Dr. Simonian that:

- CTT had over 80 products that would be commercialized in the near-term; and
- CTT would have "direct doctor dispensing with a mail order initiative … in place [by] 1st qtr 2016" and revenue projections based on the same.

252. Klein and CTT misrepresented to Messrs. Hartman and Smith that:

- He had invested over $1 million each in three NDAs for drug combinations to be sold in Compliance PACs;
- CTT possessed fully developed claims adjudication software that allowed for physician dispensing and he had invested over $1 million in the same;
- CTT had a network of 1,500 salespeople who were getting a lot of interest from physician groups, including a cardiology group in Miami that was ready to work with CTT as soon as it had commercialized Compliance PACs and would yield $4 million in annual revenue; and
- CTT had developed over 30 Compliance PACs that the company would begin selling between January and April 2016.

253. Klein's and CTT's misrepresentations were material.

254.     Klein and CTT made these material misrepresentations knowing that they were false, and that the financial projections were not supported by a reasonable basis given the actual state of the business.

255.     In reality, CTT did not have any developed products prior to Plaintiffs' investments, and the company was not even close to having a product ready for mass consumption.  CTT did not develop its first commercialized Compliance PAC until June 2016.

256.     Instead, Klein and CTT omitted material information from Plaintiffs that Klein's true intent was to use their investments to support his lavish lifestyle and pay back undisclosed early investors as a Ponzi scheme.  Klein's and CTT's material omissions included that:

- On the day of and in the days and weeks following Plaintiffs' investments Klein would use Plaintiffs' funds to pay personal expenses, including, but not limited to, real estate taxes on his $30 million Alpine mansion, personal income taxes, personal American Express bills, school tuition for his children, a Sagaponack summer rental, and season tickets for the Chicago Bears, among others.  He would also repeatedly withdraw cash from CTT's bank account in amounts of just under $10,000 (the federal reporting requirement) totaling approximately $125,000 and make improper and unexplained payments in excess of $1.1 million to his brother, friends, and other associates who had no connection to CTT's business; and
- Klein used CTT as a vehicle for his Ponzi scheme.  Klein had previously solicited other outside investments in CTT before Plaintiffs, and he would reimburse millions of dollars to these earlier investors using Plaintiffs' (and other later investors') funds.

257.     These material omissions altered the total mix of information available to Plaintiffs.  Klein and CTT had a duty to disclose this information because it rendered his affirmative statements about the purpose for Plaintiffs' investments (*i.e.*, investment in the company) and their status as initial outside investors misleading.

258.     Klein and CTT acted with scienter and knew that (or was reckless in not knowing that) these representations and omissions were false when made.

259.    Klein and CTT had a motive to commit fraud.   Klein needed Plaintiffs'
investments to fund his lavish lifestyle and pay back undisclosed early investors as a Ponzi
scheme.

260.    As a CTT insider, Klein had the opportunity to commit fraud.

261.    Plaintiffs reasonably and justifiably relied on Klein's and CTT's
misrepresentations and omissions.

262.    Had Plaintiffs been told the truth by Klein and CTT they would never have
invested in CTT-NJ.

263.    The losses sustained were a direct result of Klein's and CTT's misrepresentations,
which went directly to the viability of CTT as a company and the Plaintiffs' ability to receive a
return on their investments.   Moreover, Klein immediately misappropriated all or most all of
Plaintiffs' investments for his personal use.

264.    Plaintiffs' investments in CTT-NJ have not been recognized by CTT-DE and are
now worthless.   Plaintiffs have never received a return on their investments, whether it be a share
of profits or tax losses.

265.    As a result of Defendant Klein's and CTT's material misrepresentations, Plaintiffs
have each suffered a loss in the amount of their respective investments in CTT-NJ.

### COUNT V – UNJUST ENRICHMENT (AGAINST KLEIN ONLY)

266.    Plaintiffs repeat and reallege all prior allegations as if fully set forth herein.

267.    Defendant Klein was personally enriched as a result of misappropriating the
Plaintiffs' respective CTT investments to pay for his lavish lifestyle.

268.    Klein used Plaintiffs' investments to pay personal expenses, including, but not
limited to, real estate taxes on his $30 million Alpine mansion, personal income taxes, personal
American Express bills, school tuition for his children, a Sagaponack summer rental, and season

tickets for the Chicago Bears, among others.  He also repeatedly withdrew cash from CTT's bank account in amounts of just under $10,000 (the federal reporting requirement) totaling approximately $125,000 and made improper and unexplained payments in excess of $1.1 million to his brother, friends, and other associates who had no connection to CTT's business.

269.    Klein paid these personal expenses from CTT's bank account the day of and in the days and weeks following each individual Plaintiff's investment.

