# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

MARK ADAMS, AV SELECT )
INVESTMENTS, LLC, DR. GREGORY )
SIMONIAN, WADE HARTMAN, and )
FRANK EDWARD SMITH, )
           )
       Plaintiffs, )
           )
   v. )     C.A. No. 18-1330 RGA
           )
JOHN H. KLEIN, )
           )
       Defendant. )

## <u>JOINT SUBMISSION OF [PROPOSED] FINAL PRETRIAL ORDER</u>

This matter comes before the Court at a final pretrial conference to be held on July 2, 2020

at 12:00 p.m. pursuant to Rule 16 of the Federal Rules of Civil Procedure.

**Counsel for Plaintiffs Mark Adams, AV Select Investments, LLC, Dr. Gregory Simonian, Wade Hartman, and Frank Edward Smith:**

COZEN O'CONNOR
Gregory F. Fischer (No. 5269)
Martin S. Bloor (*pro hac vice*)
Michael B. de Leeuw (*pro hac vice*)
Matthew L. Elkin (*pro hac vice*)
1201 N. Market Street, Suite 1001
Wilmington, DE 19801
Telephone:  (302) 295-2000
Email:  gfischer@cozen.com
mbloor@cozen.com
mdeleeuw@cozen.com
melkin@cozen.com

**Defendant**

John H. Klein
P.O. Box 1276
Alpine, NJ 07620
Telephone:  (201) 910-0773
Email:  johnhklein@msn.com
*Pro Se*

## I.      Nature of the Case

The parties in this case are Plaintiffs Mark Adams, AV Select Investments, LLC ("**AV Select**"), Dr. Gregory Simonian, Wade Hartman, and Frank Edward Smith (collectively, "**Plaintiffs**") and Defendant John H. Klein.  The Parties' claims and defenses are set out in the Plaintiffs' First Amended Complaint (D.I. 74), Klein's Amended Answer (D.I. 76), and Klein's Counterclaim (D.I. 9, which is incorporated by reference into D.I. 76).[1]

### A.      Plaintiffs' Contentions

Plaintiffs contend that Klein fraudulently induced them to invest in Cambridge Therapeutic Technologies ("**CTT**").  Klein claimed that CTT was a revolutionary pharmaceutical packaging company.  It was not.  It was a vehicle for Klein's Ponzi scheme.  Instead of using Plaintiffs' investments for CTT business, Klein misappropriated their funds to support his lavish lifestyle— including writing checks for personal expenses, taking cash withdrawals, paying personal American Express bills, property taxes for his Alpine, New Jersey mansion, private school tuition for his children, and renting a Hamptons summer house, among other defalcations.  Klein also used Plaintiffs' funds (along with money from other past and future "investors") to pay back earlier undisclosed CTT investors in classic Ponzi scheme style.  Plaintiffs are five of more than twenty known victims of Klein's fraud dating back to 2011, only some of whom have been cashed out— after repeatedly complaining and/or threatening to sue Klein—as part of the scheme.

As for the company, Klein invented the actual CTT "business" out of whole cloth.  Contrary to Klein's representations, CTT had no developed products, pipeline, inventory,

---

[1] Klein's Counterclaim is no longer an operative pleading in this lawsuit because the Court granted Adams' Motion for Summary Judgment on May 12, 2020.  However, the Klein Counterclaim still sets forth factual allegations relating to Adams and the other Plaintiffs that Klein may attempt to use as part of his defense at trial.  The Klein Counterclaim is referenced in this Pretrial Order accordingly.  Plaintiffs seek to limit evidence regarding some of these factual allegations in Plaintiffs' MIL #1 to Exclude CTT-DE Defense Evidence.  Klein opposes Plaintiffs' MIL #1 to Exclude CTT-DE Defense Evidence.

software, or valuable intellectual property at the time the Plaintiffs invested. CTT existed solely to steal money from investors. Therefore, it is no surprise that when Klein actually attempted to launch a CTT business in 2016—through a separate Delaware LLC that did not recognize the Plaintiffs' New Jersey LLC investment interests—the company failed spectacularly.

In furtherance of his scheme, Plaintiffs contend that Klein misrepresented eight material facts relating to each Plaintiff's investment:

1) Klein misrepresented that the Plaintiffs were investing in an actual company, CTT. Klein failed to disclose, however, that he would immediately turn around and misuse their funds to pay personal expenses and to reimburse earlier undisclosed investors ("**Use of Funds Misrepresentations**").

2) Klein misrepresented to the Plaintiffs that he was CTT's "sole shareholder" at the time of their investments. Klein failed to disclose, however, the existence of other investors in CTT and CTT "products," and multi-million dollar liabilities owed to these investors ("**Sole Shareholder Misrepresentations**").

3) Klein misrepresented his background and past success in the pharmaceutical industry, particularly that sold his former company DAVA Pharmaceuticals, Inc. to Endo International plc for $600 million in June 2014 ("**Background Misrepresentations**").

4) Klein misrepresented the current state of CTT's business, including that CTT had: "developed and [was] poised to begin commercializing a proprietary solution that enables doctors to dispense safely and directly a variety of pre-packaged generic drugs and drug combinations directly to patients from their offices"; exclusive access to cheap drugs due to Klein's stature and relationships in the generic pharmaceutical industry; and exclusive access to custom claims adjudication software that was the lynchpin of CTT's business model ("**Business Model Misrepresentations**").

5) Klein misrepresented CTT's projected near- and intermediate- term financial performance, which projections were not supported by a reasonable basis based on what Klein knew or should have known about the actual state of CTTs' business when the Plaintiffs invested ("**Projection Misrepresentations**").

6) Klein misrepresented the value of CTT's Investigational New Drug assets, and that he had invested millions of dollars into these products ("**IND Misrepresentations**").

7) Klein misrepresented that CTT owned a New Drug Application asset, NDA 50-824, a/k/a the Omeclamox Pac, which Klein in fact owned personally and was paid multi-million dollar royalties ("**NDA Misrepresentations**").

2

8) Klein misrepresented that he had previously received an offer to sell CTT for $26-27 million, which he had turned down because it did not sufficiently value to company ("**Acquisition Misrepresentations**").

The proximate result of Klein's material misrepresentations materializing caused the complete loss of Plaintiffs' CTT New Jersey investments, as well as the failure of the Delaware CTT entity by the end of 2017.  Plaintiffs' CTT investments are completely worthless.

Plaintiffs assert claims against Klein for securities fraud under Section 10(b) of the Securities and Exchange Act and Rule 10b-5 thereunder (Count I) and the New Jersey Uniform Securities Act (N.J.S.A. 49:3-52) (Count II), common law fraud/intentional misrepresentation (Count III), negligent misrepresentation (Count IV), and unjust enrichment (Count V).  Simonian also asserts a claim for breach of contract (Count VI).  Plaintiffs seek to recover their entire investment losses—Adams ($581,250), AV Select ($450,000), Simonian ($600,000), Hartman ($300,000), and Smith ($100,000)—plus prejudgment interest.

**B.      Klein's Response**

The Plaintiffs contend that CTT was a vehicle for Klein's Ponzi Scheme.  That he used their invested funds to support his lifestyle and not build a company.  We will show that this contention is totally false and without merit.  The Plaintiffs want you to believe that Mr. Klein is guilty by their accusations, but the facts will prove Mr. Klein had built a real company and the company was successful early on, with over $20 million in sales and would have continued to make progress but due to the complete incompetence and failure of one of the Plaintiffs, which was one of the major reason CTT as an ongoing entity failed.  Notwithstanding some impact of PBM and Insurance company related obstacles.  The definition of a Ponzi Scheme is that it's a fraudulent investment scheme in which money contributed by later investors generates artificially high dividends for the original investors, whose example attracts even larger investments.

To date, the Plaintiffs have not put forth evidence demonstrating that any alleged "prior investor", if any, other than the Plaintiffs themselves was a member of CTT.

LEGAL\47222487\1

The Plaintiffs' contentions fall apart and lack credibility because their own statements conclusively along with their individual actions demonstrate that CTT was not a Ponzi Scheme.

All of the Plaintiffs worked for CTT and acknowledged that CTT was a real business.

Unlike the Ponzi Scheme described in the definition cited by the Plaintiffs, Plaintiffs assert that the existence of earlier investors was concealed, and they make no contention that artificially high returns to early investors were touted in order to generate later investment. In short, the Plaintiffs' own description of CTT is totally inconsistent with their definition of a Ponzi Scheme, and in fact, there were no prior investors in the company, CTT. The Plaintiffs cite cases that, when reviewed, are all pure Ponzi Scheme cases involving no legitimate business. None of the cases cited bear any resemblance to the facts in this matter.

Here, in contrast, not only did CTT develop, package, market, and sell actual products, generating over $20 million in sales prior to the merger, but Adams asked and was CTT's principle sales executive and the other Plaintiffs were employed or part of CTT's product supply, packaging, engineering, production, promotion, physician marketing, and product selection.

CTT spent over $7 million prior to the merger on inventory from vendors and paid over $600,000 in commissions and customer returns. After the 6/16/16 merger, CTT spent over $16 million on additional inventory purchases, over $4 million in wages and salaries, and over $1.4 million in packaging.

Plaintiffs acknowledge that following their purchases of Klein's interest, CTT's products had the potential to be highly profitable (Adams Tr. 162: 10-13, Hartman Tr. 66: 6-67:19).

Plaintiffs' claims are based on alleged misrepresentations made prior to their purchases of Klein's interests in CTT. Rather than asserting claims promptly after investing, Plaintiffs believed in CTT sufficiently to join in the effort to make it a success, several of them becoming highly paid members of executive management and two of them becoming a paid vendor and a paid consultant.

Klein totally depended on the Plaintiffs for their alleged expertise in field salesforce management, recruitment, engineering, physician practice expertise, management skills, and advice are all of which why Klein decreased his ownership in CTT and gave the Plaintiffs his interest.  Had any of Adams failed 22 sales initiatives to increase sales succeeded, and CTT continued to be successful after the merger, Plaintiffs would now be thanking Klein for allowing them to purchase his interest and allowing them to join.  Instead, they waited until after their gamble did not pay off, and things did not turn out the way they had hoped and for all of them, waited until after they derived substantial income and fees from CTT, before turning around and claiming Klein defrauded them into purchasing his interest.  Plaintiffs are treating their investment as an "option" that they could exercise if things went well, and in fact Adams and Simonian requested and received additional options to take more of Klein's interest.

Now that things have gone not as planned and none of Adams' sales initiatives had succeeded, Plaintiffs are seeking to avoid the very risk they knowingly undertook.  Clearly, this is absolutely investing in a startup, and they all knew it.

The Plaintiffs further contend that Klein misrepresented eight material facts relating to each Plaintiffs' investment.

Klein will show each of their presented facts is false, misleading, or misrepresented by the Plaintiffs and is outrightly contradicted by the express language of the presented documents relating to the Simonian, Hartman, and Smith purchases of interest in CTT (Adams and AV Select have no documents and Klein never dealt with AV Select until two months after Rob Ashton's death).  These documents are presented by Plaintiffs and explicitly state that each of these Plaintiffs purchased their interests directly from Klein, and each paid Klein for his interest, diluting his ownership of CTT, rather than from CTT.  Klein contends Adams and Ashton (AV Select) also purchased their interest from Klein, not CTT.

5

These documents, actions, and Klein's testimony directly contradict Plaintiffs' suggestion that Klein misled them into believing they were purchasing interests from CTT instead of from Klein and somehow misled them as to the intended use of their funds by CTT.

**The Plaintiffs claim misrepresentation regarding sole shareholder.  Plaintiffs move failed to present any evidence or argument suggesting that the presence of prior investors, if any, were material to each Plaintiffs' decision to purchase any of Klein's interests.  Without evidence or argument demonstrating that the sole member representations were material (as a matter of law and/or understand facts).  Their contention is false.**

**Plaintiffs continuous contentions (of their alleged material facts) are completely fabricated, false, and meant to camouflage the real facts.**

They contend background misrepresentation regarding Klein's former company.  Klein was the founder, chairman, and CEO of the company (DAVA) for over eight years until new investors came in and he resigned to pursue CTT full time in 2013.  **Klein was successful in building up over 100 products, hiring the staff, same of whom had worked previously for him for 10 years.  The company grew from $0 revenue to almost $250 million, at one point, under Klein's leadership.  Endo had one call with Klein during their due diligence.**  Endo purchased DAVA for $600 million approximately 15 months after Klein resigned.  DAVA was very successful.

The Plaintiffs speak to the business model misrepresentations, however, the Plaintiffs contributed extensively to CTT.  Adams **was ex VP of sales/marketing since December 2014, Hartman/Smith engineered and produced the unique packaging, Ashton (AV Select) was Chief Medical Officer, Physician Web Site Designer, Product Selection Officer, and Simonian was the physician strategy consultant.  Ashton and Adams were important aspects**

of the physician software.  **Klein definitely had relationships in the generic drug industry (e.g. President of Sandoz, who became a major supplier).**

Adams' product and customer forecasts were the backbone of the business model, the responsibility he had as ex-VP of sales and marketing and had asked for.

The Plaintiffs contend Klein misrepresented **projections,** but as in all examples **again they falsely misled the real facts**.  **Projections** were based on Adams' customer forecasts and Ashton's (AV Selects) product analysis, and Klein's substantial ability to obtain product and **schedule** engineering of packaging and production to support.

The contention of misrepresentation concerning "IND," investigative new drugs, is totally false.  CTT never intended to work on these products, as shown that they were never in Adams customer business plans, nor worked on in the company.  The value of the approved "IND" was established at **the time of** the merger, because the Breslow group asked Klein to value them for balance sheet purposes.  The value put forth had absolutely nothing to do with the Plaintiffs decisions and there is no document to support their contention.

**Regarding Plaintiffs' contention that Klein told them CTT owned a NDA 50-824 is totally false.  The approved NDA 50-824, Omeclamox PAC was developed in 2009, by Klein's group, approved in 2011 and marketed by a separate company Klein had a 30% interest in. The product was a three-drug combination to cure peptic ulcers and was used as "a proof of concept" example for future combination drugs.**

**This drug was never part of CTT, and documents will show this.  Also, Adams, as head of sales and marketing, never promoted the NDA, it was not included it in his forecast because he knew, contrary to what Plaintiffs contend NDA 50-824 was never in CTT.  It was mistakenly listed in an exhibit at closing of the merger, however the line item should have been deleted, according to emails we have.**

The Plaintiffs finally contend that an offer was made for CTT and that was a misrepresentation.  Again, the documents showed a merger was in late stage discussions with Biozone before Plaintiffs bought Klein's interests, thus as all 7 other Plaintiffs' contentions that Klein misrepresented facts are totally false.

Plaintiffs attempt to reinvent history by contending they did not purchase Klein's interests but put capital infusions into CTT.  Their own documents show they were buying Klein's interest, not funds as capital.

The Plaintiff's point to self-serving statements from their depositions in support of their assertion that Klein made certain representations regarding the use of their funds.  However, an inference must be draw from (i) the documentary evidence demonstrating that Simonian, Hartman, and Smith purchased their interests from Klein and (ii) Klein's testimony regarding the purchases by Adams and AV Select, that Plaintiffs were purchasing interests in CTT from Klein and paying the purchase price to Klein and that, as a result, the Plaintiffs fully understood that the proceeds were Klein's to do with what he pleased.

### Plaintiffs Purchases of Klein's Interests

1. **Simonian Purchase**

Simonian's Membership Unit Purchase and Option Agreement (the "Simonian Membership Agreement") provides that "[Klein] desires to sell three (3) units of membership interests in [CTT] to [Simonian] to [Klein] for the three (3) units if Six Hundred Thousand Dollars."  (*Id.*)  What the Simonian Membership Agreement makes clear is that Simonian was paying Klein for a portion of Klein's interest in CTT.  Consistent with the plain language of the Simonian Membership Agreement, Klein testified at his deposition that the Simonian purchased his shares from Klein. (Fisher Decl. at Ex. 23 ("Klein Tr."), at 259: 10-19 ("[Simonian] came in and bought my shares."), 260-264).

2.    **Hartman and Smith Purchases**

Hartman and Smith each entered into a substantially similar, but separate, Unit Purchase Agreement with Klein. (Fischer Decl., Exs. 16, 17). In their respective Unit Purchase Agreements, Hartman and Smith each agreed "to purchase and [Klein] agrees to sell the 'Purchased Units' in Cambridge TT, LLC currently owned by [Klein]." (Fischer Decl., Ex. 16 at § 1.1; Ex. 17 at § 1.1). Consistent with the **plain** language of each of the Unit Purchase Agreements, Klein testified at his deposition that Hartman and Smith "bought my shares." (Klein Tr. at 272: 12-16).

3.    **Adams and AV Select Purchases**

There are no contemporaneous written transaction documents relating to Adams' or AV Select's acquisition of interests in CTT. While Adams testified at his deposition that he purchased interests from CTT (Adams Tr. at 49:13-50:6), Klein testified that each of the Plaintiffs purchased his or its interests from Klein. (Klein Tr. at 259: 10-13; *see also* Declaration of Bradley P. Lehman ("Lehman Decl.") at Ex. 1, Affidavit of John H. Klein ("Klein Aff.") at ¶¶ 2-3).[2]

With respect to AV Select, Plaintiffs point to no admissible evidence suggesting that AV Select purchased any interest in CTT from CTT rather than Klein. Indeed, the only evidence in the record on this issue is Klein's uncontroverted testimony that Ashton (AV Select), like the other Plaintiffs, acquired its interest from Klein.

The evidence clearly demonstrates that the Plaintiffs were purchasing some of Klein's interest in a start-up business in the hope that the business would be wildly successful and that their purchased interests would appreciate in the future, as other investors in Klein's previous

---

[2] Plaintiffs falsely assert in their Brief that Adams acquired a 6% interest in CTT in exchange for $581,250 in October of 2014. (Brief at pp. 4-5). However, as Klein has consistently maintained, Adams acquired 3% of CTT from him, with the option to acquire another 3% at a later date. (Klein Aff. At ¶ 5).

9

companies.  **The capital structure of the company, as of 12/31/19, showed that Klein's** interests were purchased by Adams, Simonian, Ashton (AV Select), Smith, Hartman, and his interests were decreased.

While Plaintiffs go to great lengths seeking to paint CTT as a Ponzi scheme on the basis that prior investors were bought out, suggesting that CTT was not an "actual company" or a "legitimate company," the evidence, again, does not support their claim.  As set forth above, Klein was personally entitled to the funds that the Plaintiffs paid to him to purchase his interests to use as he saw fit.  To the extent he may have used his funds to pay back earlier investors, for their product investment, in a separate product transaction, of one sort or another, that was Klein's prerogative.  Furthermore, Plaintiffs' repeated suggestion that CTT was not a real business and was just a Ponzi scheme is contradicted by the Plaintiff's own acknowledgments (set forth already) that CTT was a real business, generated revenues, had products, paid several of the Plaintiffs actual large salaries and other substantial fees, and otherwise functioned as a typical start-up business.

Plaintiffs suggest that Klein's Employment Agreement is invalid as a consequence of alleged self-dealing, Klein's alleged failure to disclose it to each of the Plaintiffs (*Id.*).  However, Plaintiffs fail to provide any legal or factual basis (much less an undisputed factual basis) for these bald and conclusory assertions.

### Klein's Interest in and Control over CTT at the Time of His Employment Agreement Does Not Invalidate Klein's Employment Agreement

Plaintiffs baldly assert that Klein's Employment Agreement is invalid because Klein controlled CTT.  Plaintiff's provide no legal basis for this proposition, particularly given that the evidence is construed in the manner most favorable to Klein.  Contrary to Plaintiff's suggestion, New Jersey Law expressly recognizes the validity of contracts between an LLC and its members under proper circumstances.  *See* N.J.S.A. § 42:2C-39(f)(h).  Klein's uncontradicted deposition testimony is that he entered into his Employment Agreement with CTT when he was the sole

member of CTT, and that he approved the agreement.  (Klein Tr. at 280: 10-18).  Plaintiffs assert no facts, much less undisputed facts (or legal argument), tending to indicate that Klein's Employment Agreement is invalid based on his status as a member of or control over CTT.

### Klein's Purported Non-Disclosure of His Employment Agreement to Plaintiffs Does Not Invalidate Klein's Employment Agreement

Not only is there a factual dispute as to whether Klein disclosed his Employment Agreement to the Plaintiffs, but Plaintiffs point to no legal authority giving rise to an obligation on the part of Klein to disclose his Employment Agreement to the Plaintiffs prior to their investments.  Each Plaintiff performed their own due diligence prior to their purchase of Klein's interests.  Furthermore, Plaintiffs fail to identify any factual or legal basis for this assertion that Klein's alleged failure to disclose his Employment Agreement to the Plaintiffs might somehow render the agreement invalid.