270.    Klein appreciated these benefits.

271.    Given the materially false representations and promises made by Klein—who knew of the falsity of his statements, or who at minimum recklessly disregarded the truth of his statements—which induced Plaintiffs to make their investments, it would be inequitable for Klein to retain the benefits.

## COUNT VI – BREACH OF CONTRACT (DR. SIMONIAN ONLY)

272.    Dr. Simonian repeats and realleges all prior allegations as if fully set forth herein.

273.    The Simonian Operating Agreement is a valid and enforceable agreement.

274.    The Simonian Operating Agreement provides Dr. Simonian with notification, right of first refusal, and drag-along rights if Defendant Klein issues new Units or enters into a material transaction with respect to his Units of CTT-NJ.

275.    Section 5.1 of the Simonian Operating Agreement also provides Dr. Simonian with new Units and/or a right of first refusal to purchase additional Units if Klein offers additional Units to new shareholders:

>  (b)   If the Company proposes to issue any New Units at a valuation equal to or less than $200,000 per Unit, the Company shall first issue to Simonian a portion of such New Units equal to a fraction, the numerator of which is the number of Units held by Simonian and the denominator of which is the aggregate number of Units held by all of the Members collectively.

(c)  If the Company proposes to issue any New Units at a valuation greater than $200,000 per Unit, the Company shall first offer to sell to Simonian a portion of such New Units equal to a fraction, the numerator of which is the number of Units held by Simonian and the denominator of which is the aggregate number of Units held by all of the Members collectively.  Simonian shall be entitled to acquire the offered New Units at the most favorable price and on the most favorable terms as such New Units are proposed to be offered to, or purchased by, any other Person.

(Exhibit B, at pgs. 4-5.).

276.    Klein and CTT breached Section 5.1 of the Simonian Operating Agreement when Klein sold shares of CTT-NJ to Hartman/Smith, and shares of CTT-DE to TSG LLC, the Breslow Investors, Blue Valley and others without issuing Dr. Simonian new Units and/or providing him with a right of first refusal to purchase additional Units.

277.    Section 9 of the Simonian Operating Agreement also provides Dr. Simonian with drag-along rights, including, notice of the same if Klein enters a material transaction with respect to his Units of CTT-NJ:

(9.11)  Drag-Along Right.  If Klein desires to enter into a purchase and sale agreement for all or a portion of his Interests, then Klein shall have the right to require the other Members to participate in such sale and to sell up to all of their Interests to the prospective purchaser at the same price and upon the same terms as Klein is selling his Interests.  The closing on the purchase and sale of all Interests pursuant to the provisions of this Section 9.11 shall occur at the same time and place.  Klein shall give written notice to the other Members of any such proposed sale at least twenty (20) business days prior to the closing of such sale.  Such notice shall include the name and address of the prospective purchaser and the price, terms and conditions of such sale.

(Exhibit B, at pg. 22.)

278.    Klein and CTT breached Section 9.11 of the Simonian Operating Agreement when he merged CTT-NJ into CTT-DE without notice to Dr. Simonian and did not recognize Dr. Simonian's interest in CTT-DE.

49

279.    Dr. Simonian has performed his contractual obligation by tendering $600,000 to CTT-NJ.

280.    Following the merger of CTT-NJ into CTT-DE, CTT-DE is the successor-in-interest to CTT-NJ and is responsible for CTT-NJ's liabilities.

281.    As a result of Defendant Klein's breach of the Simonian Operating Agreement, Dr. Simonian has been damaged in an amount to be determined at trial.


WHEREFORE, the Plaintiffs demand:  (a) judgment in an amount to be determined at trial, plus applicable interest, and including their reasonable attorneys' fees and costs; (b) rescission of their investments; and (c) such other and further relief as the Court may deem just and proper.


Dated: Wilmington, DE
       March 22, 2019

COZEN O'CONNOR

By:        */s/ Gregory Fischer*

Gregory F. Fischer (DE 5269)
1201 North Market Street, Suite 1001
Wilmington, DE 19801
(302) 295-2000
gfischer@cozen.com

-and-

Michael B. de Leeuw (*pro hac vice*)
Matthew L. Elkin (*pro hac vice*)
Jaimie Fitzgerald (*pro hac vice*)
45 Broadway, Suite 1600
New York, NY 10006
(212) 509-9400
mdeleeuw@cozen.com
melkin@cozen.com
jfitzgerald@cozen.com

*Attorneys for Plaintiffs*
*Mark Adams, AV Select Investments, LLC, Dr.*
*Gregory Simonian, Wade Hartman, and Frank*
*Edward Smith*