### CTT's Status as a Start-Up Company Does Not Invalidate Klein's Employment Agreement

Plaintiffs assert that Klein's Employment Agreement is invalid because it was issued by a company with no operations or revenue and because the salary was unreasonable.  Not only do the Plaintiffs fail to provide any authority for the proposition that an employment contract is invalid where the employer has no operations or revenue, but Adams, Simonian and Dr. Robert Ashton ("Ashton"), a member of AV Select, each received a salary from CTT during the same period of time that Klein did.  (Fischer Decl., Ex. 7 ("Adams Tr.") at 257:21-258:2; Ex. 11 ("Simonian Tr."), at 39:25-44:5, 310:20-310:24).  Furthermore, Plaintiffs suggestion that CTT had no operations is belied by Plaintiffs' acknowledgments that CTT employed Klein, Ashton, Simonian and Adams and had revenues for a time approaching $20 million.

LEGAL\47222487\1

**Plaintiffs Fail to Address, Much Less Demonstrate Conclusively on the
Undisputed Facts, the Materiality of the Sole Member Representations**

On the issue of whether Klein's purported Sole Member Representations constitute material misrepresentations for purposes of Plaintiff's fraud-based claims, Plaintiffs must not only demonstrate that the representations were made and that the representation was false, but they must also show that is it undisputed that the representation was "material." Plaintiffs' Brief does not address the materiality of this alleged representation in any way, shape, or form.

Furthermore, not one of the Plaintiffs has asserted that Klein's alleged representation that such Plaintiff was "the first" member other than Klein in any way impacted the percentage interest purchased, or any appurtenant management or control rights. None of the Plaintiffs disputes that he/it received exactly what he/it believed was purchased. In short, even if Klein represented to one or more of the Plaintiffs that he/it was "the first" other member, Plaintiffs have failed to even argue, much less demonstrate as a matter or undisputed fact, that the Sole Member Representations were in any way material to their decision to invest. In fact, at least one of the Plaintiffs acknowledged as much in his deposition. (Smith Tr. at 154:20-155:10). The Plaintiffs own testimony and documentary evidence are in substantial conflict with their **alleged contentions.**

The Plaintiffs have acknowledged that that following their purchase of Klein's interest, CTT's products had the potential to be highly profitable. Plaintiffs believed in CTT sufficiently to join in the effort to make it a success, all of whom had very responsible positions, with substantial monetary benefits. All Plaintiffs asked and were on the CTT Team. **As stated, if CTT had continued its success after the merger, 6/16/16, all of the Plaintiffs would now be thanking Klein for allowing them to purchase his interest and join.** Instead, as stated, they waited until after their gamble did not pay off, and things did not turn out the way they had hoped, due in large part to the complete failure of the one of Plaintiffs to execute his very vital job successfully and some road blocks **initially put in CTT's way by PBM's and Insurance Co's.**

However, all of them waited until after they derived substantial income from CTT, before turning around and falsely claiming Klein defrauded them into purchasing his interest. The fact is, all Plaintiffs asked to buy Klein's interest, no solicitation. Plaintiffs are treating their investment as an "option" that they could exercise if things went well. Now that things have gone poorly, Plaintiffs after already substantially benefitting financially, are seeking to avoid the very risk they all knowingly undertook. **All Plaintiffs were financially astute, with Adams having over 20 years of experience in finance, he showed on his resume. That is not how investing in start-ups works and they knew they risks and possible rewards.** All Plaintiffs had the opportunity of due diligence. Based on the true facts of the history of CTT, the Plaintiffs asserted claims should all be completely denied.

**The assertion of securities fraud is totally false. All common law fraud, intentional misrepresentation, negligent misrepresentation, and unjust enrichment (Counts I, II, III, IV) and Simonians breach of contract have been shown to be totally false and contradicted** by the Plaintiffs own documents, testimony, actions, and self-serving interests.

**All recovery of their purchase price paid for Klein's interest should be denied in total. The Plaintiffs, led by Adams, have tried to show Klein as guilty totally and falsely by their accusations. They have papered up their lies to protect from defamation lawsuits, they are trying to obtain a windfall settlement, hide Adams' incompetence, and to economically hurt him and destroy his highly regarded reputation.**

**All previous companies Klein was chairman, CEO, and founder of, have been very rewarding for investors and employees. CTT, in this case, did not reward all investors, but certainly rewarded the Plaintiffs substantially financially and now they want more based on totally false accusations.**

## II.    Jurisdiction

The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because Plaintiffs assert a claim for violation of the federal securities laws (Count I).  The Court has supplemental jurisdiction over Counts II – VI pursuant to 28 U.S.C. § 1367 because these claims are part of the same case or controversy as Count I.  The Court has personal jurisdiction over this matter pursuant to the forum-selection clause in CTT's September 2016 Operating Agreement.  No party has disputed that the Court has subject matter and personal jurisdiction over this matter.

### III.   Facts

#### A.   Uncontested Facts

The following facts are not disputed or have been agreed to or stipulated by the parties:

#### *The Parties*

##### *Klein*

1.   Klein is CTT's founder and largest shareholder.

2.   He was CTT's Chief Executive Officer (CEO) from at least October 2014 until he was terminated on December 22, 2017.

##### *Adams*

3.   Adams is an experienced financial industry executive from Massachusetts.

4.   Adams had over 20 years of financial experience when he met Klein.

5.   He met Klein on June 24, 2014.

6.   They were introduced by a mutual acquaintance at their sons' hockey camp in Chicago.

7.   In June 2017, Klein appointed Adams to CTT's three member Board of Managers.

8.   Adams became CTT's acting CEO in December 2017 following Klein's termination.

##### *AV Select*

9.   AV Select is a limited liability company comprised of the Estate of Dr. Robert Ashton, Dr. Jennifer Ashton, Greg and Nancy Vorbach, and their children.

10.   AV Select was organized by Greg Vorbach for the purpose of investing in CTT.

11.   Dr. R. Ashton was a thoracic surgeon from New Jersey.

12.   Dr. R. Ashton asked Klein to help him with a water treatment company in 2014.

13.   Dr. R. Ashton tragically took his own life in February 2017.

14.     Greg and Nancy Vorbach reside in Florida.

15.     They are longtime friend of the Ashtons.

16.     AV Select is now managed by Greg Vorbach and Dr. J. Ashton.

17.     The Ashtons invested $275,000 and the Vorbachs invested $175,000.

18.     He remained in this role until the time of his death.

**_Dr. Simonian_**

19.     Dr. Simonian is a vascular surgeon from New Jersey.

**_Hartman and Smith_**

20.     Hartman, from New Jersey, is the President and owner of Keystone Folding Box Co. ("**Keystone**").

21.     Hartman invested $300,000 in exchange for a purported 1.5% (1.5 of 100 shares) of CTT-NJ on November 23, 2015.

22.     Smith, from Ohio, is the Director of Marketing at Keystone.

**_CTT_**

23.     CTT's key market would be physicians and physician groups, who would be able to realize new revenue streams by dispensing Compliance PACs directly to patients from their offices.

24.     The process of obtaining an approved New Drug Application ("NDA") could take more than a year and costs in excess of $1 million per application.

25.     In 2016, CTT also engaged in the business of wholesaling prescription gels and creams for generic drug manufacturer Sandoz, Inc. ("**Sandoz**").

26.     The operative CTT business entity before June 2016 was CTT-NJ.

27.     In June 2016, Klein began the process of merging CTT-NJ into CTT-DE.

28.     CTT-DE became the operative CTT entity.

*The Plaintiffs' Investments*

     *Adams*

29.    Klein represented himself to be a recognized leader in the United States generic pharmaceuticals industry, having held senior positions at various companies for over 24 years and, since 1995, returning over $3.3 billion to investors.

30.    In a June 25, 2014 email, Klein represented that CTT was his "most exciting project and has the best upside of all my projects" and that he "was offered $26.4 million for the company over a year ago," which he turned down because the offer was insufficient.

31.    A presentation titled "Cambridge Technologies, Second Quarter 2013" ("**2Q 2013 Deck**") represented that CTT had "4 IND's [sic] approved."

32.    A presentation "Cambridge Therapeutic Technologies Corporate Overview, September 2014" ("**September 2014 Deck**") stated "Cambridge will be the first to market with a pre-packaged compliance solution for generic drugs and drug combinations to be dispensed directly from doctors to their patients.  Cambridge has fully developed its first Compliance PAC and is poised to begin commercializing a pipeline of 60+ similar Compliance PACs over the next six to eighteen months."

33.    The presentation stated CTT had "[e]xclusive bulk purchasing for generic drugs directly from manufacturers for distribution by physicians."

34.    Klein told Adams that some of the leading industry executives had worked for him in the past.

35.    Klein claimed that CTT also had exclusive access to custom claims adjudication software through a company called DispensePoint.

36.    Klein explained to Adams that the software was "private label," designed and customized for CTT, and CTT had exclusive rights to it.

17

37.     Klein told Adams that he chose this software solution after vetting over 50 potential providers over the course of a year, and determined it was the best in the industry.

38.     In an October 17, 2014 text message, Klein reiterated to Adams that he would be CTT's first outside investor.

39.     The same day, Mr. Adams wired $581,250 to CTT's account XX-XXX-5094 at PNC Bank ("**PNC A/C 5904**").

### AV Select

40.     A presentation "Cambridge Therapeutic Technologies Corporate Overview, October 2014" ("**October 2014 Deck**") makes representations, among others, relating to Klein's background, the use of investment proceeds and the current state of Klein's business (*i.e.*, a completed Compliance PAC, approved INDs, exclusive bulk purchasing of generic drugs, and custom software).

41.     On January 26, 2015, the Vorbachs wired $450,000 from four different accounts to PNC A/C 5904.

42.     The next day, Mr. Vorbach organized AV Select, a Florida limited liability company, as the vehicle for this co-investment.

43.     But he never did.

### Dr. Simonian

44.     Klein emailed Dr. Simonian informal updates on the company.

45.     Dr. Simonian reasonably believed that CTT's projections were attainable.

46.     He knew the size of the multi-billion dollar U.S. generic pharmaceutical market due to his expertise as a physician specializing in, among other things, population health.

47.     On May 8, 2015, Dr. Simonian met Klein for lunch at the Coach House Diner in Hackensack, New Jersey.

48.     Klein explained CTT's custom adjudication software, offered through DispensePoint, to Dr. Simonian and offered to set him up with DispensePoint for a demonstration.

49.     Soon after, DispensePoint presented a webinar to Dr. Simonian that demonstrated the software's capabilities.

50.     The demonstration included the entire lifecycle of the transaction—from prescription medication dispensed from a physician's office, to the Pharmacy Benefit Manager ("**PBM**") adjudicating the claim, and the insurance company paying the claim.

51.     These figures were based on the assumption that "direct doctor dispensing with a mail order initiative [would be] in place [by] 1st qtr 2016."

52.     At no point before he invested did Klein disclose to Dr. Simonian that he had an Employment Agreement with CTT, or that he would be paid a $100,000 per month salary.

53.     The terms of Dr. Simonian's investment are set forth in the "Membership Unit Purchase and Option Agreement" ("**Simonian Membership Agreement**") and "Operating Agreement of Cambridge TT Limited Liability Company (a New Jersey limited liability company)" ("**Simonian Operating Agreement**").

54.     Klein used his longtime law firm, Cole Schotz, to draft Dr. Simonian's CTT-NJ investment documents.

55.     Klein's lead Cole Schotz attorney, Stewart Komrower, facilitated Cole Schotz's representation of Klein in connection with Dr. Simonian's investment.

56.     Dr. Simonian and Klein executed these documents on August 10, 2015.

57.     The Simonian Operating Agreement represents that "As of the date hereof, the Company has issued 100 Units to the Members as set forth on Exhibit A."

58.     That same day, Dr. Simonian wired $600,000 to PNC A/C 5904.

*Hartman and Smith*

59.     Hartman and Smith's investments in CTT grew out of the business relationship between Keystone and CTT.

60.     Klein contacted Keystone in the fall of 2014 after hearing about the success that Walmart's pharmacy had dispensing prescription drugs using Keystone packaging.

61.     Klein and Keystone's executives, Hartman and Smith, mutually recognized the potential of doing business together.

62.     Klein said that all he needed to complete his Compliance PACs was well-regarded, patented child resistant drug packaging, which Keystone could provide.

63.     Keystone and CTT formalized their business relationship in October 2014.

64.     Over the next year and a half, the companies worked together to design a Compliance PAC prototype, explore automation of drug packaging fulfilment, identify an FDA registered prescription drug packager to fill and ship the Compliance PACs, and launch the product.

65.     Hartman and Smith received a presentation titled "Cambridge Therapeutic Technologies, Sandoz, October 2015" ("**October 2015 Deck**").

66.     It makes representations, among others, relating to Klein's background and the current state of Klein's business (*i.e.*, CTT's product pipeline, approved INDs, exclusive bulk purchasing of generic drugs, and custom software).[3]

67.     The deck specifically highlights CTT's "Proprietary Dispensing Office Software."

68.     At this meeting, and over the next two months, Klein communicated with Hartman and Smith regularly through telephone calls, emails, and text messages.

---

[3] *See* Footnote 3.

LEGAL\47222487\1

69.     Klein represented that Klein had already received, and turned down, a $27 million offer to sell CTT.

70.     The terms of Hartman's investment are set forth in the "Unit Purchase Agreement by and between John H. Klein and Wade Everett Williams-Hartman" ("**Hartman Agreement**").

71.     Hartman executed the Hartman Agreement on November 23, 2015, and wired $300,000 to PNC A/C 5904 the same day.

72.     The terms of Smith's investment are set forth in the "Unit Purchase Agreement by and between John H. Klein and NuViewis IRA Inc. FBO Frank Edward Smith" ("**Smith Agreement**").

73.     Smith executed the Smith Agreement on or about December 10, 2015, and NuViewis IRA Inc. wired $100,000 from Smith's account to PNC A/C 5904 on December 11, 2015.

### Klein's Actual Use of Plaintiffs' Funds

74.     Prior to Adams' investment, the account balance for CTT's PNC A/C 5904 was just $3,069.20.

75.     Adams wired $581,250 to PNC A/C 5904 on October 16, 2014 and Klein disbursed out over $550,000 within a month.

76.     Klein's transactions included: (i) two personal checks of $100,000 each (October 16 and November 3); (ii) a $134,733.29 check to American Express to pay his personal credit card bill (October 16); (iii) a $39,718 check to the Borough of Alpine, New Jersey to pay his personal property taxes (November 9); (iv) a $124,000 wire to undisclosed early investor Steven Shaw (October 17); and (v) two checks of $50,000 (October 16) and $10,000 (November 5) each to undisclosed early investor Patrick Dapuzzo.

77.     AV Select wired $450,000 to PNC A/C 5904 on January 26, 2015 and Klein disbursed out nearly $300,000 within a month.

78.     Klein's transactions included: (i) a personal check of $100,000 (January 27); (ii) two checks of $127,174.63 and $13,429.99 each to American Express (January 26); (iii) two cash withdrawals of $8,500 and $6,000 each (January 30 and February 13); (iv) a $39,718 check to the Borough of Alpine (February 3); and (v) two checks of $10,000 each (January 22 and February 6) to Dapuzzo.

79.     Dr. Simonian wired $600,000 to PNC A/C 5904 on August 10, 2015 and Klein dispersed out over $520,000 over the next six weeks.

80.     Klein's transactions included: (i) three personal checks of $300,000 (August 10), $100,000 (September 10), and $22,000 (September 21); (ii) a $46,000 check for a summer rental in East Hampton, NY (August 14); (iii) three checks totaling $15,000 for a rental apartment (September 4-6); and (iv) two checks of $15,000 (August 7) and $25,000 (September 1) each to Dapuzzo.

81.     Hartman and Smith wired $300,000 and $100,000 to PNC A/C 5904 on November 23, 2015 and December 11, 2015, respectively, and Klein disbursed out over $320,000 during that period.

82.     Klein's transactions included: (i) two personal checks of $50,000 (November 22, the day before Hartman's agreed investment) and $100,000 (January 2, 2016) each; (ii) a $42,319.28 check to American Express (November 23); (iii) a $42,460.98 check to the Borough of Alpine (November 22); (iv) a check of $23,000 to Jeanette Rober, who Plaintiffs believe is Klein's relative; and (v) two checks of $45,000 each to undisclosed early investors Michael Rosenberg and Jeffrey Khalaf (December 29).

83.     CTT earned no revenue in late 2014 and 2015 when Plaintiffs invested.

84.     Thus, Klein disbursed approximately $1.7 million of Plaintiffs' collective $2.1 million investment funds to himself and to reimburse undisclosed early investors on the same day, and in the days and weeks after the Plaintiffs invested.

85.     During this litigation, Klein has claimed that his use of Plaintiffs' funds was "back pay" under his CTT Employment Agreement or payment of personal expenses in lieu of "back pay."

86.     However, Klein did not disclose an Employment Agreement or a proposed salary of $100,000 per month (from a company with no operations or revenue) that he issued to himself to the Plaintiffs.

87.     Indeed, as part of his 2016 claim, Klein had a marketing consultant prepare a document that showed he was paid $0 in 2014 and $27,692 in 2015 under this same Employment Agreement.

### *The State of CTT's Actual Business Before the Plaintiffs Invested*

88.     CTT's supposed products were four IND applications that Klein's former company, DAVA, filed with the FDA in 2009-2010.

89.     Neither Klein nor CTT sought to develop these INDs into NDAs.

90.     Before Adams invested, Klein had previously solicited approximately $6 million in investments (in amounts ranging between $100,000 and in excess of $1 million) from various investors into CTT's purported pre-2015 business developing NDAs, or profit and loss interests into CTT's INDs (collectively, "**Products Investors**").

91.     This document confirms that CTT's products were actually DAVA products.

92.     Shaw and Klein settled in June 2013.

93.     Klein's longtime Cole Schotz attorney Stewart Komrower negotiated Klein's settlement with Shaw.

94.     *Second*, Patrick Dapuzzo was another large Products Investor.  Dapuzzo invested more than $1 million into profit and loss interests in a IND product.

95.     Part of Dapuzzo's investment consisted of $470,000 cash in an Adidas duffel bag.

96.     Klein used at least one of Dapuzzo's $100,000 investment checks to pay, among other things, American Express bills, gas and electric bills, luxury car bills, and private school tuition for his children at the Dwight Englewood School.

97.     Klein repaid Dapuzzo at least $980,000.

98.     These payments also included funds from PNC A/C 5904 in 2016.

99.     *Third*, Alois Rupp and Kirsten Ferrara ("**Rupp**") are another large Products Investor.

100.    Rupp invested $1 million into profit and loss interests in an IND product.

101.    Rupp wired his investment proceeds into Klein's personal bank account.

102.    The next day, Klein wired $875,000 out of that account to an unknown recipient.

103.    *Fourth*, Oded Berkowitz was a Products Investor.

104.    Berkowitz invested $600,000, which was paid into Klein's personal account, and was repaid.

105.    *Fifth*, Trav-elee, LLC ("**Trav-elee**") was a Products Investor.

106.    Trav-elee invested $500,000 in January 2014, and it was repaid from PNC A/C 5904 in 2016.

107.    Of note, Klein immediately repaid Shaw $410,000 and American Express $60,000 upon receipt of Trav-elee's investment funds.

108.    *Sixth*, Dr. Lubliner invested $500,000 in November 2014, and he was repaid from PNC A/C 5904.

24

109.    Of note, Klein immediately paid himself $450,000 and repaid Dapuzzo $100,000 upon receipt of Dr. Lubliner's investment funds.

110.    *Seventh*, Jerry Treppel was a Products Investor.

111.    Treppel invested $150,000, which was paid into Klein's personal account, and he was repaid.

112.    *Eighth* and *ninth*, Michael Rosenberg and Jeffrey Khalaf were Products Investors.

113.    Rosenberg and Khalaf collectively invested $250,000, which was paid into Klein's personal account, and they were repaid.

114.    Their payments also included funds from PNC A/C 5904 in 2016.

115.    *Tenth* and *eleventh*, Jeffrey Dickenson/Rebecca Dickenson and William Connollon are Products Investors.

### *The Purported Biozone Acquisition*

116.    In October and November 2012, Klein engaged in preliminary discussions to sell CTT to Biozone Pharmaceuticals, Inc. ("**Biozone**").

117.    On October 25, Michael Brauser, a banker, sent Klein a proposed term sheet for the transaction that was "quite preliminary and has not yet been reviewed by" the principals of the company.

118.    The proposed term sheet offered Klein at most $5 million cash if the combined company hit very lofty revenue milestones and 17.5% shares of the combined entity.

119.    On November 5, Klein made a counteroffer that would pay himself at most $6 million cash if the combined company hit less lofty revenue milestones and 20% shares of the combined entity.

120.    There is no evidence in the record that Klein or Brauser ever discussed this transaction again.

*CTT's Business Fails Spectacularly*

*CTT From Plaintiffs' Investments to June 2016*

121.    Klein did not have any CTT business in place at the time the Plaintiffs invested.

122.    Each Plaintiff (and R. Ashton, on behalf of AV Select) communicated with Klein directly between their investment and around June 2016 when CTT formally "launched."

123.    Notwithstanding his significant employment offer, Adams worked informally with Klein—without compensation—developing CTT's sales channel, attending conferences, and forming relationships with industry contacts and making introductions to Klein.

124.    Adams frequently traveled to New Jersey to meet with Klein and Barry Posner—an attorney and longtime Klein confidant who would work for CTT as its Executive Vice President of Business Development and Regulatory Affairs.

125.    Klein introduced Adams to Posner.

126.    Adams also traveled around the country in furtherance of his sales duties.

127.    Dr. R. Ashton worked informally with Klein on CTT business during this period, including without compensation through December 2015.

128.    Dr. R. Ashton identified a CFO candidate for Klein to hire, Joe DosSantos, because he had been working with him and told Klein he was very competent.

129.    Notwithstanding his employment offer, Dr. Simonian worked informally with Klein—without compensation—researching opportunities for physician engagement.

130.    Dr. Simonian told Klein that he could contribute to CTT because of his expertise in physician practices and his belief in CTT objectives.

131.    Keystone, primarily through Smith, continued to work with Klein developing CTT's Compliance PACs.

132.    Klein did not provide the Plaintiffs with CTT financial statements (formal or informal).

133.    Klein did not provide the Plaintiffs with CTT tax returns or K-1s.

134.    Klein also did not provide the Plaintiffs with access or information relating to PNC A/C 5904 or any other CTT bank accounts.

### The Breslows, Blue Valley, and the Merger

135.    Adams met with Ashton and Klein on numerous occasions prior to the June 2016 merger.

136.    In September 2016, Blue Valley invested $7 million in CTT-DE.

### CTT Does Not Have Access to Custom Claims Adjudication Software

137.    The arrangement that CTT ultimately negotiated with DispensePoint in August 2016 was a failure.

138.    This unfavorable arrangement was steered by Posner, a minority shareholder in DispensePoint, who had falsely represented he would wall himself off from the companies' negotiations.

139.    CTT paid $250,000 for a license and tens of thousands of dollars more to install the system.

140.    As a stopgap measure, Adams formed a relationship with well-recognized pharmacy software provider RX30, and CTT began working with RX30 on its launch.

### CTT Does Not Have Access to Cheap Generic Drugs

141.    CTT developed its first Compliance PAC, Doxycycline, in June 2016.

142.    The next month, Klein bulk purchased in excess of $1.3 million of Doxycycline from Chartwell Pharmaceuticals, LLC ("**Chartwell**").

### Adams, Dr. R. Ashton, and Dr. Simonian Uncover Each Other

143.     After February 2017, Dr. Simonian entered a consulting agreement with CTT and he worked with the company on physician engagement.

144.     Dr. Simonian obtained FDA credentials to physician direct dispense, installed RX30 software and hardware, and attempted to dispense Compliance PACs to patients on a trial basis.

145.     Dr. Simonian and his staff found the RX30 software to be very antiquated and cumbersome.  In his opinion, this software was not something that physicians' offices would use regularly.

146.     Instead of giving up, however, Dr. Simonian actively worked with Adams and RX30 to improve CTT's software offerings.

### *MedCreations*

147.     Beginning around March 2016, Klein, via CTT-NJ, commenced business wholesaling prescription gels and creams ("**Gels Business**") for Sandoz.

148.     In 2016, Sandoz and CTT recognized that they could have a mutually beneficial business relationship.

149.     Sandoz and CTT stopped doing business in late 2016.

150.     CTT entered into a settlement agreement with Sandoz in June 2017, obligating CTT to pay Sandoz in excess of $2.9 million in three installments.

151.     CTT made one payment against the settlement agreement.

152.     Sandoz never did business with CTT again.

153.     Klein chaired these Board meetings.

154.     These amounts matched wires received into PNC A/C 5904.

155.    Wasserman demanded that Klein provide the Board and CFO DosSantos with copies of these bank statements for 2014 through 2016, and provide a reconciliation of his 2016 account transactions.

156.    Klein finally provided copies of CTT's 2016 PNC A/C 5904 statements in May 2017.

157.    Klein provided a proposed reconciliation of his 2016 spending in June 2017.

### Adams Gives Klein the Benefit of the Doubt for Months After Uncovering the MedCreations Fraud

158.    Adams initially refused.

159.    In particular, Adams believed that Wasserman's proposal for Breslow control of post-Klein CTT was not in the best interest of CTT and its minority shareholders.

160.    Adams also wanted to give Klein the benefit of the doubt.

161.    Adams formally noted to Klein and CTT attorneys of how disruptive Wasserman was to the company.

### CTT's Business Model Does Not Work

162.    CTT spent weeks installing RX30 hardware and software at Wellmont Health System, training its physicians on dispensing, getting its physicians licensed to dispense, and selling Compliance PACs after conducting due diligence into physician prescribing habits.

### Adams and Wasserman, The Majority of CTT's Board, Terminates Klein as CEO For "Cause"

163.    Klein did not contribute his GastroEntero-Logic, LLC ("**GEL**") payments to CTT.

164.    On December 14, 2017, Wasserman and Adams executed a Written Consent terminating Klein for "cause."

165.    The Written Consent was prepared by the Breslow's attorneys, who had reviewed Klein's Employment Agreement (which was ultimately incorporated into the Breslow's investment documents).

166.    Adams relied on the Breslows attorneys and that they prepared the document correctly.

167.    "Cause" under the Employment Agreement includes:

> (1) "Employee's act or acts of dishonesty constituting an indictable or disorderly persons offense involving or resulting or intending to result directly or indirectly in personal enrichment at the expense of the Company (including, without limitation, acts of embezzlement, fraud or misappropriation); or (2) The commission by Employee of a felony or crime involving moral turpitude; or (3) Willful misconduct by Employee inimical to the interests of the Company's business … ; or (4) Any other material breach or attempted material breach of … this Agreement.

168.    With respect to Clause (4) only, Klein would be entitled to notice and a 10 day period to cure, unless the "cause for termination is not capable of being cured."

169.    The agreement further provided that "[t]he determination of 'Cause' shall be determined by the managing director of the Company in his reasonable discretion."

170.    Adams and Wasserman, in their reasonable discretion as CTT Board members, determined that Klein's multiple misdeeds fell within the definition of "cause," and could not be cured.

171.    On December 22, 2017, the FBI executed a search warrant at CTT's office and Wasserman sent the Written Consent to Klein.

### *Adams' Job As CTT's Acting CEO*

172.    The Board appointed Adams as CTT's acting CEO following Klein's termination.

173.    Adams did not receive any additional compensation as CTT's acting CEO.

174.    Adams also had to deal with CTT's mounting legal problems.

175.    On February 2, 2018, CTT's new counsel Riker Danzig sent Klein a letter demanding that Klein repay CTT $2.9 million that he misappropriated from CTT-DE.

176.    In response to this letter, Klein, through Attorney Komrower, obstructed CTT's efforts to pursue litigation against Klein.

177.    Klein and Palmer then executed a Written Consent that purported to eliminate Adams' ability as CTT's acting CEO, among other things, to work with outside counsel or cooperate with the grand jury investigation.

178.    In a February 3, 2018 email, Attorney Komrower wrote to CTT's Riker Danzig attorney: "To preserve the claims of CTT and Mr. Klein, on January 29, 2018, Mr. Klein exercised his right to appoint a second Board Manager in place of Mr. Adams. … Pursuant to the Designation, Tamarack Associates, Inc. has been designated as a Manager in place of Mr. Adams who is no longer a Manager.  Pursuant to the Consent, Mr. Adams, while remaining CEO, is no longer authorized nor empowered to take any action or steps with respect to litigation, discovery or investigation involving CTT, including to refrain from directives or communications with counsel for Cambridge."

179.    The Breslows new Board representative, Patrick Woytek, Esq., rejected Klein and Palmer's Written Consent.

**B.    Contested Facts**

**<u>Plaintiffs' Statement of Contested Facts</u>**

*The Parties*

> *Klein*

1.    Klein was terminated from CTT for "cause."

2.    During the relevant period, Klein resided in an 11-bedroom, 13-bathroom mansion in Alpine, New Jersey.

3.    The New York Post described Klein's mansion as a "sprawling residence, whose glitzy interiors are reminiscent of a palace, [and] is more than 35,000 square feet on 8 acres." (https://nypost.com/2017/08/09/new-jersey-megamansion-price-chopped-to-just-30m/        (last visited June 24, 2020).

> *Adams*

4.    Adams invested $581,250 in exchange for a purported 6% (6 of 100 shares) of CTT on October 16, 2014.

5.    In June 2016, CTT employed Adams as Executive Vice President, National Director of Sales and Marketing.

6.    Adams was relieved of this role in November 2019 after CTT appointed a receiver to wind-down the company as part of the settlement of related lawsuits.

> *AV Select*

7.    AV Select invested $450,000 in exchange for a purported 3% (3 of 100 shares) of CTT on January 26, 2015.

8.    In June 2016, CTT employed Dr. R. Ashton as Executive Vice President, Clinical and Formulary Affairs.

### *Dr. Simonian*

9.    Dr. Simonian met Klein in June 2014 at a fundraiser for Hackensack University Medical Center held at Klein's mansion.

10.    Dr. Simonian invested $600,000 on August 10, 2015 in exchange for a purported 3% (3 of 100 shares) of CTT-NJ, with an option to purchase an additional 3% of CTT-NJ and a right of first refusal to purchase additional shares if Klein solicited further CTT investments.

11.    In March 2017, CTT retained Dr. Simonian as a consultant on medical affairs.

### *Hartman and Smith*

12.    Keystone provided packaging for CTT's Compliance PACs.

13.    Smith invested $100,000 in exchange for a purported 0.5% (0.5 of 100 shares) of CTT-NJ on December 10, 2015.

### *CTT*

14.    Klein represented to each Plaintiff that CTT developed and marketed medication adherence solutions, which consisted of drug packaging designed to help patients properly take their prescription medications.

15.    CTT's primary business plan was to sell proprietary calendarized dosing packs for individual combinations of generic prescription medications that are typically prescribed together ("**Compliance PACs**").

16.    Certain Compliance PACs would consist of individual prescription drugs or combinations of a prescription drug with a non-prescription drug, for example, Clopidogrel (generic Plavix) with Aspirin for cardiology patients.

17.    Other Compliance PACs would combine two or more prescription drugs into a package ("**Combination PACs**"), which required approval by the U.S. Food and Drug Administration (FDA).

18.    This was to be CTT's primary line of business.

19.    The process for bringing a Combination PAC to market begins with the applicant submitting an Investigational New Drug ("**IND**") application to the FDA.

20.    From there, the applicant provides the FDA with information and responds to inquiries regarding, among other things, the safety and efficacy of the product, with the ultimate goal of obtaining an approved New Drug Application ("**NDA**").

21.    Klein represented that CTT owned one NDA, NDA 50-824, a/k/a the Omeclamox-Pak, which was used to treat peptic ulcers.

22.    Klein also represented that CTT owned four INDs that were "approved and ready for commercialization."

23.    Each of the Plaintiffs invested in CTT-NJ.

24.    Klein did not recognize the Plaintiffs' CTT-NJ investment interests into the surviving CTT-DE company.

### *Klein Solicits the Plaintiffs' CTT Investments*

#### *Adams*

25.    Klein began soliciting Adams' investment in CTT from their first meeting on June 24, 2014.

26.    Klein told Adams that on that very same day his company DAVA Pharmaceuticals, Inc. ("**DAVA**")—a generic drug manufacturer he founded in 2004, and of which he served as Chairman and CEO—announced that it would be acquired by publicly traded pharmaceutical company Endo International plc ("**Endo**") for $600 million.

27.    Klein represented to Adams that he was instrumental in facilitating this transaction.

28.    The next day, June 25, 2014, Klein sent Adams an email enclosing a CTT investor presentation.

29.     The email stated "Enclosed is the description of my current company [CTT].  I had to put it on hold for seven months while I completed work on Dava."

30.     The presentation attached to the email, titled "Cambridge Technologies, Second Quarter 2013" ("**2Q 2013 Deck**"), described CTT's business.

31.     The presentation represented CTT had "1 NDA approved" for "Peptic Ulcers – LAUNCHED."

32.     The presentation represented that CTT had generated $1.1 million of revenue as a royalty from this product in 2013.

33.     From their very first meeting, Klein represented that he was CTT's sole shareholder and he was offering Adams a unique opportunity to get into CTT as an "insider."

34.     Adams reasonably understood that this was the current state of the company based on his prior discussion with Klein, Klein's email, and the content of the presentation.

35.     Among other things, the 2Q 2013 Deck represented that CTT "provides products delivered by patented specialized packaging technology which promote and provide compliance … ", and "[p]rovide specialized engineered packaging solutions … " and "[f]ull capability to manufacture machines, tooling and systems to satisfy very specialized and difficult requirements."

36.     The 2Q 2013 Deck also represented that CTT owned NDA 50-824, a/k/a the Omeclamox-Pak, which was used to treat peptic ulcers.

37.     The presentation also displayed the Omeclamox-Pak packaging on a standalone page.

38.     This product was also projected to bring in $2 million in 2014 and $2.5 million in 2015-2017.

LEGAL\47222487\1

39.     The presentation represented that CTT owned a 10 year license to a product that treated cataracts in dogs, and that the product was currently undergoing a study at the University of Pennsylvania.

40.     Over the next four months, Klein pursued Adams' investment through telephone calls, emails, and text messages, and at in-person meetings in New Jersey and Massachusetts.

41.     Klein emailed Adams three successive versions of the investor presentation and business plan for CTT, on September 10, September 29, and October 6, 2014.

42.     He also emailed Adams informal updates on the company.

43.     Klein emailed Adams the presentation "Cambridge Therapeutic Technologies Corporate Overview, September 2014" ("**September 2014 Deck**") on October 6, 2014.

44.     The September 2014 Deck represented that "Cambridge has developed and is poised to begin commercializing a proprietary solution that enables doctors to dispense safely and directly a variety of pre-packaged generic drugs and drug combinations directly to patients from their offices."

45.     Klein explained to Adams that he was able to secure this exclusivity as a result of his longtime experience and relationships in the generic pharmaceutical industry.

46.     The September 2014 Deck represents that the "software that records that the patient received the Compliance PAC, as opposed to a paper prescription, at the physician's office is novel and patent applications are being prepared for this solution.  This software interfaces with standard medical office software to implement this feature and patent applications are being prepared for this solution."

47.     The September 2014 Deck further represented that CTT had competitive advantages over the market in "Purchasing and Packaging," "Business Model & Drug Combinations," "Patient Instructions," and "Software."

36

48.     The September 2014 Deck also represented that CTT had "66 Generic Compliance PACs currently in product configuration," "55 additional Generic Compliance PACs in [the] product pipeline," access to "Four IND Combination Compliance PACs approved and ready for commercialization," and "21 additional Combination Compliance PACs in Cambridge's product pipeline."

49.     Based on this current state of the business, Klein projected gross revenues for CTT of over $134 million and $347 million and net profits of over $34 million and $136 million in 2015 and 2016, respectively.

50.     Klein also told Adams that his funds would be used to develop drugs and pay for NDAs.

51.     Klein also represented this same thing in a presentation he sent to another potential investor in 2017.

52.     Moreover, the investor presentation claimed that "in reality, these forecasts are inherently conservative and defensible."

53.     The September 2014 Deck also included a specific "Use of Proceeds" summary, which explained how Klein planned to use investor proceeds for CTT business purposes.

54.     Klein's October 17, 2014 text message said that he was "not sending [a] balance sheet to [other potential] funders until you transfer [your investment] but they wanted [it] this week.  Don't mean to push but want you as an insider."

55.     At no point before he invested did Klein disclose to Adams that he would use Adams' investment funds to pay personal expenses.

56.     At no point before he invested did Klein disclose to Adams that he had an Employment Agreement with CTT, or that he would be paid a $100,000 per month salary.

57.     At no point before he invested did Klein disclose to Adams that he had previously solicited approximately $6 million in investments (in amounts ranging between $100,000 and in excess of $1 million) from Products Investors.

58.     At no point before he invested did Klein disclose to Adams that he would reimburse certain Product Investors directly from his investment funds.

59.     At no point before he invested did Klein disclose to Adams that he would be investing in an entity called the "Klein Group."

60.     In reasonable reliance on Klein's and CTT's various material misrepresentations and omissions, Adams negotiated the terms of his CTT investment with Klein.

61.     Adams initially rejected Klein's first two offers, 3% of CTT (3 of 100 shares) for $1 million and then 3% of CTT (3 of 100 shares) for $600,000.

62.     Instead, Adams countered the second offer with a proposal that he purchase 6% of CTT (6 of 100 shares) for $581,250 (which he had readily available to invest at that time).

63.     Klein accepted on October 16, 2016.

64.     Klein never provided Adams with an operating or subscription agreement for CTT-NJ despite repeated requests.

65.     As an additional part of his investment solicitation, Klein offered Adams a position heading sales for CTT at a proposed salary of $450,000 to $600,000, plus bonus.

66.     This particular employment offer never came to fruition.

*AV Select*

67.     Klein emailed Dr. Ashton an investor presentation for CTT on January 22, 2015.

68.     The "Cambridge Therapeutic Technologies Corporate Overview, October 2014" ("**October 2014 Deck**") is substantially similar to the September 2014 Deck and other presentations that Klein had sent to Adams.

69.     The only difference between the presentations is that the October 2014 Deck projected additional revenue and income based on the current state of CTT's business:  gross revenues for CTT of over $119 million and $326 million and net profits of over $23 million and $124 million in 2015 and 2016, respectively.

70.     The Vorbachs were impressed by the projections in the October 2014 Deck and felt comfortable with the investment opportunity because they understood that Dr. R. Ashton would become a CTT insider with Klein.

71.     On January 25, 2015, Dr. R. Ashton and his wife, Dr. J. Ashton, discussed the CTT opportunity with Gregory and Nancy Vorbach over dinner.  Dr. R. Ashton shared the October 2014 Deck with the Vorbachs and relayed his various conversations with Klein about the company.

72.     Dr. Ashton offered the Vorbachs the opportunity to co-invest in CTT with the Ashtons, but he stressed that the Vorbachs needed to make a decision and fund the investment immediately.

73.     The investment was time-sensitive because Klein represented to Dr. R. Ashton that he was CTT's 100% shareholder of a business valued at $15 million, and that Dr. R. Ashton needed to move fast if he was to be CTT's first outside investor.

74.     Based on his conversations about CTT and the investment opportunity with Dr. R. Ashton, Greg Vorbach reasonably understood that Klein would use AV Select's investment funds for ordinary business purposes.

75.     At no point before AV Select invested did Klein disclose that he would use its investment funds to pay personal expenses.

76.     At no point before AV Select invested did Klein disclose that he had an Employment Agreement with CTT, or that he would be paid a $100,000 per month salary.

77.     Klein represented to AV Select that he was CTT's sole shareholder.

39

78.     At no point before AV Select invested did Klein disclose that Adams had previously invested in CTT.

79.     At no point before AV Select invested did Klein disclose that he had previously solicited approximately $6 million in investments from Products Investors.

80.     At no point before AV Select invested did Klein disclose that would reimburse certain Product Investors directly from its investment funds.

81.     At no point before AV Select invested did Klein disclose that it would be investing in an entity called the "Klein Group."

82.     In reasonable reliance on Klein's and CTT's various material misrepresentations and omissions, the Ashtons and Vorbachs agreed to purchase 3% of CTT-NJ (3 of 100 shares) for $450,000, with the Ashtons investing $275,000 and the Vorbachs investing $175,000.

83.     The members of AV Select—Dr. R. Ashton, Dr. J. Ashton, Gregory Vorbach, Nancy Vorbach, Bryan Vorbach, and Ian Vorbach—agreed to the operating agreement as of February 12, 2015.

84.     Klein repeatedly promised Dr. R. Ashton that he would provide AV Select with a subscription agreement and stock certificates for its CTT investment, and CTT K-1 tax forms.

### *Dr. Simonian*

85.     Klein began soliciting Dr. Simonian's investment from their first meeting.

86.     At this meeting, Klein represented that he was the sole shareholder of CTT and he was looking for an active minority investor with Dr. Simonian's medical expertise to assist him with growing the business.

87.     Beginning in or around May 2015, Klein began pursing Dr. Simonian's investment in earnest through emails, text messages, and telephone calls.

88.     Klein emailed Dr. Simonian an investor presentation and business plan for CTT on May 7, 2015.

89.     The "Cambridge Therapeutic Technologies Corporate Overview, March 2015" (**March 2015 Deck**") is substantially similar to the September 2014 Deck and October 2014 Deck that Klein had sent to Adams and Dr. R. Ashton.

90.     It makes the same representations, among others, enumerated in paragraphs herein, including those relating to Klein's background, the use of investment proceeds and the current state of Klein's business (*i.e.*, a completed Compliance PAC, approved INDs, exclusive bulk purchasing of generic drugs, and custom software).

91.     The only difference between the presentations is that the October 2014 Deck projected additional revenue and income based on the current state of CTT's business:  gross revenues for CTT of over $78 million and $262 million and net profits of over $4 million and $84 million in 2015 and 2016, respectively.

92.     At the diner meeting, Klein and Dr. Simonian discussed all aspects of the CTT investment and Dr. Simonian's potential role working for the company.

93.     Klein represented to Dr. Simonian that he was instrumental in facilitating DAVA's sale to Endo for $600 million.

94.     Klein represented to Dr. Simonian that his investment funds would go to CTT's drug inventory, marketing, packaging, and product stability.

95.     Klein also represented to Dr. Simonian that he would not pay distributions or dividends until CTT was profitable, and in the interim Klein would reinvest profits in the business.

96.     If CTT could obtain even less than a 1% market share, which he believed was possible given the business model that Klein represented was already in place, then CTT's revenue and profits could reach these levels.

97.     Klein represented to Dr. Simonian that he had invested $11 million into CTT—through a combination of cash and NDA and IND assets that Klein contributed to the business.

98.     According to Klein, he did not need to take distributions from CTT because he was wealthy and had put his own money into the company.

99.     Klein showed Dr. Simonian a sample package for one of these NDA products and represented that this product was an asset of the company.

100.    Based on this demonstration, Dr. Simonian reasonably understood that Klein's representation about CTT's "fully developed" Compliance PAC (in the March 2015 Deck) meant that Klein had tested the product's associated National Drug Code ("**NDC**")[4] against the DispensePoint software and confirmed that the drug would adjudicate.

101.    On June 19, 2015, Klein emailed Dr. Simonian "updated" pro-forma revenues and company valuations for 2015 to 2018.

102.    In the same June 19, 2015 email, Klein wrote:

> At this point I am very open to your desire;if [sic] you could give me some idea of you range Iwill [sic] quickly come back to you as to how I could accommodate it.
>
> I know you would be a huge contributor to future favorable valuations and I am willing to bring you in confidentially as a founder with me.That [sic] being said anything we did would have to be done before anyone else participated or your value would have to be at theirs.
>
> As a side bar I was offered $26.5 million for the company Oct 2012 but I said no; it was just to [sic] early.
>
> So please think about what you would like to do and lets talk over the weekend.
>
> As to your role,you [sic] would be very favorably compensated for all activities trips white papers expenses and salary as income

---

[4] A NDC code is a unique identifier registered with the FDA for each drug product distributed in the United States.

achieved and you would be on executive committee of company with me.

Await you thoughts;however [sic] some urgency because of conversations for final funding partner.

103.    Klein again revised the pro-forma revenues and company valuations for 2015 to 2018 in a June 22, 2015 email.

104.    He justified the increases due to "moving up some very profitable products into 2016 along with recanted commissions and royalties [sic] and reductions in ongoing SG&A."

105.    At no point before he invested did Klein disclose to Dr. Simonian that he would use his investment funds to pay personal expenses.

106.    At no point before he invested did Klein disclose to Dr. Simonian that Adams or AV Select (or Dr. R. Ashton) had previously invested in CTT.

107.    At no point before he invested did Klein disclose to Dr. Simonian that he had previously solicited approximately $6 million in investments from Products Investors.

108.    At no point before he invested did Klein disclose to Dr. Simonian that would reimburse certain Product Investors directly from his investment funds.

109.    At no point before he invested did Klein disclose to Dr. Simonian that he would be investing in an entity called the "Klein Group."

110.    In reasonable reliance on Klein's and CTT's various material misrepresentations and omissions, Dr. Simonian agreed to purchase 3% of CTT-NJ (3 of 100 shares) for $600,000, with an option to purchase an additional 3% of CTT-NJ and a right of first refusal to purchase additional shares if Klein solicited further investments.

111.    The Simonian Membership Agreement represents that "Seller [Klein] owns One Hundred (100) units of membership interests in Cambridge TT Limited Liability Company" and that "Seller is the sole owners [sic] of the Units" and "No other person or entity has any legal or equitable claim to ownership of the Units."

112.    Exhibit A to this agreement represents that Klein owns 97 Units and Dr. Simonian owns 3 Units of CTT-NJ.

113.    Klein also offered Dr. Simonian a position as CTT's Executive Vice President, Physician Strategies & Regulatory Affairs, with Simonian's compensation to be determined at a later date.

114.    This supposed employment offer was also part of Klein's investment pitch to Dr. Simonian.

115.    This position was supposed to be on CTT's Executive Committee, reporting directly to Klein, with the role of working with the medical community to achieve acceptance of physician dispensing.

116.    Dr. Simonian's Executive Vice President, Physician Strategies & Regulatory Affairs position never came to fruition.

### Hartman and Smith

117.    Klein represented that he had an infrastructure in place, including access to custom claims adjudication software and exclusive access to cheap generic drugs for physician dispensing.

118.    Keystone did all of this work with Klein without compensation.

119.    In a meeting at Keystone's Newark, New Jersey office in October 2015, Klein provided Hartman and Smith with the October 2015 Deck.

120.    The October 2015 Deck is similar to the September 2014 Deck, October 2014 Deck, and March 2015 Deck that Klein had sent to Adams, Dr. R. Ashton, and Dr. Simonian, respectively.

121.    Hartman and Smith reasonably understood that this presentation described the current state of CTT's business due to their conversations and recent history working with Klein.

122.    Klein represented that he was instrumental in facilitating DAVA's sale to Endo for $600 million.

123.    Klein represented that he was the sole shareholder of CTT and he was offering Hartman and Smith the opportunity to get in on the ground floor as CTT's first outside investors before he sought venture capital funding.

124.    He told them that "you are buying a piece of me," which was an investment position in a holding company that would own various CTT operating subsidiary business.

125.    These subsidiaries included: (i) physician dispensing of Compliance PACs, (ii) developing INDs into NDAs, and then selling Combination PACs, and (iii) wholesaling prescription gels and creams.

126.    Klein represented that he had personally invested $1 million into developing and customizing claims adjudication software for CTT.

127.    Klein represented that he had already invested over $1 million each in three NDAs for drug combinations to be sold in Compliance PACs.

128.    He did not disclose to Hartman and Smith that DispensePoint was CTT's software provider.

129.    Before investing, Hartman and Smith discussed Klein and CTT with Legacy Pharmaceutical Packaging LLC ("**Legacy**"), the pharmaceutical packager that Klein had hired at their recommendation.

130.    Legacy confirmed that Klein was engaged in buying and selling prescription gels and creams.

131.    At no point before they invested did Klein disclose to Hartman and Smith that he would use their investment funds to pay personal expenses.

132.    At no point before they invested did Klein disclose to Hartman and Smith that he had an Employment Agreement with CTT, or that he would pay himself a $100,000 per month salary.

133.    Klein represented that he would use Hartman and Smith's investment funds to purchase drugs and ramp up CTT's outside salesforce.

134.    At no point before they invested did Klein disclose to Hartman and Smith that Adams, AV Select (or Dr. R. Ashton), or Dr. Simonian had previously invested in CTT.

135.    At no point before they invested did Klein disclose to Hartman and Smith that he had previously solicited approximately $6 million in investments from Products Investors.

136.    At no point before they invested did Klein disclose to Hartman and Smith that he would reimburse certain Product Investors directly from his investment funds.

137.    At no point before they invested did Klein disclose to Hartman and Smith that he would be investing in an entity called the "Klein Group."

138.    In reasonable reliance on Klein's various misrepresentations and omissions, Hartman and Smith agreed to purchase 2% of CTT-NJ (2 of 100 shares) for $400,000.

139.    Hartman purchased 1.5% for $300,000 and Smith purchased 0.5% for $100,000.

140.    The Hartman and Smith Agreements each represented that Klein owned 100 of 100 shares of CTT-NJ.

### Klein's Actual Use of Plaintiffs' Funds

141.    The only money that flowed in and out of CTT after Adams' investment until 2016 was investor money.

142.    There is no evidence in the record that suggests Klein actually treated the disbursements as salary, for example, payroll or tax withholding documents.

143.    In the spring of 2017, CTT uncovered that Klein had misappropriated funds from PNC A/C 5904 in 2016.

144.    In response, Klein argued to CTT's CFO Joe DosSantos and the Board that he was owed $2.1 million in back pay under the same Employment Agreement.

145.    Klein could not have been entitled to (claim) this amount as back pay in 2016 if he believed he was contemporaneously collecting a salary in 2014 and 2015.

### CTT's Actual Business (or Lack Thereof) Before the Plaintiffs Invested

146.    According to Klein, CTT's business before the time Adams invested was developing INDs into NDAs.

147.    DAVA never sought to develop these INDs into NDAs after receiving preliminary approvals in 2011.

148.    As of October 2013, Klein referred to these products as "dormant."

149.    DAVA never invested additional money into developing these four INDs.

150.    Neither did Klein or CTT.

151.    Thus, the four INDs—to the extent that CTT even owned them—were worthless as of October 2014 and thereafter.

152.    Prior to 2014, when Klein solicited the majority of these investments, DAVA—and not Klein or CTT—owned this intellectual property.

153.    Beginning in 2011, Klein solicited approximately $6.5 million (in amounts ranging between $100,000 and in excess of $1 million) from the Products Investors.

154.    Klein took in many of these investments during a period when he was not earning a salary at DAVA.

155.    *First*, Steven Shaw invested $1.5 million for 7% of CTT on June 21, 2011.

156.    Shaw wired his investment proceeds into Klein's personal bank account.

157.    Klein did not put any of Shaw's investment funds into the development of NDAs.

158.    Financial projections Klein provided to Shaw in September 2012 reference DAVA products.

159.    Steven Shaw was the largest Products Investor.

160.    Shaw threatened to sue Klein in March 2013.

161.    Shaw and Klein settled in June 2013.

162.    Klein ultimately repaid Shaw $2.95 million by April 2, 2015—$1.45 million above his initial investment amount.

163.    Klein's payment to Shaw included $124,000 from Adams' investment proceeds.

164.    Klein did not put any of Dapuzzo's investment funds into the development of NDAs.

165.    Klein's payments to Dapuzzo included funds CTT received directly from Adams, AV Select, and Dr. Simonian's investment proceeds.

166.    Klein did not put any of Rupp's investment funds into the development of NDAs.

167.    Rupp sued Klein and CTT for fraud in U.S. District Court for the District of New Jersey, *Rupp, et al. v. Klein, et al.*, 2:17-cv-10055-JMV-SCM (D.N.J.).

168.    Klein's payments to Rosenberg and Khalaf included funds CTT received directly from Hartman and Smith's investment proceeds.

169.    The Dickensons and Connollon collectively invested $400,000, which was paid into Klein's personal account.

170.    On April 28, 2018, J. Dickenson recorded his conversation with Klein while they were playing tennis.  On this recording:

(i)     Klein tells Dickinson "don't go anywhere with the anti-nausea drug" that "the anti-nausea drug has nothing to do with Cambridge" and "that one is going to move ahead."

(ii)    Klein tells Dickinson that he kept the anti-nausea drug aside because he feels it was the best one in 15 years.

(iii)   Klein tells Dickinson, apparently referring to the drug application, that "it is a home run" and "I kept it outside Cambridge for us."

(iv)    Klein states that he can take Dickinson out of other investments, but would not take him out of the investment pertaining to the anti-nausea drug, to which Dickinson asks how long that would take.

(v)     Klein refers to the anti-nausea drug again stating that Klein and Dickinson "own" that drug.

(vi)    Klein says, "the anti-nausea drug, that's our home run."

171.    Klein represented in the Plaintiffs' investor decks, and to past Products Investors, that this same anti-nausea drug was a CTT IND asset.

172.    Klein did not repay the Dickensons and Connollon despite repeated promises Klein made to J. Dickenson.

173.    *Twelfth*, Jack Goldenberg was a Products Investor.

174.    Klein never put any of these Products Investors' funds into the development of NDAs.

175.    To the extent that these investors were repaid, Klein used the Plaintiffs' funds, other Products Investors' funds, or later CTT funds, and only after receiving repeated complaints and/or threats of litigation.

49

176.    Adams uncovered many of these Products Investors during his internal investigation in 2017 and 2018 without any assistance from Klein.

177.    Because Klein solicited investor funds into his personal account as well as into PNC A/C 5904, Adams reasonably believes that he has not yet uncovered all of Klein's undisclosed Products Investors.

### *Klein's Undisclosed Separation from DAVA*

178.    In March 2013, DAVA's board "politely" asked Klein to resign.

179.    This request came after DAVA caught Klein using DAVA resources, including staff and email, for non-DAVA business purposes.

180.    In a February 9, 2013 email, Klein's former DAVA business partner Aram Moezinia wrote to Klein:

> As DAVA CEO, you have mismanaged the company and have serious conflict of interest specially relating to cambridge.  You have made false promises to investors selling DAVA IP to raise money for your personal use.  The record is there and it can be very embarrassing and damaging to your reputation.
>
> You only think of your own pocket and not the damage you cause to your friends or the company.  It is all about John Klein.

181.    With respect to the current state of DAVA, Moezinia continued:

> How do you expect to get paid when DAVA cash flow clearly indicates the company can not pay?  DAVA just refinanced its' loan and you are making "demands" on the new lenders???.  Are your serious???  Do you expect people to put up money so that John klein can be paid to pay for his personal lifestyle?  Please WAKE UP.

182.    DAVA had defaulted on a multi-million dollar loan, the company was "very demoralized and unmotivated" and required a restructuring, and Klein had not been paid a salary in a long time.

50

183.    DAVA's business prospects vastly improved after Klein separated from the company.

184.    By separating from DAVA in 2013, Klein had absolutely nothing to do with the $600 million sale of DAVA's business to Endo.

185.    Klein did not disclose any of this to the Plaintiffs before they invested.

***Klein Was Never Offered $26-27 Million for CTT***

186.    There is no evidence in the record that Klein was offered $26-27 million to sell CTT in 2012.

187.    Neither of the proposed term sheets between CTT and Biozone were a binding offer of $26-27 million.

188.    And, regardless, the CTT entity that Klein purported to sell to Biozone consisted of DAVA intellectual property, which Klein did not own in fall 2012 and did not have the right to sell.

***CTT's Business Fails Spectacularly***

   ***CTT From Plaintiffs' Investments to June 2016***

189.    CTT did not actually have a fully developed Compliance PAC.

190.    CTT did not actually have a custom claims adjudication software.

191.    CTT did not actually have exclusive access to cheap generic drugs.

192.    During this period, each Plaintiff believed that Klein was working behind the scenes to continue developing the business.

193.    Adams introduced Klein to MedAxiom, a leading trade organization for cardiologists.

194.    Reasonably believing that he was a partner, and that he and Klein would not be paid until the business launched, Adams paid his own expenses during this period.

LEGAL\47222487\1

195.    Klein kept telling Adams that CTT's launch would be delayed, by a month or a quarter, due to factors outside of his control.

196.    A couple months after AV Select invested, Klein offered Dr. R. Ashton a position as CTT's Chief Medical Officer.

197.    Only in December 2015 did CTT begin paying Dr. R. Ashton a consulting fee of $25,000 per month.

198.    Dr. Simonian  tried to communicate with Klein, but Klein was generally not responsive.

199.    During this period, Klein kept the Plaintiffs apart from CTT's finances, each other, and his pursuit of additional outside investment.

### The Breslows, Blue Valley, and the Undisclosed Merger

200.    Klein solicited a $12.5 million investment in CTT-DE from the Breslows in June 2016.

201.    Klein did not disclose this to the Plaintiffs.

202.    In connection with the Breslow's investment, Klein purportedly merged CTT-NJ into CTT-DE on June 2, 2016.

203.    The merger, however, was not effective at this time.  Instead, Klein and Posner actually completed the merger in March 2017.

204.    Klein and Posner backdated the merger documents to make it appear as if it had occurred in June 2016.

205.    Klein did not disclose to the Breslows that the Plaintiffs were investors in CTT-NJ.

206.    To the contrary, he represented he was CTT-NJ's sole member.

207.    Klein did not disclose the Products Investors or their associated equity and/or liabilities in the Breslow Purchase Agreement and opening financial statements.

52

208.    Klein did not recognize the Plaintiffs' CTT-NJ interests in the surviving CTT-DE entity.

209.    Likewise, Klein did not disclose to Blue Valley that the Plaintiffs were investors in CTT-NJ.

210.    Instead, he represented he was CTT-NJ's sole member.

211.    CTT's opening financial statements provided to Breslow and Blue Valley showed no prior investor equity or liabilities.

212.    None of the Plaintiffs were involved with the Breslow or Blue Valley investments.

213.    Klein generally informed Adams and R. Ashton that CTT would be funded and soon launch right before the Breslows invested.

214.    He did not tell Dr. Simonian, Hartman, and Smith anything at all.

### CTT's Unsuccessful Launch[5]

215.    Adams was successful at setting up meetings for Klein and potential future business opportunities once CTT had a product formulary.

216.    Dr. R. Ashton worked with Klein advising on CTT's product formulary, and he was also tasked with formalizing CTT's relationship with DispensePoint at Klein's and Posner's direction.

217.    Soon after the Breslow investment, Klein invited Adams and Dr. R. Ashton to New Jersey to formally launch CTT.

218.    At this time, CTT did not have any "fully developed" Compliance PACs.

219.    CTT did not have access to custom adjudication software

---

[5] Plaintiffs will offer the remaining facts at trial if the Court denies Plaintiffs' Plaintiffs' MIL #1 to Exclude CTT-DE Defense Evidence.  Klein Opposes this Motion *in Liminie.*.

LEGAL\47222487\1

220.    CTT did not have an inventory of generic prescription drugs (or exclusive access to such an inventory).

221.    CTT did not have a sales force.

222.    None of these facets of the business were in place which is contrary to what Klein had represented to the Plaintiffs before they invested.

223.    Still, with Klein's purported business plan, wealth, experience, and significant outside investor money, Adams and Dr. R. Ashton remained optimistic about CTT's prospects.

224.    In his sales role, Adams traveled all over the country to conferences and to meet doctors and hospitals.

225.    Using CTT marketing materials prepared by Klein, he pitched CTT and the advantages of physician dispensing.

226.    However, CTT could not capitalize on these relationships because there was no infrastructure in place—including no software or product.

### *CTT Does Not Have Access to Custom Claims Adjudication Software*

227.    Contrary to Klein's representations: (i) CTT did not have a formal relationship with this vendor as of September 2014, (ii) the software was not custom designed for CTT, and (iii) the software did not work for CTT's business model, and thus could not have been tested.

228.    Accordingly, Klein clearly did not do any due diligence on DispensePoint or any other software providers—much less the 50-plus providers he claimed he had vetted before choosing DispensePoint.

229.    The DispensePoint relationship was cost prohibitive for both CTT and its potential customers.

230.    On top of that, each CTT customer wold be required to pay $2,500 per loation (i.e., if a hospital network had 50 offices, it would have to pay $2,500 to install DispensePoint software

at each of the offices), as well as click fees and transaction fees per patient prescription adjudication that made the system prohibitively expensive for CTT's clients.

231.    Klein just deferred to Posner with no diligence whatsoever, to CTT's detriment.

232.    Adams took over the relationship in December 2016, and terminated DispensePoint for cause.

### *CTT Does Not Have Access to Cheap Generic Drugs*

233.    Chartwell is run by longtime Klein confidant and former CTT investor Jack Goldenberg.

234.    Goldenberg had invested and/or loaned Klein $600,000 in 2012, and he had to beg Klein to repay him.

235.    Klein purchased this large volume of Doxycycline and arranged for Legacy to immediately package the tablets into Compliance PACs even though CTT did not have any customers or working adjudication software at this time.

236.    CTT's Doxycycline inventory eventually expired and CTT had to pay an outside vendor to destroy the same.

237.    In addition to purchasing an unnecessary amount of Doxycycline inventory, Klein ignored recommendations by Legacy and Keystone to perform stability testing on these tablets.

238.    The patent for this product is actually owned by Dr. Adria Burrows, who shared information regarding the same pursuant to a non-disclosure agreement with Klein.

239.    With stability testing—a shot and inexpensive testing process—prescription drugs have shelf-life of two years instead of only one year.

240.    CTT also had trouble sourcing other generic drugs, and had to rely on Legacy to source drugs for CTT.

241.    Contrary to Klein's representations, he was unable to source drugs himself, and he absolutely did not have exclusive access to cheap generic drugs from his supposed industry contacts.

242.    Nor did CTT have a 10 year license for a product that treated cataracts in dogs.

243.    Klein breached the non-disclosure agreement by representing he held this license in Adams' 2Q 2013 Deck.

### *Adams, Dr. R. Ashton, and Dr. Simonian Uncover Each Other*

244.    In the fall of 2016, Dr. Simonian was shocked to learn that CTT had formally launched and—despite his supposed executive position and wealth of medical knowledge—he had nothing to do with it.

245.    Indeed, Dr. Ashton, as CTT's Executive Vice President, Physician Strategies & Regulatory Affairs, had the exact same positon that Klein had offered Dr. Simonian when he invested.

246.    Dr. Simonian demanded that Klein involve him in CTT's operations and Executive Committee and proposed that Klein have him work with physician engagement as they had initially agreed.

247.    Dr. Simonian attended a MedAxiom conference in late-October 2016 on behalf for CTT (or so he thought).

248.    Adams and Dr. R. Ashton presented at the conference on behalf of CTT, and Klein did not tell them that Dr. Simonian would be there.

249.    One evening, Adams, Dr. R. Ashton, and Dr. Simonian met for a drink at a rooftop bar and realized for the first time that they were each CTT investors.

250.    Adams invited Dr. Simonian to the next CTT Executive Committee meeting, which was very awkward because Drs. Simonian and R. Ashton clearly had the same position.

251.    Despite Dr. Simonian's best efforts, Klein did not actually involve him more with the business until after Dr. R. Ashton committed suicide in February 2017.

252.    Among other things, Dr. Simonian set up a "beta site" at his office to test physician direct dispensing.  He did this after recognizing that Klein had never actually tested CTT's model.

253.    As Dr. Simonian became more involved with CTT, Klein continued to keep Hartman and Smith on the outside, and certainly did not disclose that their investments to the other Plaintiffs.

254.    For example, Klein directed Hartman and Smith to not to discuss their investments, or their longstanding requests for tax and valuation documents, at a March 2017 meeting held at CTT.

255.    In May 2017, Adams and Dr. Simonian had demanded that CTT-DE recognize their CTT-NJ investments.

256.    This never occurred.

257.    As part of these discussions, Klein tried to explain away the escalating confusion by claiming that Adams and Simonian were members of the "Klein Group."

258.    Klein did not identify Hartman and Smith, or other later investor, TK Strategies LLC, as members of the Klein Group in a May 2017 email to the Breslow's Board representative, Marc Wasserman, regarding the Klein Group.

259.    At his deposition, Wasserman testified that he had never heard of the Klein Group, he did not know that the Plaintiffs were members of a Klein Group, and he did not know that the Plaintiffs were CTT-NJ investors prior to the Breslow's investment.

260.    In May 2017, Klein solicited a $500,000 investment from Steve Braverman under the auspices of the Klein Group.

261.     Klein represented to another investor, Steve Braverman, that he owned the Klein Group exclusively, writing, among other things, "I highly recommend you take [the shares] for a number of positive reasons and you will be part of the Klein group, just you and I."

262.     Klein and Braverman fully executed a CTT-NJ Unit Purchase Agreement on May 31, 2017.

263.     But Klein backdated this document as of August 15, 2015.

### MedCreations

264.     The Plaintiffs were unaware at the time that Klein involved CTT-NJ in the Gels Business.

265.     The Gels Business was immediately successful, bringing in sales of $19.5 million between March and May 2016 and "healthy [profit] margins" of 10-20%.

266.     The Breslows relied on before paying the $5 million second tranche of their investment.

267.     Klein never disclosed these financial statements to the Plaintiffs.

268.     CTT reported accounts receivable ("**A/R**") of $5.2 million from the Gels Business in its June 2016 opening financial statements.

269.     Collection of Gels Business A/R—particularly the largest receivable, $3.9 million from customer MedCreations—became a major topic of conversation at Board meetings.

270.     None of the Plaintiffs were invited to these Board meetings.

271.     By September 30, 2016, however, CTT reported that this A/R had not been collected, and the company owed in excess of $4 million in accounts payable ("**A/P**") to Sandoz.

272.     At the end of 2016, CTT wrote off the MedCreations receivable as uncollectable, causing a major loss for the year.

LEGAL\47222487\1

273.    Klein resisted collecting the MedCreations receivable and told his staff to "move on."

274.    CTT defaulted on its second $970,000-plus installment payment under the Sandoz settlement agreement in September 2017.

275.    Sandoz stopped working with CTT in late 2016 after Klein did not pay Sandoz for the product he sold to MedCreations.

276.    In his role as a CTT Executive Vice President, Adams investigated the outstanding MedCreations receivable.

277.    Klein did not assist Adams at all with his investigation into the MedCreations A/R.

278.    Over several months in 2017, Adams tracked down MedCreations' purchase orders, Klein's emails confirming that MedCreations had "paid in full" prior to delivery, and a copy of MedCreations' bank statement proving that they had wired to CTT $1,901,520 on May 17, 2016, and $1,951,560 on May 31, 2016.

279.    Klein had exclusive knowledge of and control over PNC A/C 5904 account until mid-May 2017.

280.    Klein never provided copies of CTT's 2014 and 2015 statements.

281.    Caught red handed, Klein could no longer keep PNC A/C 5904 a secret.

282.    Klein also explained that he paid $1,195,000 to Product Investors.

283.    Klein's reconciliation noted that he spent approximately $5 million out of PNC A/C 5904 in 2016, including "payroll" ($973,000), his personal American Express bills ($822,968), and property taxes ($377,300).

284.    Klein sought to justify this personal spending as $2.1 million of "back pay" owed under his Employment Agreement.

285.     In July, DosSantos reviewed Klein's reconciliation and determined, in his capacity as CTT's CFO, that $2,140,823 (including $348,300 of back pay) of Klein's expenses post-Breslow investment were "non-Company related" and should be reimbursed by Klein.

286.     CTT's CFO Joseph DosSantos also identified $1,179,734 of questionable expenses from the pre-Breslow period, but refused to weigh in on Klein's Employment Agreement argument.

287.     Wasserman, a Board member, disagreed with DosSantos' latter position.  He found that "John [] kept the collections from Med Creations and other [receivables], but left the liability to Sandoz/Legacy with CTT."

288.     Wasserman demanded that Klein must reimburse the full $5 million that he spent from PNC A/C 5904 in 2016, including: (i) the $2.1 million-plus he misappropriated for personal use, and (ii) additional purportedly proper Gels Business expenses that Klein did not disclose in CTT's opening financial statements.

289.     Wasserman also rejected Klein's "meaningless" pre-June 2016 self-dealing Employment Agreement as a justification for keeping these funds.

### Adams Gives Klein the Benefit of the Doubt for Months After Uncovering the MedCreations Fraud

290.     Almost immediately after Klein appointed Adams to CTT's Board in June 2017, Wasserman asked Adams to join him in terminating Klein as CTT's CEO for "cause."

291.     Adams did not particularly trust Wasserman, believing that he was looking out for the Breslows to the detriment of CTT.

292.     Adams summarized his position on the 2016 PNC A/C 5904 funds in September 6, 2017 email to Klein and his attorneys:

> I also in fairness can see why [the Breslows and Wasserman] would be troubled by the outstanding accounts receivable situation, which is still not resolved.  It has to be and as a fiduciary I will insist that it is dealt with in a transparent fashion and

done so with the best interest of all shareholders and members at heart.  Please remember that I was the one who identified, looked into and shared with all parties my findings.  This can not simply be pushed to the side, it needs to be 100% resolved and black and white rectified, not settled but rectified. Either way....

293.     Adams sat down with Klein multiple times and asked him to return the money to CTT, including at a meeting with Klein and his attorneys in September 2017.

### *CTT's Business Model Does Not Work, Despite Best Efforts By Adams and Dr. Simonian to Salvage CTT*

294.     In the summer and fall of 2017, Adams and Dr. Simonian attempted to correct the errors caused by Klein haphazardly attempting to throw together CTT's business model in 2016.

295.     CTT attempted to launch physician distribution of Compliance PACs at the offices of customer Wellmont Health System, a hospital network in Tennessee with 12 hospitals and 2,000 physicians ("**Wellmont**").

296.     Accordingly, CTT packaged its entire drug inventory into non-functional Compliance PACs.

297.     Klein, or people Klein hired and who worked under his supervision, incorrectly registered CTT with the FDA as a manufacturer and not as a repackager.

298.     Klein did not know this even though he claimed that he had worked as the CEO of a PBM in the past.

299.     Klein did not know that leading insurance company Blue Cross-Blue Shield did not reimburse for physician direct dispensing.

300.     The rollout at Wellmont did not work because the prescriptions did not adjudicate.

301.     By November 2017, it was clear to Adams and Dr. Simonian that Klein's business model did not work.

302.     Klein, or people Klein hired and who worked under his supervision, incorrectly identified the NDC codes for the Compliance PACs as "Unit of Dose," when the correct formulation was "Unit of Use."

303.    In order to sell this inventory, CTT would have had to recreate every single Compliance PAC, including reprinting each box and replacing the capsules/tablets in the new packaging.

304.    Klein did not know that only 58% of PBMs reimburse for 90 day refills (as opposed to 30 day packages), which was CTT's business plan.

305.    The short-dated product that Klein purchased for CTT and refused to stability test was due to expire in late-2017/early-2018.   Therefore, potential customers would not buy Compliance PACs with these drugs.

306.    The failure of the Wellmont rollout damaged CTT's reputation, caused a tremendous financial loss, and proved to Adams and Dr. Simonian that Klein's business model did not work.

### Adams and Wasserman, The Majority of CTT's Board, Terminates Klein as CEO For "Cause"

307.    By December 2017, it was clear to Adams that Klein would not repay the misappropriated MedCreations receivable and that Klein's business model would not work.

308.    Adams had also continued to investigate Klein's conduct as CTT's CEO since June, and now determined that Klein had committed additional misconduct.

309.    Adams listed all of his findings in a detailed December 14, 2017 email to Wasserman, Simonian, and Blue Valley's Board observer, Jonathan Le.   Among other things, Adams found that:

310.    *First*, Klein misrepresented CTT-NJ's debts to CTT-DE (*i.e.*, pre-2016 Gels Business expenses that Klein did not disclose on CTT's opening financial statements to the Breslows).

311.    *Second*, Klein failed to disclose early CTT investors and Products Investors to Adams, Dr. Simonian, and the Breslows.

312.     *Third*, Klein improperly merged CTT-NJ with CTT-DE, without recognizing the Plaintiffs CTT-NJ interests in CTT-DE, and backdating certain merger documents.

313.     *Fourth*, Klein did not file past CTT-NJ tax returns.

314.     *Fifth*, Adams found that Klein misrepresented that he had invested $11 million into CTT, and relatedly took a $500,000 bonus from CTT without Wasserman's authorization.

315.     *Sixth*, Klein's claimed $11 million investment comprised mostly of: (i) his DAVA allegedly accrued salary while working on NDA products at DAVA (and which was repaid when he separated from DAVA), and (ii) Klein's settlement with Shaw.

316.     Neither of these components constituted an actual monetary investment in CTT.

317.     While Klein's allegedly accrued DAVA salary could never constitute a monetary contribution to CTT, Klein was in fact repaid this accrued salary as part of his separation with DAVA.

318.     Klein also paid his significantly overpriced Shaw settlement directly from Products Investors' and Adams' investment funds.

319.     And Klein had misappropriated Shaw's investment proceeds in the first place.

320.     Therefore, Klein's buyout of Shaw did not constitute a monetary contribution to CTT

321.     Under Section 7.2 of the Breslow Purchase Agreement, Klein was entitled to a $500,000 bonus if he substantiated his $11 million CTT to Wasserman's satisfaction.

322.     Although Wasserman never accepted Klein's accounting of his alleged contribution, Klein caused CTT to pay him a $500,000 bonus anyway.

323.     *Seventh*, Klein misrepresented to himself and the Breslows that revenue generating asset, NDA 50-824 – the OmeclamoxPac, belonged to CTT when Klein actually owned it personally through a Cayman Island entity, GastroEntero-Logic, LLC ("**GEL**").

324.    Klein personally earned at least $2 million from GEL royalties and proceeds from GEL's December 2018 sale of its assets to Cumberland Pharmaceuticals, Inc.

325.    *Eighth*, Klein destroyed CTT's relationship with Sandoz by failing to repay that vendor with misappropriated MedCreations' funds.

326.    Wasserman, in his capacity as a CTT Board member, agreed with each of Adams' findings.

327.    After learning about the raid from Legacy, Hartman and Smith reached out to Adams and identified themselves as CTT investors for the very first time.

328.    Adams never even saw a copy of Klein's Employment Agreement until sometime in 2018.

329.    The Employment Agreement did not require that CTT provide Klein with a written document identifying the specific "cause," or advance notice in the case of categories  (1) through (3).

### *Adams' Thankless Job As CTT's Acting CEO*

330.    Adams inherited a business that was irreparably damaged by Klein's misconduct.  Among other problems:

331.    *First*, CTT's pharmaceutical packager, Legacy, placed a hold on CTT business in December 2017 due to outstanding accounts payable.

332.    *Second*, Sandoz refused to do business with CTT after CTT defaulted on the first of two remaining $970,000 payments due and owning under a June 2017 settlement agreement.

333.    *Third*, CTT was saddled with worthless short-dated or expired drug inventory.

334.    Notwithstanding Klein's attempted obstruction, Adams diligently attempted to work toward resolving CTT's various problems for the benefit of CTT's shareholders as acting CEO.

335.    At his deposition, Wasserman testified that Adams was appointed to this role "[b]ecause there was no one else left, and because he had proven to me, as a board member, that he had the best interest of the investors at heart."

336.    This included working with legal counsel to pursue company funds misappropriated by Klein.

337.    This included cooperating with the grand jury investigation.

338.    This also included dealing with civil litigation brought by Sandoz and Rupp.

339.    Attorney Komrower had Klein remove Adams as his CTT Board designee and replace him with John Palmer of Tamarack Associates, Inc.

340.    Adams was relieved of this role when Klein and the Breslows appointed a receiver to wind-down the company as part of their settlement.

**Klein's Statement of Contested Facts**

1.    CTT was a real company with revenue, staff, inventory, and infrastructure.

2.    Adams was EX VP of Sales & Marketing per his request.

3.    Adams asked to buy some of Klein's interests.

4.    Adams purchased 3 of Klein's interests.

5.    Adams was promoting CTT to possible partners late 2014.

6.    Adams was leading the possible partnership with MedAxiom early 2015.

7.    Adams put into CTT 22 major initiatives into the company to increase sales, CTT in turn put monies & personnel forth towards them, all of which failed.

8.    Adams signed and endorsed CTT to sue Wasserman.

9.    Adams asked for a major salary increase in May 2017 and was rejected by Klein until he closed accounts and brought in sales.

10. Adams did not follow the basic strategy of CTT regarding selling at retail prices which was the foundation of CTT business plan and attempted to enter the wholesale marketplace while repeatedly told that wasn't CTT's business nor could CTT compete.

11. Adams misled the company with customer and product projections.

12. Adams had the company put specific products into stock; all of which never sold.

13. Adams was a very disruptive employee to the others in CTT.

14. Adams knew the company never was going to work on products requiring a full FDA approval.

15. Adams was involved in the plan to raise $25 million to go forward with the company.

16. Adams was introduced and interviewed by Breslow group.

17. Adams signed Operating Agreement at closing of merger in June 2016.

18. Adams knew the NDA 50-824 was never part of CTT as head of Sales & Marketing.

19. Adams was part of business projections in the capacity of his position.

20. As head of Sales & Marketing, Adams brought in zero revenue 2016, 2017, 2018 (30 months).

21. Adams was introduced to the Blue Valley Group and supported their investment and their documents show NDA 50-824 not in CTT.

22. Adams noted to CTT attorneys that Wasserman was the reason the CFO resigned.

23. Adams asked to be EX VP Sales & Marketing yet completely lacked working knowledge of the PBM & Insurance industry, although he said he knew.

24. Klein and Ashton knew and were friends for over 8 years.

25. Ashton became very interested in the objective of CTT and had numerous meals and meetings discussing the concept with Klein in 2014.

26.     Ashton told Klein he was no longer a practicing surgeon and was an independent advisor and investor in startups and small companies.

27.     Ashton told Klein he was also advising a Bio-Tech company locally but wanted to end the relationship.

28.     Ashton asked Klein to meet with the water treatment company management and access the business strategy and the company's possible application in Pharmaceuticals in late 2013 and 2014.

29.     Ashton asked Klein if he could join Klein's startup company CTT and contribute his expertise in products and physician strategies and enhance CTT capabilities presentation.

30.     Ashton knew CTT Would be in the future raising money but he asked if he could purchase some of Klein's interests.

31.     Ashton asked if he could become a paid employee as soon as possible.

32.     Ashton asked if he could purchase some of Klein's units and did.

33.     Ashton told Klein he would purchase Klein's interest by transferring his monies from a fund that managed his personnel funds early first qtr 205.

34.     Ashton had his funds sent to Klein to purchase his interests.

35.     Klein never met or knew the name AV Select until Sept 2016 when Ashton asked if and when CTT generated stock certificates could they have the name AV Select on them which Ashton told Klein was the fund that held his monies.

36.     Ashton was meeting with Klein daily from mid-2014 until his death.

37.     Ashton identified products for CTT, was responsible for website design and assisted Klein with overall strategy.  Klein showed him some product partners.

38.     Ashton was introduced to Adams in fall of 2014.

LEGAL\47222487\1

39.    Klein told Ashton about Adams' role going forward and that he had purchased some of his interests.

40.    Ashton questioned Klein was to what Adams role was in CTT because he felt he didn't have any working knowledge of pharmaceutical industry.

41.    Klein told Ashton that Adams represented himself as a manager of field sales representatives and that area was essential to CTT's success.  Klein told Ashton that Adams had purchased some of his interests.

42.    Adams and Ashton worked together on CTT presentation books so that CTT could stop using capabilities and concept presentations and created more focused presentations.

43.    Ashton and Klein reviewed numerous packagers for CTT products.

44.    Ashton and Klein reviewed over 50 software suppliers for CTT and met often with Posner regarding DispensePoint software capabilities.

45.    Klein renewed his association with Posner because they had worked together before and Klein presented the objective of CTT.

46.    Posner asked to join CTT as its in house attorney and liaison to physician software companies if CTT did not use DispensePoint.

47.    Posner and Ashton worked on the physician software.

48.    Posner asked to purchase some of Klein's interest and Klein sold him some of his interests.

49.    Keystone became CTT's choice as a packager October 2014 and all purchasing would go through Legacy in St. Louis.  Ashton and Klein did on site due diligence.  Ashton was introduced as Chief Medical Officer and a holder of interests in the Klein group.

50.    Keystone promoted their engineering and packaging to Klein and offered an exclusive to CTT to all potential clients except Walmart.

68

51.     Keystone realizing the potential in CTT asked if they could purchase any interests and Klein because of their importance and expertise willingly sold them some of his interests.

52.     Simonian very interested in CTT after Klein described it to him after he asked.

53.     Simonian asked if he could purchase some of Klein's interests in CTT and get an option for additional interests.  Simonian also asked Klein if he could get his daughter into a private school that Klein was its past president and on the board of.

54.     Simonian told Klein because of conflict issues he could not be an employee but could be a Consultant and spokesperson.

55.     Simonian asked for the title of EX VP Physician Strategies & Regulatory Affairs.

56.     Klein spoke to Ashton and he knew Simonian and felt he could assist with physician strategies.  Klein also told Ashton Simonian had requested to purchase some of his interest.

57.     In the late summer of 2015 Simonian purchased some of Klein's interests and agreed to represent the company when Klein needed him to.

58.     Prior to the Plaintiffs purchasing Klein's interests their where product investors for future NDA's but were returned their investments because the strategy of CTT had changed as of 4th qtr 2015 and no full NDAs would be worked for the foreseeable future.

59.     Prior to the merger Klein only took amounts from CTT NJ equivalent to his employment agreement and paid out over $7 million to vendors, $600K in commissions, and $383K in staff non Klein payroll.

60.     Klein had a valid employment agreement which was amended at the time of the merger with the new investors to include new incentives.

61.     Klein relied upon his in-house corporate attorney and Ashton's due diligence to use initially DispensePoint software.

62.     CTT had access to generic drugs directly from manufacturers which when used as intended in CTT financial model yielded acceptable reasonable margins.  However Adams failed to execute within the agreed upon model and put CTT operating as a wholesaler which shrunk CTT margins.  Adams was warned repeatedly about this.

63.     MedCreations got booked at closing of the merger as a receivable due to an unintentional error at Legacy.  Their product had been paid for and funds transferred before the merger.  The classification was corrected by accounting shortly after the merger.

64.     CTT had a significant issue with Sandoz regarding rejected drug product.  Adams and Ashton had proposed a list of mandatory drugs to launch into Urgent Care clinics.  The Sandoz's rejected drugs were vital to the launch, but the launch was cancelled and we got into a major dispute with Sandoz.  At the time CTT had paid Sandoz over $17 million for product.

65.     Adams had CTT buy and package a group of products for a large customer named Wellmont located in Tennessee.  He told the CTT all this would be shipped and even had CTT forward a purchase order release to Legacy because even with some issues with the software to process all claims that Wellmont was buying CTT product and giving to patients for free and or a minor charge just to increase the patients adherence and compliance, the first release of the order still sits on the dock at Legacy because Adams release to CTT was false.

66.     Adams was replaced on the board as his designee by Klein and a more competent manager was added.

67.     Adams throughout 2018 failed to fulfill his obligations as CEO, failed to answer the board's requests, nor follow the direction of the board.

68.     Adams sent the board after repeated requests a business plan for CTT and represented it as his when in fact it was a concept plan authored by some outsider, who also offered

it to Klein at a price.  Adams had the plan disappear and never produced a business plan for board review in spite of repeated requests.

69.    Adams was replaced by unanimous board consent.

70.    Klein never presented anything to AV Select and is totally unaware what Ashton told them.

71.    Adams and Posner fought openly in the office when Klein traveled; Posner informed Klein in early 2nd qtr 2017 that if Adams stayed he would leave.  Posner believed Adams incompetent.

72.    The Cambridge Therapeutics Technologies Overview 2013 book was a capabilities and projects review of CTT activities.

73.    The Cambridge Technologies 2nd Qtr 2013 update report was a presentation of detailed capabilities and projects at CTT.

74.    The Cambridge Therapeutics Technologies Corporate Overview February 2015 was the initial presentation to outside possible partners.  The presentation showed 2 sales outsource partners: Northern Tier Medical and the Pleio Group, both of which were known and listed as partners by Adams and that he would manage them as head of Sales & Marketing.

75.    The Cambridge Therapeutics Technologies Corporate Overview February 2015 showed CTT as having 4 IND's and "NO" NDA 50-824 and CTT showed no ongoing work on Vet products.  Specialty packaging operations or tooling nor projects continuing in breath medical analysis.

Klein reserves the right to add additional asserted facts based on the reclassification of contested and uncontested facts review.

## IV.     The Parties' Claims

### A.     Plaintiffs' Affirmative Claims

***Counts I – IV – Plaintiffs' Fraud and Negligent Misrepresentation Claims***
    ***Standard***

To make out a Section 10(b) and Rule 10b-5 securities fraud claim (Count I), Plaintiffs must prove a "(i) a material misrepresentation or omission; (ii) scienter; (iii) a connection with the purchase or sale of a security; (iv) reliance by the plaintiffs; (v) economic loss; and (vi) loss causation." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).

Similarly, to make out a claim for common law fraud under New Jersey law (Count III), a plaintiff must prove "(1) a material misrepresentation of fact; (2) knowledge or belief by the defendant of its falsity; (3) intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damage." *Lord Abbett Mun. Income Fund, Inc. v. Citigroup Glob. Markets, Inc.*, No. CV 11-5550 (CCC), 2012 WL 13034154, at *4 (D.N.J. July 12, 2012).[6]

The New Jersey Uniform Securities Act ("NJUSA"), 49:3–47 *et seq.* (Count II), provides civil liability against any person who, *inter alia*, "offers, sells or purchases a security by means of any untrue statement of material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading (the buyer not knowing of the untruth or omission)." N.J.S.A. 49:3–71(a)(2). To make out a claim under the NJUSA, a plaintiff must allege: "(1) an untrue material statement or omission; (2) scienter; (3) causation; and (4) injury to a plaintiff." *Lord Abbett*, 2012 WL 13034154, at *8. In

---

[6] At no point in this litigation has Klein challenged that New Jersey law applies to Plaintiffs' state law claims, but if the Court were to apply Delaware law the elements of common law fraud are essentially the same. *See, e.g.*, *Browne v. Robb*, 583 A.2d 949, 955 (Del. 1990) (common law fraud).

contrast to common law fraud, reliance is not an element of a NJUSA claim and causation is established by privity.  *Id.* (citing *Kaufman v. I–State Corp.*, 165 N.J. 94, 112-13 (2000)).

Negligent misrepresentation requires a plaintiff to prove "an incorrect statement, negligently made and justifiably relied on, which results in economic loss."  *Id.* at 9 (internal citation omitted).  "Such a claim may be based on an affirmative misrepresentation or an omission," and scienter is not an element of this claim.  *Id.*

### Material Misstatements and Omissions (Counts I – IV)

Plaintiffs intend to prove at trial that Klein made no less than eight material misrepresentations in soliciting their investments:  (1) Use of Funds Misrepresentations, (2) Sole Shareholder Misrepresentations, (3) Background Misrepresentations, (4) Business Model Misrepresentations, (5) Projection Misrepresentations, (6) IND Misrepresentations, (7) NDA Misrepresentations, and (8) Acquisition Misrepresentations (as defined in Section I(a), *supra*).

A plaintiff must establish that defendant, in connection with the purchase or sale of a security, "made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading."  *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1417 (3d Cir. 1997).  Plaintiffs will prove these eight misrepresentations by contrasting evidence regarding Klein's representations about CTT while soliciting their investments against Klein's and CTT's actual state of affairs following their investments.  In particular, immediately upon receiving Plaintiffs' investment funds, and in the days and weeks after, Klein misappropriated Plaintiffs' funds for his personal use and to reimburse undisclosed early investors.  Also, notwithstanding Klein's representations regarding the current state of CTT's business, there was no business whatsoever in place when the Plaintiffs invested.[7]

---

[7] With respect to the Projections Misrepresentations, Adams, AV Select, and Dr. Simonian will prove that the financial projections Klein provided to them were not supported by a reasonable basis because there was no business in place whatsoever when they invested.  *See, e.g.*, *In re*

### Scienter (Counts I – III)

Scienter is a "knowing or reckless mental state embracing intent to deceive, manipulate, or defraud." *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 490 (3d Cir. 2016) (internal quotations omitted). To establish scienter, a plaintiff must prove facts that either "(1) constitute circumstantial evidence of either reckless or conscious behavior or (2) establish a motive and opportunity to commit fraud." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276 (3d Cir. 2006) (internal quotations omitted). Recklessness includes "highly unreasonable conduct, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *U.S. S.E.C. v. Infinity Grp. Co.*, 212 F.3d 180, 192 (3d Cir. 2000) (internal citations and quotations omitted). At trial, Plaintiffs will prove both aspects of scienter.

Klein was the sole promoter of CTT, and in making representations to the Plaintiffs he disregarded his unique knowledge as to how he would misuse Plaintiffs' funds (*i.e.*, to support his lavish lifestyle and reimburse undisclosed early investors) and the non-existing CTT business at the time the Plaintiffs invested. This information was so obvious to Klein that he must have been aware of it. Moreover, Klein was motivated to commit fraud due to his excessive personal expenses, including, but not limited to, the carrying costs for his mansion and past investor debts, and had the opportunity to defraud the Plaintiffs by soliciting their investments.

---

*Advance Auto Parts, Inc., Sec. Litig.*, No. CV-18-212-RGA (D. Del. Feb. 7, 2020) ("A projection lacks a reasonable basis, and is thus actionable, if it was made with either (1) an inadequate consideration of the available data or (2) the use of unsound forecasting methodology."); *Burlington Coat Factory*, 114 F.3d at 1427.

*In Connection With* **(Counts I and II)**

Plaintiffs' membership interests in CTT-NJ are securities, as they each invested money, in a common enterprise (CTT), with profits to come solely from the efforts of Klein. *See, e.g.*, *Infinity Grp.*, 212 F.3d at 187 (citing *U.S. S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 1244 (1946)). Plaintiffs will prove at trial that their respective employment, consulting, and business relationships, respectively, with CTT-DE, separate legal entity, did not materialize until well after each invested, pursuant to terms under separate contracts, and were not a condition to their investments (as Klein testified at his deposition).

*Reliance* **(Counts I, III, and IV)**

"Reliance, or transaction causation, establishes that but for the fraudulent misrepresentation, the investor would not have purchased or sold the security." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 172 (3d Cir. 2001), *as amended* (Oct. 16, 2001). Reliance must also be reasonable. *AES Corp. v. Dow Chem. Co.*, 325 F.3d 174, 178 (3d Cir. 2003).

"The reasonable reliance element of a Rule 10b-5 claim requires a showing of a causal nexus between the misrepresentation and the plaintiff's injury, as well as a demonstration that the plaintiff exercised the diligence that a reasonable person under all of the circumstances would have exercised to protect his own interests." *Id.* "A sophisticated investor is not barred from reliance upon the honesty of those with whom he deals in the absence of knowledge that the trust is misplaced." *Id.* at 182. The absence of reasonable reliance "is in the nature of an affirmative defense" and "the defendant bears the burden of establishing that a plaintiff's reliance was unreasonable." *In re Daimlerchrysler AG Sec. Litig.*, 294 F. Supp. 2d 616, 620 (D. Del. 2003).

Plaintiffs will prove their actual and reasonable reliance through their testimony regarding their conversations over many months with Klein and the information he provided prior to their

investments regarding each of the eight misrepresentations.[8]  Conversely, Klein will not be able to Plaintiffs lack of reasonable reliance by contending that it was unreasonable for the Plaintiffs to rely on the honesty of his representations.  *AES*, 325 F.3d at 182.

### *Loss Causation* (Counts I and II)[9]

In a "non-typical § 10(b) action," as here (*i.e.*, not a stock drop class action), "the factual predicates of loss causation fall into less of a rigid pattern."  *McCabe v. Ernst & Young, LLP.*, 494 F.3d 418, 426 (3d Cir. 2007).  "The plaintiff must prove ... that the untruth was in some reasonably direct, or proximate, way responsible for his loss.  The causation requirement is satisfied in a Rule 10b–5 case only if the misrepresentation touches upon the reasons for the investment's decline in value."  *Id.*  "Therefore, to make the requisite loss causation showing, the [plaintiff] must show that … the very facts [the defendant] allegedly omitted were a substantial factor in causing the [plaintiff's] economic loss."  *Id.*

Plaintiffs will prove that each of the eight misrepresentations, individually and collectively, were a substantial factor in causing Plaintiffs' complete investment loss.  In summary, Plaintiffs will prove at trial that Klein made up CTT in order to steal their money, and this caused the Plaintiffs' investment losses.

The Use of Funds and Sole Shareholder Misrepresentations proximately caused Plaintiffs' loss because Klein immediately used the majority of their funds, and later CTT working capital, to pay his own personal expenses and reimburse undisclosed early investors.  Likewise, the NDA and IND Misrepresentations substantially contributed to Plaintiffs losses because CTT did not have the financial benefit from the $2 million in royalties from NDA 50-824, a/k/a the Omeclamox

---

[8] While AV Select invested soon after Klein's misleading investment pitch, Dr. R. Ashton knew Klein for a longer period of time through the northwest New Jersey community.
[9] Causation under the NJUSA is established through Klein's privity with each of the Plaintiffs. *Lord Abbett*, 2012 WL 13034154, at *8.

Pac that Klein misappropriated or any revenue that could have been derived from the INDs had they not been worthless. To the extent that CTT-DE's business could have been salvaged in late 2017, CTT did not have sufficient funds to purchase product, software, and consultant help to do so. The company failed and therefore Plaintiffs' investments are worthless.[10]

The Background, Business Model, Projection, and Acquisition Misrepresentations substantially contributed to Plaintiffs' losses because, contrary to Klein's representations, there was no CTT business whatsoever when the Plaintiffs invested and Klein did not actually have the wherewithal to lead a successful generic pharmaceutical business. The risk of these misrepresentations materialized in late-2016 and 2017 when Klein actually attempted to launch a CTT business, and it immediately failed.[11] Among other reasons, CTT never developed a Compliance PAC that would adjudicate, never had access to functional adjudication software (let alone exclusive access to custom software), and never had exclusive access to cheap drug inventory. CTT-DE failed and therefore Plaintiffs' investments are worthless.

### *Economic Loss*

*See* Section V of the Pretrial Order, Damages.

### *Count V – Plaintiffs' Unjust Enrichment Claim*

Under New Jersey law, a claim under the quasi-contractual theory of unjust enrichment has only two essential elements: "(1) that the defendant has received a benefit from the plaintiff, and (2) that the retention of the benefit by the defendant is inequitable." *Wanaque Borough Sewerage Auth. v. West Milford*, 144 N.J. 564, 575 (1996).

Plaintiffs will prove that Klein was unjustly enriched by their investments by demonstrating that he immediately disbursed approximately $1.7 million of Plaintiffs' collective

---

[10] Plaintiffs will offer this argument if the Court denies their first Motion in Limine regarding the scope of relevant CTT-DE evidence. *See* Footnote 5.

[11] *See* Footnote 10.

$2.1 million investment funds to himself and to reimburse undisclosed early investors on the same day, and in the days and weeks after the Plaintiffs invested.

### Count VI – Dr. Simonian's Breach of Contract Claim

To state a claim for breach of contract under New Jersey law, a plaintiff must allege: (1) the existence of a valid contract between itself and the defendant; (2) that the defendant materially breached the contract; and (3) the plaintiff suffered damages as a result of the breach. *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 421 F. Supp. 2d 831, 833 (D.N.J. 2006) (*citing Coyle v. Englander's*, 488 A.2d 1083 (N.J. Super. Ct. App. Div. 1985)).

Plaintiffs will prove that Klein breached the Simonian Membership Agreement and Simonian Operating Agreement by demonstrating that Klein sold Dr. Simonian shares of a business that did not exist and instead immediately misappropriated his funds.  Klein materially breached the Simonian Membership Agreement by: (i) misrepresenting that he owned 100 and had exclusive title to 100 of 100 membership units of CTT-NJ, as set forth in the preamble and Section 5(a); and (ii) not recognizing his CTT-NJ interest in CTT-DE, as required by Section 7.1 (Transfer of a Member's Interest).  Klein materially breached the Simonian Operating Agreement and damaged Dr. Simonian by not: (i) providing him with a CTT-NJ capital account, as required by Section 5.2; (ii) providing him with his allocation of tax losses for CTT-NJ, as required by Section 7.1(b).

### B.    Klein's Response to Plaintiffs' Affirmative Claims

Klein denies Plaintiffs' claims.  Klein intends to prove at trial that each Plaintiff was an essential part of CTT and benefited financially and in absolutely under no circumstance were they a victim of fraud, misrepresentation, omissions, scienter intent, unjust enrichment, or breach of contract.

## V.      Damages

On their fraud claims under Section 10(b) of the Securities and Exchange Act and Rule 10b-5 thereunder (Count I), the New Jersey Uniform Securities Act (N.J.S.A. 49:3-52) (Count II), and common law fraud/intentional misrepresentation (Count III), and on their negligent misrepresentation claim (Count IV) and unjust enrichment claim (Count V) each Plaintiff seeks to recover his/its entire CTT investment losses, plus pre-judgment interest:

- Adams ($581,250),
- AV Select ($450,000),
- Dr. Simonian ($600,000),
- Hartman ($300,000), and
- Smith ($100,000).

Dr. Simonian also seeks to recover this amount on his breach of contract claim (Count VI).

For the avoidance of doubt, each Plaintiff seeks to recover such damages and attendant prejudgment interest under Count I, and under the other causes of action only in the alternative, such that each Plaintiff is made whole on his loss.

Plaintiffs are entitled to recover their complete investment loss under either an out-of-pocket damages theory.  "Out-of-pocket losses are measured by the difference between the fair value of all that the seller received and the fair value of what he would have received had there been no fraudulent conduct."  *Daimlerchrysler*, 294 F. Supp. 2d at 626 (citing *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128, 155 (1972)).  In the alternative, a recession theory of damages is improper where the plaintiff establishes that the loss was complete and was caused entirely by the defendant's misrepresentation.  *See e.g.*, *Nolfi v. Ohio Kentucky Oil Corp.*, 675 F.3d 538, 550 (6th Cir. 2012); *Strategic Diversity, Inc. v. Alchemix Corp.*, 666 F.3d 1197, 1208 (9th Cir. 2012).  Under either theory, the CTT-NJ membership units that Klein sold to each Plaintiff

are completely worthless because CTT-NJ did not exist as a business and Klein immediately misappropriated each Plaintiff's respective investment proceeds.[12]

Federal law permits recovery of prejudgment interest on securities fraud claims.  *See, e.g.*, *SEC v. Teo*, 746 F.3d 90 (3d Cir. 2014); *U.S. S.E.C. v. Secure Capital Funding*, 2014 U.S. Dist. LEXIS 31343 (D.N.J. 2014) ("proof of a defendant's scienter justifies the award of prejudgment interest").  The 5% IRS underpayment rate should be applied to Plaintiffs' federal claim.  *Secure Id.*, at *8 ("courts have adopted the [IRS] underpayment rate without controversy").  Prejudgment interest is warranted in order to compensate Plaintiffs for the wrongful deprivation of the use of their money, and in light of principles of fairness under the federal securities laws.  *Quintel Corp, N.V. v. Citibank, N.A.*, 606 F. Supp. 898, 914 (S.D.N.Y. 1985).

Alternatively, Plaintiffs seek prejudgment interest on their state law claims.  This Court has the equitable discretion to "decide upon both the interest rate and the period of time on which the interest will be calculated."  *Teo*, 746 F.3d at 90.

Klein denies Plaintiffs' entitlement to damages.

---

[12] *See* Footnote 8.  If the Court permits Klein to offer evidence of CTT-DE defenses, Plaintiffs will also prove that any interest they hold in CTT-DE is also worthless.

## VI.    Witnesses

### A.    List of Witnesses Plaintiffs Intend to Call

(i)      Mark Adams (in person)

(ii)     Dr. Gregory Simonian (in person)

(iii)    Gregory Vorbach (in person)

(iv)    Dr. Jennifer Ashton (in person)

(v)     Wade Hartman (in person)

(vi)    Frank Edward (Ward) Smith (in person)

(vii)   John H. Klein (in person)

(viii)  Edward T. Gavin, CTP, in his capacity as CTT's Responsible Officer (in person)

(ix)    Anne Eberhardt, CFE, CAMS, in her capacity as an employee of CTT's Responsible Officer (in person)

(x)     Dr. Adria Burrows (in person)

(xi)    Harmonie Franklin (in person)

(xii)   Aram Moezinia (by deposition)

(xiii)  Marc Wasserman (by deposition)

(xiv)  Patrick Dapuzzo (by deposition)

**B.**     **List of Witnesses Defendant Intends to Call**

(i)     John H. Klein (in person)

(ii)    Mark Adams (in person)

(iii)   Greg Simonian (in person)

(iv)    Gregory Vorbach (in person)

(v)     Jennifer Ashton (in person)

(vi)    Wade Hartman (in person)

(vii)   Frank Edward (Ward) Smith (in person)

(viii)  Edward T. Gavin (in person)

(ix)    Aram Moezinia (by deposition)

(x)     Marc Wasserman (by deposition)

(xi)    Patrick Dapuzzo (by deposition)

(xii)   John Palmer (in person)[13]

(xiii)  Scott Anderson (in person)

(xiv)   Ryan Graver (in person)

(xv)    Kim Rothofsky (in person)

(xvi)   Lou Antoun (in person)

(xvii)  Jerry Blackwell

---

[13] The Plaintiffs object to Klein calling John Palmer as a witness.  During discovery, Klein's former counsel, Cole Schotz, P.C., advised Plaintiffs' counsel that they did not intend to call Mr. Palmer as a witness and therefore Plaintiffs' counsel did not depose Mr. Palmer.  Plaintiffs' submit that Klein should be bound by the agreement of his former counsel regarding this witness.  In addition, Mr. Palmer can offer no relevant evidence at trial because he did not join CTT's board until January 2018, which is after the relevant time period for this litigation.  *See* Plaintiffs' MIL #1 to Exclude CTT-DE Defense Evidence.

### C.  Testimony by Deposition

#### 1.  Plaintiffs' Designations

**Aram Moezinia**

6:12-15; 9:5-14; 9:21-24; 17:23 – 18:17; 19:12 – 20:5; 20:15-20; 20:25 – 21:15; 24:11 – 25:5; 25:19 – 26:22; 37:13 – 39:7; 40:11 – 44:2; 44:20 – 46:4; 53:17 – 55:18; 56:20 – 57:5; 57:17 – 58:7; 68:7 – 69:17; 69:24 – 70:5; 70:12-19; 73:13-21; 76:17 – 77:2-9; 86:6-24; 88:15-24; 90:18-25; 91:5-19; 91:22 – 92:7; 92:13-19; 103:21 – 104:3; 104:7 – 105:17; 106:3-8; 106:17 – 107:3; 107:10-25; 108:2-25; 109:2-25; 110:2-10; 110:19-25; 111:14 – 112:6; 112:16 – 113:3; 114:2-19; 115:4-21; 116:11-25; 117:2-20; 119:6 – 120:20; 121:5-8; 129:3-20

Klein's Objections

None noted.

**Marc Wasserman**

6:12-15; 10:16 – 11:18; 18:6-21; 21:4-25; 22:7-17; 22:25 – 24:25; 34:25 – 35:16; 35:18 – 36:4; 36:19 – 37:3; 37:12-21; 38:11-20; 39:2 - 41:14; 50:13 – 53:7; 54:3-8; 55:17 – 56:16; 59:11 – 61:5; 76:11-22; 77:23 – 78:5;79:17 – 80:2; 80:25 – 81:24; 81:25 – 8412; 85:5-15; 85:23 – 84:2; 86:12 – 88:7; 91:23 – 92:7; 93:6-23; 100:2 – 101:2; 105:4 – 107:12; 108:3 – 109:13; 110:17 – 111:3; 112:6 – 117:10 – 119:14; 120:4 – 122:19; 123:8-23; 125:6 – 128-12; 132:13 – 139:5; 147:24 – 149:2; 150:9 – 151:11; 154:17 – 156:12; 158:20 – 161:11; 164:7 – 165:6; 165:18 – 166:10; 166:20 – 167:2; 167:16 – 168:23; 169:22 – 171:8; 180:13 – 181:5; 182:5-21; 189:12 – 190:18; 196:3-15; 197:11 – 198:13; 199:9 – 206:20; 208:25 – 211:10; 212:24 – 214:2-5; 217:20 – 220:23; 223:2-10; 226:10-13; 228:15 – 230:6; 290:12 – 292:3; 292:24 – 296:6; 303:2-16; 305:22 – 308:18; 314:14-24; 340:9 – 342:22

Klein's Objections

None noted.

**Patrick Dapuzzo**

5:2-4; 28:5-6, 9-25; 29:20 – 30:20; 44:23-25, 45:2-14; 48:8-13; 49:2-25; 50:2-3; 55:20-25; 56:2-22.

Klein's Objections

None noted.

#### 2.  Klein's Counterdesignations

**Aram Moezinia**

15:24-25,16:1-22, 25:1-18, 36:7-19, 41:15-25, 76:11-25, 77:1-25,78:3-24, 81:21-25, 84:4-20, 96:18-25, 102:3-21,104:24-25,105:1-25, 112:16-25, 115:4-21, 119:20-25, 120:2-6, 134:6-25,135:2-25,136:7-10

Plaintiffs' Objections[14]

| | |
|---|---|
| 25:1-18 | I |
| 41:15-25 | R, I |
| 81: 21-25 | R, I |
| 84:4-20 | R, I |
| 96:18-25 | R |
| 105:1-25 | I |
| 112:16-25 | I |

**Marc Wasserman**

10:19-25,11:1-25, 15:19-25, 19;18-23, 25:14-16, 32:10-12, 35:20, 37:15-18, 40:14-19, 61:17-25, 64:5-12, 65:1-25, 66:13-18, 69:9-22, 70:2-9, 73:19-23, 75:1-25, 81:11-21, 84:15-25, 83:5-14, 86:3-8, 87:5-9, 94:20-25, 100:10-17, 102:3-9, 107:10-12, 133:8-13, 137:9-18, 174:14-19, 176:11-25, 177:8-25,178:2-18, 180:15-25, 185:5-25, 188:6-25, 189:2-20, 197:11-25, 198:1-25, 201:5-25, 199:9-21, 204:18-22, 206:21-25, 217:1-14, 228:2-17, 227:9-25, 230:13-25, 233:19-24, 240:12-25, 244:7-18, 248:13-25, 249;12-25, 253:14-17, 256:3-19, 255:12-23, 257:1-25, 258:16-24, 291:12-23, 289:11-13, 291:18-20, 296:11-22, 302:5-25, 304:2-18

Plaintiffs' Objections[15]

| | |
|---|---|
| 15:19-25 | R, I |
| 19:18-23 | I |
| 25:14-16 | I |
| 35:20 | I |
| 37:15-18 | I |
| 40:14-19 | I |
| 61:17-25 | R, P, I, S |
| 64:5-12 | R, I |
| 65:1-25 | R, I |
| 66:13-18 | I |
| 70:2-9 | I |

---

[14] Abbreviations used in objections to proffered testimony:
    R – Irrelevant (FRE 401)
    P – Prejudice/Confusion of the issues (FRE 403)
    H – Hearsay (FRE 802)
    I – Incomplete (FRE 106)
    S – Speculation/Lack of Personal Knowledge (FRE 602)

[15] Plaintiffs reserve the right to revisit these objections, particularly relevance objections after the Court decides Plaintiffs' MIL #1 to Exclude CTT-DE Defense Evidence.

| | |
|---|---|
| 73:19-23 | R, I |
| 75:1-25 | R, I |
| 81:11-21 | I |
| 83:5-14 | I |
| 84:15-25 | I |
| 87:5-9 | I |
| 94:20-25 | I |
| 100:10-17 | I |
| 107:10-12 | R, I |
| 133:8-13 | I |
| 137:9-18 | I |
| 174:14-19 | I |
| 180:15-25 | I |
| 185:5-25 | I |
| 188:6-25 | H, I |
| 197:11-25 | I |
| 198:1-25 | I |
| 201:5-25 | I |
| 204:18-22 | I |
| 217:1-14 | R, I |
| 248:13-25 | R, P, I |
| 249:12-25 | R, I |
| 253:14-17 | R, P, I, S |
| 255:12-23 | R, I |
| 257:1-25 | I |
| 289:11-13 | R, P, I |
| 291:12-23 | I |
| 302:5-25 | R, P, I, S |
| 304:2-18 | R, P, I, S |

**Patrick Dapuzzo**

16:16, 16:3, 19:2-7, 24:11, 22:24, 33:23, 35:2, 48:14, 53:20, 54:20, 55:9-10, 75:10-14, 83:8, 107:3-25, 101:9, 122:19

Plaintiffs' Objections

| | |
|---|---|
| 16:16 | R, P, I |
| 16:3 | R, P, I |
| 19:2-7 | R, I |
| 22:24 | I |
| 24:11 | R, P, I |
| 33:23 | R, P, I |
| 35:2 | R, P, I |
| 48:14 | R, P, I |

85

| | |
|---|---|
| 53:20 | R, P, I |
| 54:20 | R, P, I, S |
| 55:9-10 | R, P, I, S |
| 75:10-14 | I |
| 83:8 | R, P, I |
| 101:9 | R, P, I |
| 107:3-25 | R, P, I |
| 122:19 | R, P, I |

## VII.    Exhibits

### A.    Exhibits

The Joint Trial Exhibit List is attached hereto as <u>Exhibit A</u>.  Plaintiffs' Trial Exhibit List is

attached hereto as <u>Exhibit B</u>.  Klein's Trial Exhibit List is attached hereto as <u>Exhibit C</u>.

On or before the first day of trial, counsel will deliver to the Courtroom Deputy a completed

AO Form 187 exhibit list for each party.

A party will provide exhibits to be used in connection with direct examination by 3:00 p.m.

the day before their intended use and objections will be provided no later than 7:30 p.m. the night

before their intended use.  If good faith efforts to resolve the objections fail, the party objecting to

the exhibits shall bring its objections to the Court's attention prior to the witness being called to

the witness stand.

### B.    Demonstrative Exhibits

The parties will exchange demonstratives to be used in opening statements by 8:00 p.m.

two nights before opening statements.   The parties will provide any objections to such

demonstratives by 12:00 p.m. on the day before opening statements.

A party will provide demonstrative exhibits to be used in connection with direct

examination by 3:00 p.m. the day before their intended use, and objections will be provided no

later than 7:30 p.m. the night before their intended use.  If any of the demonstratives change after

86

the deadline, the party intending to use the demonstrative will promptly notify the opposing party of the change(s).

The party seeking to use a demonstrative will provide a color representation of the demonstrative to the other side in PDF form.  However, for video or animations, the party seeking to use the demonstrative will provide it to the other side on a DVD or CD.  For irregularly sized physical exhibits, the party seeking to use the demonstrative will provide a color representation as a PDF of 8.5 x 11 copies of the exhibits.

This provision does not apply to demonstratives created during testimony or demonstratives to be used for cross examination, neither of which need to be provided to the other side in advance of their use.  In addition, blow-ups or highlights of exhibits or parts of exhibits or testimony are not required to be provided to the other side in advance of their use.

If good faith efforts to resolve objections to demonstrative exhibits fail, the objecting party shall bring its objections to the Court's attention prior to the opening statements or prior to the applicable witness being called to the witness stand.

## VIII.   Bifurcated Trial

Neither side requests a bifurcated trial.

## IX.     Motions in Limine

### *Plaintiffs' MIL #1 to Exclude CTT-DE Defense Evidence*

The Court should preclude Klein from offering evidence relating to the post-June 2016 (Breslow investment) CTT-DE business as non-fraud and damages mitigation defenses to Plaintiffs' fraud and negligent misrepresentation claims (the "**Fraud Claims**").  This includes arguments advanced by Klein in his Answer and Counterclaim and at his deposition that: (i) CTT-DE's software allegedly obtained in reliance on Barry Posner did not adjudicate Compliance PAC prescriptions; (ii) Compliance PAC medications allegedly selected by Dr. R. Ashton did not take hold with physicians; and (iii) Adams, as head of sales for CTT-DE, was allegedly unsuccessful at selling Compliance PACs; as well as (iv) any compensation the Plaintiffs received working for or with CTT-DE in good faith (*i.e.*, unaware of Klein's fraud) (the "**Klein Business Excuses**"). Aside from the Klein Business Excuses being demonstrably false (which the Plaintiffs would prove at trial if needed), this evidence is not relevant to the Fraud Claims under FED. R. EVID. 401, or, in the alternative, its probative value is substantially outweighed by the danger of confusing the issues or misleading the jury under FED. R. EVID. 403, because the Plaintiffs were not CTT-DE investors.

<u>First</u>, evidence relating to CTT-DE—except for the fundamental fact that Klein *did not recognize* Plaintiffs' CTT-NJ interests in CTT-DE—is not relevant to the Fraud Claims.  Irrelevant evidence is not admissible.  FED. R. EVID. 402.  Rule 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  The Fraud Claims are centered on Klein's conduct prior to the June 2016 Breslow investment.  The Plaintiffs each invested in CTT-NJ, a business that did not actually exist.   Klein immediately misappropriated their investment funds to pay personal expenses and reimburse undisclosed early investors.  To the extent the Plaintiffs' CTT-NJ investments were not completely worthless at this

point (and they clearly were), any remaining value was lost when Klein did not recognize their CTT-NJ interests in CTT-DE.  Klein's defrauding of the Plaintiffs began and ended with CTT-NJ. Thus, the relevant, probative conduct occurred before June 2016, and the Klein Business Excuses evidence has no bearing on Plaintiffs' CTT-NJ investment losses.

Second, even if the Court were to find that the Klein Business Excuses evidence has some tangential relevance to the CTT-NJ fraud, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: … confusing the issues, misleading the jury, undue delay, [or] wasting time … ." Fed. R. Evid. 403; *Coleman v. Home Depot, Inc.*, 306 F.3d 1333, 1344 (3d Cir. 2002) ("The balancing test in Rule 403 ensures that juries are not presented with evidence that is far less probative than it is prejudicial.")  Here, the probative value of Klein Business Excuses evidence is substantially outweighed by risk of confusing the issues, Klein misleading the jury, and the associated waste of limited trial time putting on CTT-DE evidence in a case about a CTT-NJ fraud.

Klein will attempt to confuse the issues and mislead the jury in two ways.  First, Klein seeks to argue that the Klein Business Excuses (as opposed to Klein's CTT-NJ material misrepresentations) caused CTT-DE to fail and, therefore, caused and/or contributed to Plaintiffs' investment losses.[16]  But the multitude of reasons why CTT-DE failed, which would require lengthy testimony that has nothing to do with the 2014 and 2015 CTT-NJ fraud, has no bearing on Plaintiffs' CTT-NJ investment losses, which were suffered separate and apart from CTT-DE. Accordingly, the prejudicial effect of such evidence tangential evidence is substantially outweighed by any probative value of the evidence.  *See Argush v. LPL Fin., LLC*, 759 Fed. Appx.

---

[16] Of course, should the Plaintiffs need to contend with these arguments at trial, they will unequivocally prove that the manifestation of, among others, the Use of Funds, Business Model, and Background Misrepresentations caused the CTT-DE business to fail and, therefore, the complete loss of Plaintiffs' CTT investments.  *See McCabe*, 494 F.3d at 426.

121, 126 (3d Cir. 2018) (excluding evidence of circumstances surrounding the termination of different employees under separate contracts because the evidence was irrelevant to determining whether defendant breached its contract with plaintiff).

Second, Klein seeks to argue, as he suggested in his Answer and Counterclaim, that any Plaintiff salary, consulting fees, or revenues earned in good faith working for or with CTT-DE should mitigate his culpability and/or Plaintiffs' damages. But the Plaintiffs' good faith compensation earned from CTT-DE—pursuant to later, separate contracts from their investment transactions—is not relevant to their CTT-NJ investment losses. Profits and losses from unrelated investment and employment transactions will not be netted in calculating Plaintiffs' damages as a matter of law. *See In re Cigna Corp. Sec. Litig.*, 459 F. Supp. 2d 338, 350 (E.D. Pa. 2006) (applying a "transaction-based methodology" to calculating damages that "treats each transaction separately" and therefore "allows claims for unprofitable transactions without offsetting the recoverable loss with gains from profitable transactions"); *Moore v. Comcast Corp.*, 268 F.R.D. 530, 533 (E.D. Pa. 2010) (same). Accordingly, any CTT-DE compensation evidence will only serve to confuse the issues and mislead the jury about issues of culpability and damages that are contrary to the law. Therefore, the prejudicial effect of such evidence is substantially outweighed by any probative value of the evidence.

For each of the foregoing reasons, the Court should exclude the Klein Business Excuses evidence and, thus limit the substantive evidence presented at trial to CTT-NJ and Plaintiffs' CTT-NJ losses (*i.e.*, only evidence that pre-dates June 2016 and post-June 2016 evidence that relates to the uncovering of the CTT-NJ fraud).

**<u>Defendant's Response</u>**

Klein outright objects to Plaintiffs' motion to exclude the Klein Business Excuses evidence because the interconnection of pre 6/16/16 and post 6/16/16 evidence would absolutely infringe on the Defendant's rights to a fair and complete defense for which he is entitled.

LEGAL\47222487\1

## X.    Discovery

Each party has completed discovery.

## XI.    Number of Jurors

There shall be eight jurors.  The Court will conduct jury selection through the "struck juror" method, beginning with the Court reading *voir dire* to the jury panel in the courtroom, continuing by meeting with jurors individually in chambers and there addressing any challenges for cause, and concluding back in the courtroom with peremptory strikes.

## XII.    Non-Jury Trial

Inapplicable.

## XIII.    Length of Trial

In its Scheduling Order dated January 2, 2019 (D.I. 15), the Court estimated the length of trial to be three (3) days.  Assuming six (6) hours of trial time per day (18 total hours), the Plaintiffs respectfully request that they be allotted ten (10) hours of trial time to Klein's eight (8) hours of trial time due to the fact that there are five Plaintiffs who each need to testify to his/its individual investment circumstances, among other issues, to a single Defendant who will testify as to common elements of his defenses to each Plaintiffs' claims.

Defendant objects to Plaintiffs' request and in turns requests equal time for both as a minimum.

Time will be charged to a party for its opening statement, direct and redirect examinations of witnesses it calls, cross-examination of witnesses called by any other party, and closing argument.  The Courtroom Deputy will keep a running total of trial time used by counsel.

### XIV.   Amendments of the Pleadings

The parties do not seek any amendments of the pleadings.

### XV.   Settlement

Plaintiffs' counsel had approached settlement in good faith with Klein's former counsel before they withdrew from this matter.   Klein never responded to Plaintiffs AV Select, Dr. Simonian, Hartman, and Smith's settlement offers.   Accordingly, counsel never discussed settlement of Adams' claims either.

***************

**IT IS HEREBY ORDERED** that this Final Pretrial Order shall control the subsequent course of the action, unless modified by the Court to prevent manifest injustice.


DATED: _____

                              _____
THE HONORABLE RICHARD G. ANDREWS

                              _____


APPROVED AS TO FORM AND SUBSTANCE:

*/s/ Gregory F. Fischer*
Gregory F. Fischer (No. 5269)
COZEN O'CONNOR
*Attorneys for Plaintiffs*


*/s/ John H. Klein*
Pro Se

**EXHIBIT A**

**JOINT TRIAL EXHIBIT LIST**

| TRIAL EXHIBIT NO. | DEPOSITION EXHIBIT NO. and/or BATES NO. | DESCRIPTION OF EXHIBIT |
|---|---|---|
| JX 1 | Simonian Dep. 2 KLEIN 0000365 | 2015.05.07 Klein email to Simonian with March 2015 Deck |
| JX 2 | Simonian Dep. 6 Simonian 0003778 | 2015.06.22 Klein email to Simonian re CTT Investment |
| JX 3 | Pl. Dep. 46 | 2015.08.10 Simonian CTT-NJ Purchase Agreement |
| JX 4 | Pl. Dep. 47 | 2015.08.10 Simonian CTT-NJ Operating Agreement |
| JX 5 | Simonian Dep. 10 Simonian 0003329 | 2015.08.10 Simonian Employment Resolution |
| JX 6 | Keystone 3 Keystone001348 | 2015.10 October 2015 Deck |
| JX 7 | Pl. Dep. 50 | 2015.11.23 Hartman CTT-NJ Purchase Agreement |
| JX 8 | Pl. Dep. 49 | 2015.12.10 Smith CTT-NJ Purchase Agreement |
| JX 9 | Wasserman Dep. 3 KLEIN 0012889 | 2016.06.15 Breslow Investment Closing Book |

**EXHIBIT B**

**PLAINITFFS' TRIAL EXHIBIT LIST**

| TRIAL EXHIBIT NO. | DEPOSITION EXHIBIT NO. and/or BATES NO. | DESCRIPTION OF EXHIBIT | EVIDENTARY ISSUES/ OBJECTIONS |
|---|---|---|---|
| PX 1 | Adams CTT 0078508 | 2009 DAVA Projections | |
| PX 2 | Pl. Dep. Ex 33 KLEIN 0026774 | 2011.06.21 Shaw CTT Investment Agreement | |
| PX 3 | KLEIN 0005613 | 2011.07.21 Klein PNC Bank Statement (Shaw Investment) | |
| PX 4 | Khalaf Subpoena | 2011.08.11 Khalaf investment letter | |
| PX 5 | Pl. Dep. 29 KLEIN 0019190 | 2011.11.08 Rupp Investment Documents | |
| PX 6 | Pl. Dep. 31 KLEIN 0005656 | 2011.11.21 Klein PNC Bank Statement (Rupp Investment) | |
| PX 7 | Pl. Dep. 16 JDFF 0000001 | 2011.12.09 Dickenson Investment Documents | |
| PX 8 | Pl. Dep. 6 | 2012.06 PNC AC 5904 Checks (Use of Dapuzzo 6.20212 100k Investment Funds) | |
| PX 9 | Pl. Dep. 5 | 2012.06.29 PNC AC 5904 Statement (Dapuzzo Investment) | |
| PX 10 | Pl. Dep. 34 KLEIN 0010178 | 2012.09.15 Klein email to Shaw with CTT Financial Projections | |
| PX 11 | KLEIN 0054275 | 2012.10.27 Klein email to Brauser re: Biozone with Pro Forma | |
| PX 12 | KLEIN 0054345 | 2012.12.19 Klein email to Goldenberg re: Return of Investment | |
| PX 13 | Pl. Dep. 3 Dapuzzo 00005 | 2012-2013 Dapuzzo Investment Checks | |
| PX 14 | KLEIN 0010214 | 2013.01.30 Klein email to Goldenberg re: Return of Investment | |
| PX 15 | Pl. Dep. 15 KLEIN 0010216 | 2013.02.10 Klein email to Moezinia | |
| PX 16 | Pl. Dep. 19 DAVA-00001 | 2013.03.04 DAVA-Klein Deferred Salary Payment and Release Agreement | |
| PX 17 | KLEIN 0054358 | 2013.03.10 Klein email to Fienga re: Omeclamox | |
| PX 18 | KLEIN 0010232 | 2013.03.11 Klein email to Shaw re: legal action | |
| PX 19 | KLEIN 0010258 | 2013.04.30 Klein email to Treppel re: Omeclamox Pac | |
| PX 20 | Pl. Dep. 22 DAVA014840 | 2013.05.13 DAVA-Klein Stock Repurchase Agreement | |
| PX 21 | Pl. Dep. 25 KLEIN 0042054 | 2013.10.25 Klein email to Moezinia re: DAVA INDs | |
| PX 22 | Adams CTT 0078514 | 2014 CTT Products | |
| PX 23 | KLEIN 0010515 | 2014.01.22 Klein email to Lee re Trav-Elee investment | |

| PX 24 | Pl. Dep. 23 KLEIN 0008413 | 2014.01.30 DAVA-Klein Assignment of Rights | |
| PX 25 | Simonian 0009001 | 2014.06 Simonian picture at Klein mansion | |
| PX 26 | Publicly available | 2016.06.24 DAVA Endo press release | |
| PX 27 | Adams 0000033 | 2014.06.25 Klein email to Adams with 2Q 2013 Deck | |
| PX 28 | KLEIN 0010608 | 2014.06.29 Klein email to Edelson re DAVA and 100 percent owner of CTT | |
| PX 29 | Adams 0018625 | 2014.09.09 Klein email to Adams re: DispensePoint | |
| PX 30 | KLEIN 0054735 | 2014.09.10 Klein email to Adams enclosing 3Q 2014 Deck | |
| PX 31 | Adams 0001870 | 2014.09.15 Klein email to Adams re: Adams proposed CTT salary | |
| PX 32 | Exhibit A to Klein Counterclaim | 2014.10.01 Klein Employment Agreement | |
| PX 33 | Pl. Dep. 40 Keystone 0001298 | 2014.10.02 Klein email to Hartman re: CTT-Keystone relationship | |
| PX 34 | Pl. Dep. 28 Adams 0018229 | 2014.10.07 Klein email to Adams with September 2014 Deck | |
| PX 35 | LUBL00000134 | 2014.11.21 Lubliner investment agreement | |
| PX 36 | Pl. Dep. 41 AV Select 0003004 | 2015.01.23 Klein email to R. Ashton with October 2014 Deck | |
| PX 37 | AV Select 0002977 | 2015.01.26 R. Ashton email to Klein re: AV Select Investment | |
| PX 38 | Pl. Dep. 43 VORBACH 00064 | 2015.01.31 Vorbach email to R. Ashton re: AV Select-CTT investment documents | |
| PX 39 | VORBACH 00001 | 2015.02.15 AV Select Operating Agreement | |
| PX 40 | Pl. Dep. 35 KLEIN 0026817 | 2015.04.15 Klein-Shaw Release | |
| PX 41 | KLEIN 0009892 | 2016.01.19 Klein email to Kaban with CTT Deck | |
| PX 42 | KLEIN 0015999 | 2016.03.31 Rosenberg email to Klein re CTT investment and royalties | |
| PX 43 | LUBL00000011 | 2016.04.28 Lubliner email to Klein re: Demand to Return Investment | |
| PX 44 | Pl. Dep. 52 Adams CTT 0013656 | 2016.05 CTT-Legacy MedCreations Purchase Orders | |
| PX 45 | KLEIN 0040722 | 2016.05.02 Goldenberg email to Klein re Doxy | |
| PX 46 | Pl. Dep. 54 Adams CTT 0008009 | 2016.05.31 PNC AC  5904 Statement (MedCreations Payments) | |
| PX 47 | BRESLOWS_0010927 | 2016.06.03 Wasserman email to Breslows with CTT Due Diligence (Salaries start in 2016) | |
| PX 48 | KLEIN 0016022 | 2016.06.06 Hamet email to Klein with DAVA INDs | |
| PX 49 | Publicly available | 2017.06.23 CTT - Sandoz Settlement Agreement | |

| PX 50 | KLEIN 0006132 | 2016.06.30 Ashton email to Klein with AV Select investment information and consulting salary | |
| PX 51 | KLEIN 0040817 | 2016.08.31 Goldenberg email to Klein re: Doxy | |
| PX 52 | KLEIN 0006057 | 2016.08.31 Posner email to Berry, DosSantos and Klein with CTT Opening Financial Statements (5.31.2016) | |
| PX 53 | Pl. Dep. 59<br>KLEIN 0012752 | 2016.09.26 Blue Valley Membership Unit Purchase Agreement | |
| PX 54 | | 2016.09.26 CTT-DE Operating Agreement | |
| PX 55 | KLEIN 0031619 | 2016.10 - 2017.01 CTT Board Minutes | |
| PX 56 | Adams CTT 0003179 | 2016.11.04 Guerra email to Adams with Klein MedCreations Paid In Full email | |
| PX 57 | Simonian 0003252 | 2016.11.18 Simonian email to Klein re: CTT status | |
| PX 58 | Obtained from CTT | 2016.11.26 Goldschmidt email to Klein re: Sandoz Debt and Business | |
| PX 59 | BRELOWS_0006710 | 2016.12.03 Adams email to DosSantos re: Dispense Point | |
| PX 60 | Aibel subpoena | 2017 Aibel Klein Salary Analysis | |
| PX 61 | Obtained from CTT | 2017.01.24 Sandoz Non-Payment Letter | |
| PX 62 | Simonian 0003193 | 2017.02.04 Klein email to Simonian re: staus at CTT | |
| PX 63 | KLEIN 0020806 | 2017.02.09 Klein email to DosSantos re: no CTT-NJ Tax Returns | |
| PX 64 | Keystone 0000123 | 2017.03.06 Klein email to Smith re: Tax and FMV Documents | |
| PX 65 | Simonian 0003154 | 2017.03.09 Klein email to Simonian re: Klein Group | |
| PX 66 | Wasserman Dep. 5<br>Adams CTT 0022556 | 2017.04.10 Posner email to Klein, Wasserman, Le and DosSanos re: Allocation 2016 CTT Tax Loss | |
| PX 67 | Simonian 0002823 | 2017.04.11 NCPDP email to Simonian re: Dispensing License | |
| PX 68 | Pl. Dep. 57, Wasserman Dep. 6<br>KLEIN 0012113 | 2017.05.04 Klein email to Wasserman re: Klein Group | |
| PX 69 | Adams CTT 0039727 | 2017.05.14 Adams email to Klein, Simonian and DosSantos re PBM Reimbursement | |
| PX 70 | KLEIN 0057035 | 2017.05.30 Braverman email to Klein re: Klein Group - CTT Investment | |
| PX 71 | KLEIN 0057280 | 2017.05.31 Klein email to Braverman with backdated Associated Private Equity CTT - NJ Unit Purchase Agreement | |
| PX 72 | Adams 0011004 | 2017.06.20 Klein email to DosSantos re: PNC AC 5904 Reconciliation | |
| PX 73 | Wasserman Dep. 7<br>KLEIN 0012453 | 2017.06.20 Wasserman email to Klein re PNC AC 5904 Misappropriated Funds | |

| | | | |
|---|---|---|---|
| PX 74 | Adams CTT 0017437 | 2017.07.13 DosSantos email to Adams, Wasserman, Klein and Le with PNC AC 5904 Reconciliation | |
| PX 75 | Pl. Dep. 61 KLEIN 0012495 | 2017.07.16 Klein email to J. Ashton re: Selling Shares | |
| PX 76 | Publicly available | 2017.08.09 NY Post Article re: Klein Mansion Listing | |
| PX 77 | Pl. Dep. 58 Adams CTT 0000152 | 2017.08.17 Posner (Adams) email to Adams and Simonian re: CTT Merger (5.18.2017) | |
| PX 78 | EDELSON008400 | 2017.08.24 Klein email to Edelson with CTT Stages Deck | |
| PX 79 | KLEIN 0037927 | 2017.09.06 Adams email to Klein and Cole Schotz re: A-R Misappropriaition andBreslows-Wasserman | |
| PX 80 | Publicly available | 2017.09.06 Sandoz Letter to Klein re: Breach | |
| PX 81 | Adams CTT 0035985 | 2017.10.03 Simonian email to Adams re: Wellmont Launch | |
| PX 82 | VORBACH 00123 | 2017.11.07 Vorbach email to Klein re: AV Select K-1 | |
| PX 83 | Adams CTT 0037199 | 2017.11.27 Wubker email to Adams and Klein re: Wellmont Launch | |
| PX 84 | Adams CTT 0005940 | 2017.11.28 Klein email to Adams, Wasserman and Le with 11.1.2017 Board Minutes | |
| PX 85 | Simonian 0000167 | 2017.12.22 Simonian email to Adams re: Hartman and Smith Investments | |
| PX 86 | Adams CTT 0024492 | 2017.12.22 Adams email to Simonian and Wasserman re: Breit Investment | |
| PX 87 | Adams CTT 0038681 | 2017.12.30 Adams email to Klein re: Unit of Dose v. Unit of Use | |
| PX 88 | Adams CTT 0006936 | 2017.12.11 Adams email to Wasserman and Simonian with MedCreations Bank Statement | |
| PX 89 | Pl. Dep. 63, Wasserman Dep. Ex. 12 Simonian 0000696 | 2017.12.14 Adams email to Wasserman, Simonian and Le re: Klein Termination Decision | |
| PX 90 | Adams CTT 0006234 | 2017.12.21 Klein email to Adams re: Legacy CTT Account Hold | |
| PX 91 | Wasserman Dep. 11 Adams CTT 0006222 | 2017.12.22 Wasserman email to Guerra, Simonian, Rodriguez, Adams and Le with Klein Termination Written Consent | |
| PX 92 | Aibel subpoena | 2018 Aibel Klein Intellectual Property | |
| PX 93 | GEL_0000001-48 | 2018 Klein GEL K-1s (compilation 2012 - 2018) | |
| PX 94 | Pl. Def. 60 Adams CTT 0012158 | 2018.01.02 DosSantos email to Adams with Breslow due diligence (11mm contribution) | |
| PX 95 | Adams CTT 0024998 | 2018.01.05 Adams email to Klein re: CTT Settlement | |
| PX 96 | VORBACH 00128 | 2018.01.09 Vorbach email to Adams re: AV Select Investment | |

| PX 97 | Adams CTT 0060290 | 2018.01.24 Simonian email to Adams and CTT staff with memo re: attempting to save CTT | |
|---|---|---|---|
| PX 98 | Adams CTT 0079488 | 2018.02.02 Riker Demand Letter to Klein | |
| PX 99 | Adams CTT 0079508 | 2018.02.03 Komrower email to Qurashi, Adams, S. Klein, Smith and Regan with Board Designation and Written Consent | |
| PX 100 | Adams CTT 0009706 | 2018.04.10 Adams emails memorializing Klein-Adams October 2014 Adams text | |
| PX 101 | JDFF 0000152 | 2018.04.28 Dickenson recording | |
| PX 102 | Adams CTT 0012181 | 2018.05.28 Berkowitz email to Adams with CTT Investment Agreement | |
| PX 103 | Adams CTT 0071581 | 2018.05.28 Adams email to Le with Use of Funds Analysis | |
| PX 104 | Adams CTT 0030583 | 2018.06.14 Adams email to Woytek with R. Lee email and Trav-Elee Investment Documents and Use of Funds | |
| PX 105 | BRESLOWS_0012571 | 2019.02.06 Adams email to Woytek forwading 6.12.2017 Wasserman email to Adams with Proposed Klein Termination Written Consent | |
| PX 106 | Prepared by Klein counsel | 2019.07.19 Klein interrogatories in *Breslow et al. v. Klein* (D. Del.) lawsuit | |
| PX 107 | Obtained from CTT Responsible Officer | 2020.01.16 Gavin Solmonese CTT Analysis | |
| PX 108 | Obtained from CTT Responsible Officer | 2020.01.28 Gavin Solmonese CTT All Transactions | |
| PX 109 | Publicly available | 2020.03.29 Weissmann Sagaponack Website | |
| PX 110 | PNC_Klein0000001, 181-184, 187-192, 196-198, 201, 202-206, 209-220, 227, 262, 264, 266, 268, 269, 271, 272, 276, 278-287, 289-292, 299, 303, 313-320, 324, 327, 328, 330, 332, 334, 337, 350 | 2019.08.26 Extracts from PNC Bank subpoena | |
| PX 111 | Adams CTT 0071589 | Adams Use of Funds | |
| PX 112 | Adams CTT 0071624 | AV Select Use of Funds | |
| PX 113 | Adams CTT 0071641 | Simonian Use of Funds | |
| PX 114 | Adams CTT 0071656 | Hartman-Smith Use of Funds | |

**Exhibit C**

DEFENDANT'S TRIAL EXHIBIT LIST

1) email MA to JK 11-15-16. DP 12-12-19 Adams-2 Employment
2) email Scarpa to MA 6-27-14 " " "     Adams-3 CTT Presentation
3) Consent of BOD 1-29-18 " " "     Adams-4 BOM Consent **(Pl. Objections: R, P)**
4) email MA to Anderson 11-3-15 " " "     Adams-5 CTT Image
5) email MA to Weil 10-21-15 " " "     Adams-6 CTT Update **(Pl. Objections: R, P, I)**
6) email MA to Teirmed 8-14-16 " " "     Adams-7 CTT forecast **(Pl. Objections: R, P)**
8) email JK to MA 3-28-17 " " "     Adams-8 Northern Tier Medical **(Pl. Objections: R, P)**
9) email MA to Posner 4-18-17" " "     Adams-8 Northern Their Medical **(Duplicate of No. 8)**
10) email Posner to MA 4-18-17". " "     Adams-8 Northern Their Medical **(Duplicate of No. 8)**
11) email JK to SK 3-28-17". " "     Adams-9 Breslow Compliant **(Pl. Objections: R, P, H)**
12) email MA to MA 3-30-17". " " "     Adams-9 Breslow compliant **(Duplicate of No. 11)**
13) email MA to Scarpa 1-26-16". " "     Adams10 CTT
14) CTT Sandoz Book Oct/2015 – *Joint Exhibit*
15) Keystone Unit Pir 11-9-14 DP 12-18-14 Keystone(KS) general – *Joint Exhibit*
16) email Hartman to JK 9-8-14 " " " "     KS-5 CDA
17) email Hartman to JK 10-2-14". " " "     KS-6 Exclusivity
18) email JK to Smith 11-17-15". " " "     KS-7&8 Product Lists
19) email Smith to JK 3-15-16". " " "     KS-10 Patent
20) email Smith to JK 6-16-16". " " "     KS-12 Exclusivity
21) email Smith to JK 6-16-16". " "     KS-13 Exclusivity
22) email Smith to Skinner Jun/2016". " "     KS-17 Consumer Reports **(Pl. Objections: R, P)**
23) email Dave to JK 7-18-17". " "     KS-18 Turchette Article **(Pl. Objections: R, P)**
24) email Smith to MA 10-19-17". " "     KS-19 2.0 Package **(Pl. Objections: R, P)**
25) email JK to GS 5-11-15 DP 12-18-19. Simonian(GS) -2 CTT Overview – *Joint Exhibit*
26) email GS to JK 5-11-15". " "     GS-3 BIO
27) email GS to JK 5-8-15". " "     GS- 3 CTT Potential
28) email JK to DE 6-18-15". " "     GS-4 School **(Pl. Objections: R, P)**
29) CTT Book FEB/MAR 2015". " "     GS-2 CTT Presentation
30) email JK to GS 6-10-15". " "     GS-5 Product List
31) email GS to JK 5-15-15". " "     GS-6 CTT Overview – *Joint Exhibit*
32) GS Membership Agree Aug/2015". " "     GS-Agreement – *Joint Exhibit*
33) CTT Operating Agree GS Aug/2015". "     GS-Agreement – *Joint Exhibit*
34) GS Job Description 6-2-15". " "     GS-9 BOM Declaration – *Joint Exhibit*
35) email MA to GS 8-16-17". " "     GS-10 Klein Group **(Pl. Objections: X)**
36) email MA to GS 9-29-17". " "     GS-11 Merger **(Pl. Objections: X)**
37) CTT Amend.OP.Agree 12-20-17". " "     GS-21 Group breakout
38) AV Select OP Agree.2-12-15 DP 3-5-19 Vorbach(GV) -2 AV Select OP Agree
39) email RA to Vorbach 9-8-15". " "     GV-10 Ashton comments **(Pl. Objections: X)**
40) email JK to RA 9-7-16". " "     GV-10 Ashton name to return funds **(Pl. Objections: X)**
41) email RA to JK 8-20-17". " "     GV-14 CTT update **(Pl. Objections: X)**
42) email Vorbach to JK 9-17-17". " "     GV-15 AV Sel History **(Pl. Objections: X)**
43) email JK to Vorbach 9-23-17". " "     GV-17 CTT update **(Pl. Objections: X)**
44) email ME to Breslow 4-19-16 DP 1-8-20 Wasserman(MW)-1 Due Diligence
45) Freeborn Doc CTT Closing 6-15-16". " "     MW-3 Freeborn Closing Docs – *Joint Exhibit*
47) CTT BOD Minutes Financial 12-31-16". " "     MW-4 CTT status
48) email Posner to MW 4-10-17". " "     MW-5 Tax Loss
49) email JK to MW 5-4-17" " "     MW-6 Group transfer

50)email MA to MW 12-14-1". " "          MW-12 Adams summary
51)email Marrson to Posner 6-15-16". " "   MW-13 No NDA & value IND **(Pl. Objections: R, P, H)**
52)email MA to MW 8-15-17". " "           MW-16 Interference **(Pl. Objections: R, P)**
53)email JK to MW 8-15-17". " "           MW-16 Interference **(Duplicate of No. 52)**
54)email MA to MRB 2-27-18". " "          MW-17 Adams/MW **(Pl. Objections: R, P)**
55)Complete 2016 5904 account.          PNC Bank statement **(Pl. Objections: X)**
56)CTT Marketing Rollout Jan 2016      MW Doc **(Pl. Objections: X)**
57)CTT BOM 11-1-17 minutes.            CTT BOM **(Pl. Objections: X)**
58) JK Bio **(See Pl. Objection to No. 36)**
59)email 3-5-19 Vorbach-13 J Ashton to GV/Adams update **(Pl. Objections: X)**


**Plaintiffs' Objections**

R – Irrelevant (FRE 401)
P – Prejudice/Confusion of Issues (FRE 403)
H – Hearsay (FRE 802)
I – Incomplete (FRE 106)
C – Cumulative (FRE 403)
X – Exhibit inaccessible based on inadequate description by *pro se* Defendant.  Plaintiffs reserve the right
to assert additional objections once the document is provided.

*Plaintiffs reserve the right to assert additional relevance objections based on the outcome of Plaintiffs'*
*MIL #1 to Exclude CTT-DE Defense Evidence*