IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MARK ADAMS, AV SELECT
INVESTMENTS, LLC, DR. GREGORY
SIMONIAN, WADE HARTMAN, and
FRANK EDWARD SMITH,

                    Plaintiffs;

      v.

JOHN KLEIN,

                  Defendant.

Civil Action No. 18-1330-RGA

MEMORANDUM OPINION

Gregory Fischer, COZEN O'CONNOR, Wilmington, DE; Martin S. Bloor, Michael B. de
Leeuw, Matthew L. Elkin, COZEN O'CONNOR, New York, NY,

Attorneys for Plaintiff.

John Klein, Alpine, New Jersey.

*Pro se*

September 28, 2021



**ANDREWS, U.S. DISTRICT JUDGE:**

Plaintiffs Mark Adams, AV Select Investments, LLC ("AV Select"), Dr. Gregory Simonian, Wade Hartman, and Frank Edward Smith brought six counts against Defendant John Klein. Plaintiffs' First Amended Complaint (D.I. 74) asserts claims against Klein for securities fraud under Section 10(b) of the Securities and Exchange Act and Rule 10b-5 thereunder (Count I) and the New Jersey Uniform Securities Act (N.J.S.A. § 49:3-52) (Count II), common law fraud/intentional misrepresentation (Count III), negligent misrepresentation (Count IV), and unjust enrichment (Count V). Dr. Simonian also asserts a claim for breach of contract (Count VI). I conducted a bench trial from April 5 to 8, 2021. (D.I. 191, 192, 193, 194).

## I.  BACKGROUND

This matter concerns Plaintiffs' interactions with John Klein, who was the founder and CEO of non-party Cambridge Therapeutic Technologies ("CTT"). (D.I. 170 ¶ 1). CTT was a pharmaceutical packaging company. (JX1-004). Prior to June 2016, CTT's operating entity was a New Jersey LLC ("CTT-NJ") and in June 2016, CTT's operating entity became a Delaware LLC ("CTT-DE"). (JX9-049).

Klein was CTT's CEO from 2011 until his termination in December 2017. (D.I. 192 at 358:8-12; JX1-031). Klein represented that CTT's business was distributing two or more generic prescription drugs combined in a single package. (JX1-011). Klein represented that these pre-packaged drug combinations ("Compliance PACs") would primarily be distributed from doctors' offices, which was a "novel" feature of the business. (JX1-004, 010, 017). Klein represented that CTT had "fully developed its first Compliance PAC" (JX1-008), and that CTT owned one NDA, NDA 50-824, which is the Omeclamox-Pak (JX9-032; PX27-012). This gastroenterology product treated peptic ulcers. (JX9-032). Klein further represented that in addition to this NDA, CTT owned four INDs that were "approved and ready for commercialization." (JX1-010). Klein

indicated that he invested millions of dollars into these INDs. (D.I. 193 at 565:17-21, 588:10-589:9).

Plaintiffs are investors in CTT; the Court will address each Plaintiff individually.

### A. Adams

Between June 24, 2014 and October 16, 2014, Klein made numerous representations to Adams about CTT, the CTT investment opportunity, and his professional and personal background in emails, text messages, phone calls, and at two in-person meetings. (D.I. 191 at 224:15-225:23, 234:7-239:13). Klein offered Adams the opportunity to be CTT's first outside investor and to help build CTT's Compliance PAC business line as a partner. (D.I. 170 ¶ 24; D.I. 191 at 254:5-10; PX100-001).

Klein represented that he was instrumental in facilitating DAVA's $600 million acquisition by Endo. (D.I. 191 at 223:6-224:14). Klein represented that he "was offered $26.4 million for the company [CTT] over a year ago," which he turned down because the offer was insufficient. (D.I. 170 ¶ 20).

Klein emailed Adams a CTT investor presentation titled "Cambridge Technologies, Second Quarter 2013" ("2Q 2013 Deck") on June 25, 2014. (PX27). In this presentation, and in related conversations, Klein represented that the Compliance PAC business was a current part of CTT's business. (D.I. 191 at 227:14-228:23, 234:2-6; PX-27-012). Klein represented that CTT owned NDA 50-824, the Omeclamox-Pak. (D.I. 191 at 230:16-231:11). Klein further represented that CTT had generated $1.1 million of revenue as a royalty from this product in 2013, it was currently receiving this royalty in 2014, and it would continue to do so into the future. (*Id.* at 231:13-232:10; PX27-032). Klein represented that CTT owned various INDs, including four noted as "IND Approved" in the 2Q 2013 Deck. (PX27-013; *see also* PX34-010).

Klein sent Adams a second presentation titled "Cambridge Therapeutic Technologies Corporate Overview, September 2014" ("September 2014 Deck") on October 7, 2014. (PX34). This presentation also represented the state of CTT's Compliance PAC business. (PX34-004 ("Cambridge has developed and is poised to begin commercializing a proprietary" Compliance Pack); PX34-008 ("Cambridge has fully developed its first Compliance PAC and is poised to begin commercializing a pipeline of 60+ similar Compliance PACs over the next six to eighteen months"); PX34-016 (CTT's "[i]nfrastructure," including its drug suppliers and software (DispensePoint), were "In-Place & Ready for Launch."). Klein told Adams he was planning to bring Compliance PACs to market in the third or fourth quarter of 2014. (D.I. 191 at 239:14-24).

Klein represented that CTT had "[e]xclusive bulk purchasing for generic drugs directly from manufacturers for distribution by physicians" (PX34-017), which was due to his stature and significant contacts in the industry (D.I. 191 at 242:23-243:17). Klein represented that CTT "had exclusive access to custom claims adjudication software through a company called DispensePoint. The DispensePoint software was 'private label,' designed and customized for CTT, and CTT had exclusive rights to it." (D.I. 170 ¶¶ 22-23; *see also* PX34-017).

Klein projected gross revenues for CTT of over $134 million and $347 million and net profits of over $34 million and $136 million in 2015 and 2016, respectively. (PX34-035-036). He further represented that "these forecasts are inherently conservative and defensible." (*Id.* at 036). Adams believed that these projections were achievable because of Klein's representations about the current state of the Compliance PAC business and Klein's past success obtaining market share in the generic pharmaceutical industry. (D.I. 191 at 247:4-18).

Adams purchased 6% of CTT-NJ (6 of Klein's 100 shares) for $581,250. (*Id.* at 250:8-13, 256:23-257:2).

4

Adams understood that he was investing in the CTT business, and that his funds would be used for CTT business purposes. In particular, Klein told Adams in October 2014 that Adams' funds would be used to buy inventory, roll the product out, and launch the product. (*Id.* at 254:24-255:3). Klein also told Adams that Adams would have a capital account in CTT and that money was being raised to fund the company. (*Id.* at 260:23-261:9). In addition, the September 2014 Deck shown to Adams included a Use of Proceeds slide. (PX34-009). And, in two October 16, 2014 text messages, Klein told Adams that he was already showing Adams' funds on a CTT balance sheet for a potential outside funder. (PX100). Lastly, Adams wired his funds to a Cambridge Therapeutic Technologies, LLC bank account, account XX-XXX-5904 at PNC Bank ("PNC A/C 5904"). (D.I. 170 ¶ 25; PX103-009-010). Adams understood that he was wiring the funds to a company account. (D.I. 191 at 257:10-15).

In addition to offering an investment opportunity, Klein offered Adams a job as CTT's head of sales for the northeast and southeast regions at a salary of $450,000 to $600,000 per year plus a bonus. (PX31; PX34-001). Adams never received that salary and did not expect one because the company was not making money yet. (D.I. 191 at 258:20-259:9).

Klein never provided Adams with a CTT operating agreement, a subscription agreement, tax returns, or K-1s despite repeated requests. (*Id.* at 257:16-258:9).

### B. AV Select

AV Select is a limited liability company consisting of Dr. Robert Ashton (later, the Estate of Dr. Ashton), Dr. Jennifer Ashton, Gregory Vorbach, Nancy Vorbach, and the Vorbach children. (D.I. 170 ¶ 10). Mr. Vorbach organized AV Select on January 26, 2015 for the purpose of investing in CTT. (D.I. 192 at 508:1-10; PX 117).

Dr. J. Ashton learned about CTT from Dr. R. Ashton in January 2015. (*Id.* at 288:6-8). At that time Dr. R. Ashton told Dr. J. Ashton that Klein had approached him about being involved in the company. (*Id.* at 290:18-19). The Ashtons did not have any personal relationship with Klein prior to AV Select's investment in CTT, but they knew of each other through the community. (*Id.* at 290:15-291:1). The Vorbachs are experienced private equity investors (*id.* at 497:18-498:2), and the Ashtons and the Vorbachs have invested together in the past (*id.* at 292:14-293:18.).

Klein emailed a presentation titled "Cambridge Therapeutic Technologies Corporate Overview, October 2014" ("October 2014 Deck") to Dr. R. Ashton on January 23, 2015. (PX36). The October 2014 Deck is substantially similar to the September 2014 Deck that Klein had sent to Adams. (*Compare* PX36 *with* PX34). It makes representations relating to Klein's background, the use of investment proceeds, and the current state of CTT's business (*i.e.*, a fully developed Compliance Pack, approved INDs, exclusive bulk purchasing of generic drugs, and custom software), among others. (PX36). The only material difference between the presentations is that the October 2014 Deck projected slightly less revenue and income: gross revenues for CTT of over $119 million and $326 million and net profits of over $23 million and $124 million in 2015 and 2016, respectively. (*Compare* PX36-036-038 *with* PX34-036-038).

On January 25, 2015, Dr. R. Ashton shared the October 2014 Deck with the Vorbachs and explained the business opportunity to them. (D.I. 192 at 293:21-294:6, 500:17-19). The Vorbachs reviewed the October 2014 Deck "thoroughly" (*id.* at 500:17-501:14) and asked Dr. R. Ashton "a lot of questions" (*id.* at 294:5-6).

Mr. Vorbach understood that the October 2014 Deck's purpose was to solicit investors' money for CTT. (*Id.* at 502:9-15). Mr. Vorbach found Klein's "extensive experience in the

pharmaceutical industry" and the large target market to be particularly important information included in the October 2014 Deck. (*Id.* at 502:22-503:15). Based on the presentation, Mr. Vorbach believed that CTT was "ready to go." (*Id.* at 504:3-10). Mr. Vorbach also found it significant that the company had existed for four years, which he considered ample time for Klein to put the company's infrastructure in place. (*Id.* at 505:13-17).

Mr. Vorbach reviewed the CTT financial projections included in the October 2014 Deck, and believed them to be "fantastic and achievable because the company was already in place for four years, and they had the key people in place according to the org[anization] chart, and that they had already purchased all the medicine for 2014." (*Id.* at 507:11-18). Mr. Vorbach understood the investment was urgent because Klein owned all the shares in CTT and AV Select was to be the first outside investor. (*Id.* at 501:9-12). Mr. Vorbach believed that AV Select needed to send in the investment as soon as possible to not lose the opportunity to other investors. (*Id.* at 501:12-14).

On January 26, 2015, the day after Dr. R Ashton shared the October 2014 Deck with the Vorbachs, Mr. Vorbach organized AV Select Investments, LLC. (PX117). The Ashtons and the Vorbachs formed the entity in order to jointly invest in CTT. (D.I. 192 at 508:6-10). The Ashtons invested $275,000 (borrowed from the Vorbachs) and the Vorbachs invested $175,000. (*Id.* at 294:10-14). In total, AV Select purchased 3% of CTT-NJ (3 of Klein's 100 shares) for $450,000. (*Id.* at 501:4-6, 509:13-14; PX96). Mr. Vorbach wired the $450,000 from four different Vorbach family accounts at UBS to PNC A/C 5904. (PX96). Each of the wires stated that it was an investment from AV Select Investments, LLC (PX103-049-050), and identified Cambridge Therapeutics Technologies as the Payee. (PX96-002-005). On that same day, Dr. R. Ashton told Klein to list the shares under AV Select Investments, LLC. (DX4).

7

Mr. Vorbach understood that AV Select purchased its CTT shares from CTT because he sent four wires on behalf of AV Select to Cambridge Therapeutics Technologies. (D.I. 192 at 513:4-10). Mr. Vorbach understood that the investment "would be used for business expenses for the company," as set forth on the "Use of Proceeds" slide in the October 2014 Deck. (*Id.* at 514:18-515:2; *see also* PX36-009). Klein never provided AV Select with a CTT operating agreement, subscription agreement, tax returns, or K-1s despite repeated requests. (D.I. 192 at 516:7-517:4, 521:6-10).

Although Klein did give Dr. R. Ashton a job as CTT's Chief Medical Officer, he did not actually pay him for many months. (*Id.* at 295:1-24). At the time of Dr. R. Ashton's death, CTT owed him $60,000 in back pay, which was eventually paid. (*Id.* at 302:4-13).

### C. Dr. Simonian

Dr. Simonian is a vascular surgeon from New Jersey. (D.I. 170 ¶ 17). Between June 2014 and August 10, 2015, Klein made numerous representations to Dr. Simonian about CTT, the CTT investment opportunity, and his professional and personal background in emails, text messages, phone calls, and at two in-person meetings at his Alpine mansion and the Coach House Diner. (D.I. 191 at 64:5-20, 65:13-66:14, 70:1-72:14).

Klein offered Dr. Simonian the opportunity to be CTT's first outside investor and for Dr. Simonian to "be coming in at the ground level." (*Id.* at 64:25-65:2, 68:15-19, 70:3-6). Klein told Dr. Simonian that Klein was willing to bring Dr. Simonian in "as a founder" and that "anything we did would have to be done before anyone else participated." (JX2-002). Klein represented to Dr. Simonian that Klein owned a hundred percent of CTT, and that he was the founder and the owner of the company. (D.I. 191 at 101:5-9). Klein did not inform Dr. Simonian that Adams and AV Select had invested in CTT. (*Id.* at 97:21-98:1).

8

Klein emailed Dr. Simonian a presentation titled "Cambridge Therapeutic Technologies Corporate Overview, March 2015" ("March 2015 Deck") on May 7, 2015. (JX1). This presentation described CTT, its business, and its financial projections. (*See generally id.*). Dr. Simonian reviewed this document in connection with making an investment in CTT. (D.I. 191 at 74:16-21).

The March 2015 Deck is substantially similar to the September 2014 Deck that Klein sent to Adams. The March 2015 Deck makes representations, among others, relating to Klein's background, the use of investment proceeds, and the current state of CTT's business (*i.e.*, a fully developed Compliance Pack, approved INDs, exclusive bulk purchasing of generic drugs, and custom software). (*Compare* JX1 *with* PX34). The only material difference between the presentations is that the March 2015 Deck projected slightly less revenue and income: gross revenues for CTT of over $78 million and $262 million and net profits of over $4 million and $84 million in 2015 and 2016, respectively. (*Compare* JX1-036 *with* PX34-036).

Klein represented that CTT had custom prescription adjudication software, offered through DispensePoint (D.I. 170 ¶¶ 27), which had been tested and was working (D.I. 191 at 84:2-6). Klein had DispensePoint present a webinar to Dr. Simonian that demonstrated the software's capabilities. (D.I. 170 ¶ 28). After the webinar, Dr. Simonian was told that the software was up and running. (D.I. 191 at 86:6-9). Klein also represented to Dr. Simonian that CTT owned an NDA and that there were other drugs that Cambridge owned or was going to own (*id.* at 70:23-71:20), and that he personally invested $11 million into the company (*id.* at 158:21-159:5).

Klein represented that he was "offered $26.5 million for the company Oct 2012 but I said no; it was just to[o] early." (JX2-002). Klein also represented to Dr. Simonian that he had

recently finished a big deal at DAVA. (D.I. 191 at 66:7-9). Dr. Simonian understood that the company was built and that it would be rolled out in six to eighteen months. (*Id.* at 76:7-8).

On June 19, 2015, Klein emailed Dr. Simonian "updated" pro-forma revenues and company valuations for 2015 to 2018. (JX2). In a subsequent email, on June 22, 2015, Klein sent "updated" EBITDA valuations, which were larger than Klein projected in the June 19 email. (JX2-001). Dr. Simonian believed that Klein's projections were attainable based on what he understood to be the current state of the business and Klein's assumption that CTT only needed to capture a small share of a massive market to achieve them. (D.I. 191 at 86:14-87:21; 94:5-95:21).

Dr. Simonian agreed to purchase 3% of CTT-NJ (3 of Klein's 100 shares) for $600,000. (*Id.* at 97:3-5). Dr. Simonian also had an option to purchase an additional 3% of CTT-NJ and a right of first refusal to purchase additional shares if Klein solicited further investments. (*Id.* at 101:21-102:12; *see also* JX3-002-003; JX4-007-008). Based on his conversations with Klein and the March 2015 Deck, Dr. Simonian understood that his investment funds would be used for CTT's drug inventory, marketing, packaging, and administrative expenses. (D.I. 191 at 78:9-80:3; *see also* JX1-009).  Dr. Simonian understood that his investment in CTT would be treated as a capital contribution. (D.I. 191 at 104:3-8).

Dr. Simonian and Klein executed a "Membership Unit Purchase and Option Agreement" and "Operating Agreement of Cambridge TT Limited Liability Company (a New Jersey limited liability company)" on August 10, 2015. (D.I. 170 ¶ 32; *see also* JX3; JX4). The terms of Dr. Simonian's investment are memorialized in these documents, including that Dr. Simonian would be given a CTT-NJ capital account and he had notice rights and a right of first refusal if Klein were to issue new CTT units. (JX3-002, JX4-007-009, 034). In accordance with this agreement,

on August 10, 2015, Dr. Simonian wired $600,000 to PNC A/C 5904. (D.I. 170 ¶ 33). Dr.

Simonian understood that he was wiring this investment to CTT's account at PNC Bank. (D.I.

191 at 101:18-20).

Klein also offered Dr. Simonian a position as CTT's Executive Vice President, Physician

Strategies & Regulatory Affairs, with his compensation to be determined at a later date. (JX5).

This job never actually materialized after the investment (D.I. 191 at 107:8-11), and Dr.

Simonian later learned that Klein had given the same job to Dr. R. Ashton (*id.* at 111:6-21).

Klein never provided Dr. Simonian with CTT tax returns or K-1s despite repeated requests. (*Id.*

at 110:2-9).

### D.  Hartman and Smith

Keystone Folding Box Co. ("Keystone") is a manufacturer of pharmaceutical packaging.

(D.I. 170 ¶ 34). Hartman is the owner and President of Keystone, and Smith is the Director of

Marketing. (*Id.* ¶ 18-19). Keystone and CTT formalized their business relationship in October

2014. (*Id.* ¶ 36).  Keystone agreed to provide CTT with exclusive access to its proprietary

compliance packaging if CTT hit certain minimum volume thresholds. (D.I. 192 at 592:7-14;

PX33). Over the next year and a half, the companies worked together to design a Compliance

PAC prototype, to explore automation of drug packaging fulfilment, to identify an FDA

registered prescription drug packager to fill and ship the Compliance PAC, and to launch the

product. (D.I. 170 ¶ 37.)[1]

In October 2015, the relationship between Smith, Hartman, and Klein changed from a

business relationship to an investment relationship. (D.I. 192 at 563:18-21). Between October

2015 and December 2015, Klein made numerous representations to Hartman and Smith about

---

[1] Keystone stopped doing business with CTT in 2017. (D.I. 193 at 606:2-5). Keystone ultimately did not make any money from its business relationship with CTT. (*Id.* at 605:14-18).

CTT, the CTT investment opportunity, and his professional and personal background in emails, text messages, phone calls, and at an in-person meeting at Keystone's plant. (D.I. 170 ¶ 38).

Klein represented at an October 2015 meeting at Keystone's plant that he was the sole shareholder of CTT and he was offering Hartman and Smith the opportunity to get in on the ground floor as CTT's first outside investors. (D.I. 193 at 563:22-565:25, 568:3-10; *see also* JX7-003-004 (Klein owned 100 of 100 Class A Units of CTT-NJ; JX8-002-003 (same)). He offered this as a "thank you" for their significant role working on the business since October 2014. (D.I. 193 at 563:22-565:25, 594:13-596:14).

Klein represented the current state of CTT's business in a presentation titled "Cambridge Therapeutic Technologies, Sandoz, October 2015" ("October 2015 Deck"), given to Hartman and Smith at the October 2015 meeting, and in various related conversations. (*Id.* at 566:1-12, 567:6-15, 595:18-596:5; JX6). The October 2015 Deck is similar to the September 2014 Deck, October 2014 Deck, and March 2015 Deck.  It makes representations relating to Klein's background and the current state of CTT's business (*i.e.*, CTT's product pipeline, approved INDs, exclusive bulk purchasing of generic drugs, and custom software). (*Compare* JX6 *with* JX1, PX34 and PX36).

Klein represented that CTT had "[e]xclusive bulk purchasing for generic drugs directly from manufacturers for distribution by physicians" (JX6-019), which was due to Klein's extensive experience and contacts in the industry. (D.I. 193 at 597:5-14). Klein represented that CTT had "Proprietary Dispensing Office Software," which was "novel and patent [pending]" (JX6-019, 021), and that he had personally invested $1 million into developing and customizing this software. (D.I. 193 at 561:3-7, 590:11-19).

Klein represented that CTT owned an NDA, a peptic ulcer drug combination product, and invested millions of dollars into additional INDs. (*Id.* at 565:17-21, 588:10-589:9). Klein represented that he was instrumental in facilitating DAVA's sale to Endo for $600 million. (*Id.* at 565:4-16, 589:10-12). Klein also represented that he had already received, and turned down, a $27 million offer to sell CTT. (D.I. 170 ¶ 39.)

Klein represented that he would use Hartman and Smith's investment funds to purchase drugs and continue to roll out Compliance PAC physician dispensing. (D.I. 193 at 598:25-599:11). Hartman understood that the nature and use of the investment funds would be to fund projects for CTT. (*Id.* at 600:22-24). Hartman and Smith further understood that their funds would be used for CTT business because they sent them to a Cambridge Therapeutic Technologies corporate account at PNC A/C 5904. (*Id.* at 570:23-571:13, 601:13-602:6; PX103-078).

Klein represented that he was selling shares of the company and that each share was a one-percent ownership valued at $200,000 a share. (*Id.* at 598:7-10). Hartman and Smith agreed to purchase 2% of CTT-NJ (2 of Klein's 100 shares) for $400,000. (*Id.* at 598:5-24). Hartman purchased 1.5% for $300,000 and Smith purchased 0.5% for $100,000. (*Id.* at 568:3-569:5; JX7; JX8).

The terms of Hartman's investment are set forth in the "Unit Purchase Agreement by and between John H. Klein and Wade Everett Williams-Hartman." (JX7). Hartman executed this agreement on November 23, 2015 and wired $300,000 to PNC A/C 5904 the same day. (*Id.*; PX103-078). The terms of Smith's investment are set forth in the "Unit Purchase Agreement by and between John H. Klein and NuView IRA Inc. FBO Frank Edward Smith." (JX8). Smith's NuView IRA Inc. executed this agreement on or about December 10, 2015, and the company

13

wired $100,000 from Smith's retirement account to PNC A/C 5904 on December 11, 2015. (*Id.*; PX103-078).

Klein never provided Hartman and Smith with CTT tax returns, K-1s, or a fair market valuation statement despite repeated requests. (D.I. 193 at 572:18-573:7, 602:25-603:13).

### E. Current Status of CTT

In June 2016, the Breslow family invested $12.5 million in CTT. (JX9-006). As part of this transaction, CTT transferred its operating business from CTT-NJ to CTT-DE. (JX9-031, 049). Klein represented in the Breslows' CTT operating agreement that he was CTT-NJ's sole member. (JX9-049). He did not disclose to the Breslows that Plaintiffs were investors in CTT-NJ. (*Id.*).

In September 2016, Blue Valley invested $7 million in CTT-DE. (D.I. 170 ¶ 74). Klein did not disclose to Blue Valley that Plaintiffs were investors in CTT-NJ. Klein represented in CTT's operative Amended and Restated Operating Agreement, dated September 19, 2016, that he was CTT-NJ's sole member. (PX54-005). None of Plaintiffs are recognized as holders of CTT-DE Class A Units. (PX54-074).[2] The Amended and Restated Operating Agreement identifies Klein as having 100% of issued membership interests. (*Id.*). To this day, none of the Plaintiffs' CTT-NJ investments are recognized in CTT-DE. (D.I. 192 at 342:1-17).

For a short time in 2016, CTT engaged in the profitable business of wholesaling prescription gels and creams for generic drug manufacturer Sandoz, Inc. ("Gels and Creams). (D.I. 191 at 279:5-14). CTT exited that business at the end of 2016. (PX55-009-010). As of February 2017, CTT's Compliance PAC physician dispensing business was nonexistent. (D.I.

---

[2] By not giving Dr. Simonian notice of these investments and the opportunity to buy shares under the same terms, Klein breached Section 5.1 of Dr. Simonian's CTT-NJ Operating Agreement. (JX4-007-009). Likewise, this violation makes it clear that Klein never gave Dr. Simonian a CTT-NJ capital account in breach of Section 5.2 of the Operating Agreement. (*Id.*)

192 at 343:22-24). Adams and Simonian attempted to launch the business (*id.* at 343:15-344:10), but it was unsuccessful (D.I. 191 at 145:7-146:21). CTT is currently controlled by a "disposition" officer and is no longer an operating company. (D.I. 192 at 377:13-24). Plaintiffs' CTT investments are now worthless. (*Id.* at 377:18-378:2).

## II.   REPRESENTATIONS

Plaintiffs argue that there were at least six categories of material misstatements made: (1) "Use of Funds Misrepresentations;" (2) "Sole Shareholder Misrepresentations;" (3) "Background Misrepresentations;"[3] (4) "NDA and IND Misrepresentations;" (5) "Business Model Misrepresentations;" and (6) "Projection Misrepresentations." (D.I. 195-1). A large portion of Klein's representations occurred through his discussions with Plaintiffs and the presentations Klein sent to them. (PX34 (Adams in October 2014); PX36 (AV Select in January 2015); JX1 (Simonian in May 2015), JX6 (Smith and Hartman in October 2015)). Plaintiffs have proven the Use of Funds Misrepresentations, Sole Shareholder Misrepresentations, NDA and IND Misrepresentations, Business Model Misrepresentations, and Projection Misrepresentations.[4]

### A.   Klein Misrepresented the Use of Plaintiffs' Funds

Each Plaintiff understood that their investments would be used for CTT business. Klein did not disclose to any of the Plaintiffs that he would use their funds to pay his personal expenses. (D.I. 191 at 258:10-261:11 (Adams), 103:11-104:8 (Simonian); D.I. 192 at 513:2-515:8 (AV Select); D.I. 193 at 571:7-13 (Smith), 602:7-24 (Hartman)).

---

[3] The Court does not find that Plaintiffs have proven the "Background Misrepresentations." While Klein made numerous representations to Plaintiffs, particularly in the slide decks, Plaintiffs have not shown that those representations were false. (*See* PX34 (Adams); PX36 (AV Select); JX1 (Simonian), JX6 (Smith and Hartman)). In addition, while Plaintiffs testified that Klein represented that he received a $26.4 million dollar offer for CTT, Plaintiffs have not provided sufficient evidence that proves that Klein did not actually receive such an offer.
[4] The Plaintiffs need only prove one misrepresentation. The Court has found that Plaintiffs have proven multiple misrepresentations for which Klein could be liable.

Adams wired $581,250 to PNC A/C 5904 on October 16, 2014 and Klein disbursed out over $550,000 within a month. (D.I. 170 ¶ 40). Klein's transactions included: (i) two personal checks of $100,000 each (October 16 and November 3); (ii) a $134,733.29 check to American Express to pay his personal credit card bill (October 16); (iii) a $39,718 check to the Borough of Alpine, New Jersey to pay his personal property taxes (November 9); (iv) a $124,000 wire to undisclosed earlier investor Steven Shaw (October 17); and (v) two checks of $50,000 (October 16) and $10,000 (November 5) each to undisclosed earlier investor Patrick Dapuzzo. (*Id.* ¶ 41).

AV Select wired $450,000 to PNC A/C 5904 on January 26, 2015 and Klein disbursed out nearly $300,000 within a month. (*Id.* ¶ 42). Klein's transactions included: (i) a personal check of $100,000 (January 27); (ii) two checks of $127,174.63 and $13,429.99 each to American Express (January 26); (iii) two cash withdrawals of $8,500 and $6,000 each (January 30 and February 13); (iv) a $39,718 check to the Borough of Alpine (February 3); and (v) two checks of $10,000 each (January 22 and February 6) to Dapuzzo. (*Id.* ¶ 43).

Dr. Simonian wired $600,000 to PNC A/C 5904 on August 10, 2015 and Klein spent over $520,000 over the next six weeks. (*Id.* ¶ 44). Klein's expenditures included: (i) three personal checks of $300,000 (August 10), $100,000 (September 10), and $22,000 (September 21); (ii) a $46,000 check for a summer rental in East Hampton, New York (August 14); (iii) three checks totaling $15,000 for a rental apartment (September 4-6); and (iv) two checks of $15,000 (August 7) and $25,000 (September 1) each to Dapuzzo. (*Id.* ¶ 45).

Hartman and Smith wired $300,000 and $100,000 to PNC A/C 5904 on November 23, 2015 and December 11, 2015, respectively, and Klein disbursed out over $320,000 during that period. (*Id.* ¶ 46). Klein's transactions included: (i) two personal checks of $50,000 (November 22, the day before Hartman's investment) and $100,000 (January 2, 2016); (ii) a $42,319.28

check to American Express (November 23); (iii) a $42,460.98 check to the Borough of Alpine (November 22); (iv) a check of $23,000 to a relative; and (v) two checks of $45,000 each to undisclosed earlier investors Michael Rosenberg and Jeffrey Khalaf (December 29). (*Id.* ¶ 47).

During this litigation, Klein took the position that his use of Plaintiffs' funds was "back pay" under his CTT Employment Agreement or payment of personal expenses in lieu of back pay. (*Id.* ¶ 48). He initially said the same thing at trial. (D.I. 193 at 772:23-773:12). When confronted at trial that his use of the Plaintiffs' funds did not have the trappings of payroll (*i.e.*, no payroll processing, no W-2s, no payment of estimated taxes, etc.), however, Klein abandoned this excuse and admitted that he treated investment money and CTT's PNC A/C 5904 as his own "personal account." (*Id.* at 773:22-775:4, 781:4-9). Klein omitted this fact in his discussions with Plaintiffs, and led Plaintiffs to believe that the investment funds would be used for CTT's business.

### B. Klein Misrepresented that Plaintiffs were CTT's First Outside Investors

Klein told each Plaintiff that he or it (in the case of AV Select) would be CTT's first outside investor. (D.I. 170 ¶ 24 (Adams); D.I. 191 at 101:5-9 (Simonian); D.I. 192 at 501:9-12 (AV Select); JX7-003-004 (Hartman); JX8-003-004 (Smith)). These were lies.

In reality, there had been approximately $6 million in investments in CTT and/or INDs (that Klein claimed CTT owned) in the years prior to Plaintiffs' investments. (D.I. 193 at 640:11-24). Steven Shaw invested $1.5 million into CTT for a 7% share. (*Id.* at 639:7-11). When Shaw sought his investment back, Klein negotiated a settlement agreement and part of that settlement payment was $124,000 from PNC A/C 5904 the day after Adams wired his investment. (*Id.* at 658:2-11). Patrick Dapuzzo invested more than $1 million into a profit and loss interest in an IND, including $470,000 cash in an Adidas duffel bag. (*Id.* at 640:2-7; D.I. 170 ¶ 49). Klein

repaid Dapuzzo at least $980,000 (D.I. 170 ¶ 51), including part directly from the investment

funds of Adams, AV Select, and Dr. Simonian (*id.* ¶¶ 41, 43, 45), and part from PNC A/C 5904

in 2016. (*Id.* ¶ 52). Alois Rupp invested $1 million into a profit and loss interest in an IND on

November 8, 2011. (*Id.* ¶ 54). Trav-elee, LLC invested $500,000 for a 5% equity interest in CTT

and a profit and loss interest in an IND in January 2014. (PX104). Dr. Jerry Lubliner invested

$500,000 in CTT in November 2014. (PX103-030-031). Michael Rosenberg and Jeffrey Khalaf

collectively invested $250,000 as Products Investors. (D.I. 170 at ¶¶ 62-63). They were repaid

(*id.*), including directly from Hartman and Smith's investment proceeds (*id.* ¶ 47) and from PNC

A/C 5904 in 2016 (*id.* ¶ 64).

Jack Goldenberg invested $600,000 into CTT, and he had to "beg" Klein to repay him in

2012. (PX12). Other investors in INDs that pre-dated Plaintiffs' investments include Oded

Berkowitz, Jerry Treppel, Jeffrey Dickenson, and William Connollon. (D.I. 170 ¶¶ 56, 60, 65;

D.I. 192 at 373: 6-10; D.I. 193 at 640:11-16). Plaintiffs were not informed of these investors, let

alone each other.

Adams invested in October 2014. (D.I. 170 ¶ 25). AV Select invested in January 2015.

(PX96). Dr. Simonian invested in August 2015. (D.I. 170 ¶ 33). Hartman invested in November

2015 (JX7) and Smith invested in December 2015 (JX8).  Based on the existence of the prior

investors and the dates of Plaintiffs' investments, it is clear that none of them were CTT's first

outside investor. Therefore, Klein's representation to each Plaintiff that they would be CTT's

first outside investor was false.

### C. Klein's Misrepresented CTT's NDA and IND Assets

Klein represented to each Plaintiff that CTT owned an NDA and four valuable INDs.

(D.I. 191 at 230:16-23:11 (Adams); PX36 (AV Select); JX1 (Simonian); D.I. 193 at 565:17-21

(Smith), 588:10-589:9 (Hartman)). Despite Klein's representation that CTT owned NDA 50-824, the NDA was actually owned by Gastroenterological LLC ("GEL") (Moezinia Dep. Tr. 69:11-17), in which Klein personally owned an interest. (D.I. 193 at 666:21-23). Klein received over $1 million in royalties from this product over five years. (*Id.* at 666:13-23).

In addition, before 2014, CTT's supposed IND assets were actually owned by DAVA. (*Id.* at 663:23-664:6). DAVA filed the INDs with the FDA and Klein admitted they were DAVA intellectual property. (*Id.* at 640:25-641:11). Klein and DAVA discussed assigning DAVA's INDs to Klein as part of his separation from the company, but this assignment never actually occurred. (Moezinia Dep. Tr. at 103:20-106:8). Endo currently owns the INDs. (*Id.* at 117:6-20, 118:3-8.)

Even if Klein had actually contributed DAVA's INDs to CTT, the INDs were "worthless" anyway. (*Id.* at 108:7). DAVA never developed the INDs into NDAs after filing initial letters with the FDA, and DAVA never invested any money into this process. (*Id.* at 106:17-110:10). In fact, as of October 2013, Klein acknowledged that the INDs were "dormant," as "nothing has been done with them nor are there any plans to do anything with them." (PX21-002). Klein's representations to Plaintiffs regarding the status of the NDA and IND assets were false.

Not only did Klein misrepresent to Plaintiffs that CTT's Combination PAC business owned valuable NDA and IND assets, but he also failed to disclose that he had saddled CTT with an approximately $6 million debt from funds raised from investments in INDs that DAVA, not CTT, owned, and which he misappropriated for his personal use. (*See* D.I. 193 at 640:11-23; Moezinia Tr., 106:17-110:10).

### D. Klein Misrepresented the State of CTT's Compliance PAC Business and CTT's Financial Projections

To each Plaintiff, Klein represented that the Compliance PACs were "fully developed," that CTT had critical infrastructure in place, and that the physician dispensing business line would launch soon after their respective investments. (PX34-004, 008, 016 (Adams); D.I. 192 at 504:3-10, 505:13-17 (AV Select); D.I. 191 at 84:2-6, 86:6-9 (Simonian); JX6-019 (Smith and Hartman)). In fact, the presentations Klein gave to Plaintiffs Adams, AV Select, and Simonian stated, "Cambridge has fully developed its first Compliance PAC and is poised to begin commercializing a pipeline of 60+ similar Compliance PACs over the next six to eighteen months." (PX34-008 (Adams); PX36-008 (AV Select); JX1-008 (Simonian)). In addition, each presentation touted the software that the Compliance PACs would use, calling the software "novel" and saying, "This software interfaces with standard medical office software to implement this feature and patent applications are being prepared for this solution." (PX34-017 (Adams); PX36-017 (AV Select); JX1-017 (Simonian); JX6-019 (Smith and Hartman)).

At the time that Klein made these representations (October 2014, January 2015, May 2015, October 2015), the critical infrastructure of CTT was not in place. (*See* D.I. 191 at 120:20-24, 270:3-5, 270:20-271:6). Adams testified that in June 2016, the state of CTT's business was "in chaos. It was nothing in place. We didn't even have a business license." (*Id.* at 270:3-5). Dr. Simonian testified that in November 2016, "none of [CTT's Compliance PAC business] was really ready." (*Id.* at 120:20-24). In other words, as of June 2016, CTT "basically had nothing" and it was being started "from scratch." (*Id.* at 270:20-271:6). Klein admitted that CTT did not actually have a fully developed Compliance PAC, as he testified that the process of designing the PAC "started in earnest" around April 2016. (D.I. 193 at 756:25-757:7). It is uncontested that CTT developed its first Compliance PAC in June 2016. (D.I. 170 ¶ 75).

Klein did not have exclusive access to cheap generic drugs, and in fact struggled to acquire a full formulary of drug inventory in 2016. (D.I. 192 at 344:3-7). CTT also did not have custom prescription claim adjudication software, through DispensePoint or anyone else. (D.I. 191 at 116:3-12; D.I. 192 at 345:1-24). As of June 2016, the "License and Development Agreement, [was still] to be entered into between DispensePoint and CTT." (JX9-033). Further, as of September 2016, Klein had not beta-tested any CTT Compliance PAC to see if it would adjudicate for insurance reimbursement. (D.I. 191 at 115:16-116:12). And, there was no integration between the physician's software and the software Klein represented that CTT had. (*Id.* at 133:10-20).

In addition, the National Drug Codes ("NDC") on the boxes, which Klein showed in all of his presentations, had no value and most of them did not work. (*Id.* at 130:7-10). In the NDCs that did work, the doctor would have been reimbursed less than he or she would be paying for the Compliance PAC for. (*Id.* at 134:6-10). Further, in 2017, it became clear that business model that Klein was representing was inherently problematic. (*See id.* at 133:10-135:1). For instance, many states do not allow physician dispensing or restrict the amount that can be prescribed, which conflicted with the 30-day supply in the Compliance PACs. (*Id.* at 134:16-135:1). In addition, many insurance companies would not pay for the Compliance PACs. (*Id.* at 134:19). There had never been any testing of the software systems or the NDC codes. (*Id.* at 139:3-8). And, the NDCs were not usable as "unit of dose" and "unit of use" needed to be changed, which would require all of the boxes and package inserts to be completely re-done. (*Id.* at 145:7-146:21).

It is clear that Klein misrepresented the state of CTT's business and the critical infrastructure in place, as the Compliance PACs were not "fully developed" in 2014 or 2015 and

the business was not ready to launch. This also contributed to Klein's Projection Misrepresentations. Klein made financial projection representations to each Plaintiff other than Smith and Hartman. (*See* PX34-035-038 (Adams); PX36-035-038 (AV Select); JX1-033-036 (Simonian), JX6 (Smith and Hartman)). In the case of Dr. Simonian, he made multiple financial projections in addition to the slide deck, with emails on June 19, 2015 and June 22, 2015. (JX2). The "updated" EBITDA valuations were larger than Klein projected in the June 19 email. (JX2-001).

However, because Klein had put no critical infrastructure in place before the Plaintiffs invested, his projections that CTT would make millions of dollars in revenue and profit in 2015 and 2016 were not supported by a reasonable basis, and they were not made with a good faith belief in their reasonableness. (*See* JX1-034, PX34-036, and PX36-036). Therefore, Klein was basing CTT's financial projections on falsehoods, which makes his financial projections misrepresentations that were not made in good faith.

## III.  DISCUSSION

The First Amended Complaint (D.I. 74) contains six counts.

### A.  Count I: Securities Fraud under § 10(b) of the Securities Exchange Act and Rule 10b-5

To establish securities fraud under § 10(b) of the Securities Exchange Act and Rule 10b-5, Plaintiffs must prove: "(1) a material misrepresentation (or omission); (2) scienter, i.e., a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) 'loss causation,' i.e., a causal connection between the material misrepresentation and the loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005) (emphasis and citations omitted). I find that Plaintiffs have proven securities fraud under § 10(b) of the Securities Exchange Act and Rule 10b-5.

### 1. Misrepresentations

As discussed above, the Court has found Klein made five material misrepresentations to Plaintiffs.

### 2. Scienter

Scienter is a "knowing or reckless mental state embracing intent to deceive, manipulate, or defraud." *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 490 (3d Cir. 2016) (internal quotations omitted). Recklessness is "not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Institutional Investors Grp., v. Avaya, Inc.*, 564 F.3d 242, 267 n.42 (3d Cir. 2009). To establish scienter, Plaintiffs must prove that (1) Defendant "had both motive and opportunity to commit fraud;" or (2) prove "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 275 (3d Cir. 2006).

I find that Klein acted with scienter. He knew that the representations he was making to Plaintiffs were untrue.

For the Use of Funds Misrepresentations, Klein knowingly used Plaintiffs' investment funds for his personal gain, instead of using the money for its intended purpose of supporting CTT. He admitted to using PNC A/C 5904 as his "personal account" (D.I. 193 at 773:22-775:4, 781:4-9), and he knowingly used Plaintiffs' investments to pay for non-CTT expenses (*see* D.I. 170 ¶¶ 41, 43, 45, 47), which was not what he represented the funds would be used for. Such actions are "conscious misbehavior" that establish scienter. *In re Suprema Specialties*, 438 F.3d at 275.

In regards to the Sole Shareholder Misrepresentations, Klein knew of the prior investors in CTT. (*See, e.g.*, D.I. 193 at 640:11-24; PX103). He admitted as much at trial (D.I. 193 at 640:11). Further, Klein knew that these investors had wired money into CTT through PNC A/C 5904, as he was in control of the bank account and he used the money that had been wired in. (*See* PX103). Klein also entered into agreements with many of the investors or communicated with them regarding their investment, evidencing his knowledge of their existence as investors. Yet Klein represented to all five Plaintiffs that they would be the first outside investor in CTT. Telling such a falsehood to potential investors is a "knowing" act that "embrac[es] intent to deceive." *See OFI Asset Mgmt.*, 834 F.3d at 490.

As for the NDA and IND Misrepresentations, Klein knew that the assets were not owned by CTT, but still made such representations to Plaintiffs. Klein admitted at trial that he knew that NDA-824 was owned by GEL and that the INDs were DAVA intellectual property. (D.I. 193 at 666:21-23, 640:25-641:11). Klein knew this, and told Plaintiffs the opposite, demonstrating a wrongful state of mind with a knowing intent to deceive. *See OFI Asset Mgmt.*, 834 F.3d at 490.

Klein also acted with scienter in making the Business Model Misrepresentations. Klein represented to each Plaintiff that the Compliance PACs were "fully developed" and that CTT's critical infrastructure was in place. Making such representations was done with recklessness, as Klein knew such statements to be untrue. Klein made an extreme departure from an ordinary standard of care when he represented the state of the business as being "fully developed," when Klein knew that Compliance PACs had not been developed at that time, testing had not been done, and that the business was not ready to be launched. *See Institutional Investors Grp.*, 564 F.3d at 267 n.42. Similarly, as Klein knowingly based his financial projections on the Business Model Misrepresentations, he acted with scienter in making the Projection Misrepresentations.

Doing so was "an extreme departure from the standards of ordinary care," *id.*, as Klein perpetuated falsehoods by making representations regarding CTT's financial state based on other misrepresentations.

In addition to establishing scienter by proving "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness," Plaintiffs have also proven that Klein "had both motive and opportunity to commit fraud." *In re Suprema Specialties*, 438 F.3d at 275. Klein had such motive, as he needed funds to pay back prior investors in CTT and fund his personal lifestyle. (*See* PX103; D.I. 193 at 773:22-775:4, 781:4-9). Klein also had opportunity to commit this fraud, as he had control of PNC A/C 5904 and treated it as his personal account. (D.I. 193 at 773:22-775:4, 781:4-9).

I find that Plaintiffs have proven Klein acted with scienter by both circumstantial evidence of conscious misbehavior and by proving Klein's motive and opportunity to commit fraud.

### 3. In Connection with Purchase/Sale of Security

Klein's misrepresentations were made in connection with the sale and purchase of securities in CTT. Klein interacted with each Plaintiff regarding an investment in CTT, particularly through transmission of slide decks which described CTT, including the state of the company and its financial projections. (*See* PX34 (Adams); PX36 (AV Select); JX1 (Simonian), JX6 (Smith and Hartman)).

### 4. Reliance

Reliance must be reasonable and "requires a showing of a causal nexus between the misrepresentation and the plaintiff's injury, as well as a demonstration that the plaintiff exercised the diligence that a reasonable person under all of the circumstances would have exercised to

protect his own interests." *AES Corp. v. Dow Chem. Co.*, 325 F.3d 174, 178 (3d Cir. 2003). In

other words, "[r]eliance, or transaction causation, establishes that but for the fraudulent

misrepresentation, the investor would not have purchased or sold the security." *Newton v. Merrill*

*Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 172 (3d Cir. 2001).

The evaluation of whether a plaintiff has shown reasonable reliance must "be made on a

case-by-case basis based on all of the surrounding circumstances." *AES Corp.*, 325 F.3d at 179.

The Third Circuit has identified certain factors worthy of consideration in determining

reasonable reliance: "fiduciary relationship, opportunity to detect the fraud, sophistication of the

plaintiff, the existence of long standing business or personal relationships, and access to relevant

information." *Straub v. Vaisman & Co., Inc.*, 540 F.2d 591, 598 (3d Cir. 1976). The absence of

reasonable reliance is an affirmative defense and "the defendant bears the burden of establishing

that a plaintiff's reliance was unreasonable." *In re Daimlerchrysler AG Sec. Litig.*, 294 F. Supp.

2d 616, 620 (D. Del. 2003).

Plaintiffs have proven reasonable reliance on Klein's misrepresentations. Each Plaintiff

received a slide deck that contained representations regarding CTT, reviewed it, and had

conversations with Klein regarding the contents of the slide decks. (D.I. 191 at 227:4-13

(Adams); D.I. 192 at 500:17-501:4 (AV Select); D.I. 191 at 74:16-77:10 (Simonian); D.I. 193 at

567:2-5 (Smith), 597:2-5 (Hartman)).

Adams testified that "the most intriguing part of the investment" were the NDA and INDs

that Klein purported CTT owned. (D.I. 191 at 230:5-9). Adams stated, "I spent a ton of time on

my own doing a lot of research, talking on the phone to Mr. Klein a lot, and just basically

listened to him trying to learn as much as I could, doing my due diligence in terms of not so

much an investment, but just, you know, on the space what I could, you know, figure out." (*Id.* at

234:13-18). Adams testified that his due diligence also involved seeing Klein's house. (*Id.* at 246: 2-4).

Vorbach testified that he "thoroughly reviewed the deck" (D.I. 192 at 501:4), and that the deck was "very similar to other private investment decks" that he had read (*id.* at 502:6-11). Vorbach understood that "this type of deck is to solicit investors' money for your company." (*Id.* at 502:14-15). From reviewing the deck, Vorbach understood that "there was a tremendous opportunity there that was not being addressed that CTT was going to address." (*Id.* at 503:11-13). As an experienced investor (*id.* at 497:21-498:2), Vorbach understood that the founder's experience and background is a very important thing and that "the deck. . . that a founder presents to an investor would contain a lot of things that are created by the founder" (*id.* at 498:5-12). Vorbach testified that Klein's background in the pharmaceutical industry and the large target market were particularly important to him. (*Id.* at 502:24-503:15). He also stated that it was "significant" that "the company was already four years old. So that was a significant amount of time for John Klein to put pieces of the company in place." (*Id.* at 50515-17).

Dr. Simonian testified that Klein's "representation of leadership" was of interest to him, and that the "first mover advantage," "the proprietary method of compliance prepackaging drug combinations," and "the numbers" were important to him. (D.I. 191 at 75:8-9, 76:13-15, 76:18-19). To Dr. Simonian, the "holy grail" was the representation that the "software interfaces with standard medical office software to implement this feature and patent applications are being prepared for the solution." (*Id.* at 82:12-17). Dr. Simonian stated that "[t]his could be one of the things which probably got me besides everything else to invest." (*Id.* at 82:13-15).

Smith stated that he and Hartman went through the presentation with Klein and then went through it in detail on their own. (D.I. 193 at 567:2-5). Smith stated that he did not invest on the

spot as he "wanted to review the deck" and discuss it with Hartman. (*Id.* at 568:11-15). Smith testified that what stood out to him was the business model, in that Klein had "exclusive access to cheap generic drugs" and "proprietary software." (*Id.* at 567:6-15). That Klein had "a sales force ready to go on this product [the Compliance PAC]" also stood out to Smith. (*Id.* at 567:12-13). From the representations in the slide deck, Smith concluded that "it looked like [Klein] had a very good plan set up." (*Id.* at 567:14-15).

Hartman stated that Klein's "expertise and industry knowledge," "the exclusive license from Keystone," and Klein's ability "to buy drugs very inexpensively" stood out to him as interesting. (*Id.* at 597:5-17). Hartman also testified that what was very important was the software for physician dispensing that Klein had, as the "software put [Klein] light years ahead of what anyone else was doing, and it seemed to be complete and robust." (*Id.* at 597:17-23). Hartman "spoke with Smith" and did "some extensive research . . . about John before [he] decided what to invest." (*Id.* at 598:10-14).

Plaintiffs relied on Klein's representations. Klein provided Plaintiffs with information in substantially similar investors' decks and in conversations with him. Each Plaintiff testified that certain of Klein's representations were "important" or "intriguing" in their investment decision: the IND and NDA assets owned by CTT; the established business model; exclusive assets to generic drugs; proprietary software, among others. Plaintiffs found these characteristics of CTT (as represented by Klein) to be important, relied on these representations, and invested in CTT.

Based on an evaluation of the surrounding circumstances, such reliance was reasonable. Klein presented himself as an experienced pharmaceutical executive and touted his experience in both the slide decks and in conversations with Plaintiffs. (*See, e.g.*, D.I. 170 ¶ 3; PX34; JX6).  As Klein was experienced in the pharmaceutical arena, it is reasonable that Plaintiffs would believe

his representations regarding the business and the market, as Plaintiffs were not experienced in this field. (*See* D.I. 170 ¶ 4, 11, 17-19).  Further, each Plaintiff testified that he performed due diligence by doing research in the pharmaceutical space or on Klein and/or thoroughly reviewing the information that Klein had given them. (D.I. 191 at 234:13-18; D.I. 192 at 501:4; D.I. 193 at 567:2-5, 598:10-14).

In making their decisions to invest in CTT, Plaintiffs reasonably relied on Klein's misrepresentations.

### 5. Economic Loss

Plaintiffs have experienced economic loss. Each Plaintiff invested funds into CTT (D.I. 170 ¶¶ 40, 42, 44, 46). Adams invested $581,250 (*id.* ¶ 40), AV Select invested $450,000 (*id.* ¶ 42), Dr. Simonian invested $600,000 (*id.* ¶ 42), Smith invested $100,000 (*id.* ¶ 44), and Hartman invested $300,000 (*id.*). Each Plaintiff's investment is now worthless as CTT is controlled by a disposition officer and is no longer an operating company. (D.I. 192 at 377:13-24, 377:18-378:2). Plaintiffs have proven that they have suffered economic loss.

### 6. Loss Causation

Loss causation is "a causal connection between the material misrepresentation and the loss." *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 424 (3d Cir. 2007). To prove loss causation, "the plaintiff must show that the defendant misrepresented or omitted the very facts that were a substantial factor in causing the plaintiff's economic loss." *Id.* at 426. In other words, "The [loss] causation requirement is satisfied in a Rule 10b-5 case only if the misrepresentation touches upon the reasons for the investment's decline in value." *Id.* at 828 (quoting *Huddleston v. Herman & MacLean*, 640 F.2d 435, 549 (5th Cir. 1981), *aff'd in part and rev'd in part on other grounds*, 459 U.S. 375 (1983)).

Plaintiffs have shown loss causation. Klein's misrepresentations were a substantial factor in causing Plaintiffs' losses.

Klein's Use of Funds Misrepresentation was a substantial factor in causing Plaintiffs' economic losses. Plaintiffs understood that they were investing in CTT's business, but in reality, the funds were used for Klein's personal purposes. For about two years, Klein siphoned off funds approximately equivalent to the amount of the investments. Whatever chance CTT had to make good on the strategy Klein pitched to the investors, without capital to attempt to move the ideas forward, CTT had no chance. Therefore, the misuse of funds directly contributed to the failure of CTT and to the loss of Plaintiffs' investment funds.

Klein falsely represented that each Plaintiff was CTT's first outside investor. However, there had been multiple previous investors in CTT. This misrepresentation was a substantial factor in causing Plaintiffs' economic losses. Instead of Plaintiffs' investment funds being used for CTT's business, the funds were used to pay back prior investors. (*See* D.I. 170 ¶¶ 18, 45, 47; PX103). Plaintiffs' investment funds did not go towards building CTT, as they were intended to, and thus, that was a substantial factor in causing Plaintiffs' economic loss.

Loss causation also exists for Klein's NDA and IND Misrepresentations. Klein represented to each Plaintiff that CTT owned substantial assets, when in reality, it did not. That CTT did not own these assets, and therefore could not capitalize on them, was a substantial factor in causing Plaintiffs' loss.

There is also loss causation between Klein's representations regarding the state of the Compliance PAC business and Plaintiffs' economic losses. Klein represented that the business was "fully developed," when it was not. Plaintiffs' economic losses were caused by investing in a company that did not have established critical infrastructure, despite Klein's representations

that the company was poised to launch. Similarly, there is loss causation between Klein's

Projection Misrepresentations and Plaintiffs' economic losses. Klein misrepresented CTT's

financial projections, which was a substantial factor in causing Plaintiffs' economic losses, as in

reality CTT had no wherewithal to be profitable, and Plaintiffs' investments were therefore

worthless.

Plaintiffs have proven loss causation for Klein's misrepresentations.

### 7. Section 10 and Rule 10b-5 Securities Fraud Claim

Plaintiffs have proven each element of their Section 10(b) and Rule 10b-5 claim, and

therefore have proven that Klein is liable for securities fraud.

### B. Count II: Violation of the NJUSA

Count II alleges a violation of the New Jersey Uniform Securities Act ("NJUSA"). The

NJUSA provides civil liability against "any person who . . . [o]ffers, sells or purchases a security

by means of any untrue statement of material fact or any omission to state a material fact in order

to make the statements made, in the light of the circumstances under which they are made, not

misleading (the buyer not knowing of the untruth or omission)." N.J. Stat. Ann. § 49:3-71(a)(2)

(West 2021). "A claimant must show that the defendant 'knew of the untruth or omission and

intended to deceive the buyer' and the buyer suffered a loss." *Caspersen as Trustee for Samuel*

*M.W. Caspersen Dynasty Trust v. Oring*, 441 F. Supp. 3d 23, 41 (D.N.J. 2020) (quoting N.J.

Stat. Ann. § 49:3-71(b)(1)-(2) (West 2021)). In other words, to make a claim under the NJUSA,

Plaintiffs must prove: "(1) an untrue material statement or omission; (2) scienter; (3) causation;

and (4) injury to a plaintiff*." Lord Abbett Mun. Income Fund, Inc. v. Citigroup Glob. Markets,*

*Inc.*, 2012 WL 13034154, at *8 (D.N.J. July 12, 2012). "[R]eliance is not an element of a

NJUSA claim and causation is established by privity." (*Id.*).

Plaintiffs have proven that Klein is civilly liable under the NJUSA. Plaintiffs have shown

Klein made multiple misrepresentations: Use of Funds Misrepresentations, Sole Shareholder

Misrepresentations, NDA and IND Misrepresentations, Business Model Misrepresentations, and

Projection Misrepresentations. Further, Plaintiffs have proven scienter, causation, and injury to

Plaintiffs, as discussed above. In other words, Plaintiffs have demonstrated that Klein knew of

the "untruth[s]" regarding the number of shareholders, NDA and IND assets, the use of funds,

the state of the business, and the financial projections, intended to deceive Plaintiffs, and that

Plaintiffs suffered losses. *See Caspersen*, 441 F. Supp. 3d at 41. For these reasons, Plaintiffs

have proven Klein is subject to liability under N.J. Stat. Ann. § 49:3-71(a)(2) (West 2021).

### C. Count III: Common Law Fraud/Intentional Misrepresentaiton

Common law fraud requires proof of: "(1) a material misrepresentation of fact; (2)

knowledge or belief by the defendant of its falsity; (3) intention that the other person rely on it;

(4) reasonable reliance thereon by the other person; and (5) resulting damage." *Frederico v.*

*Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (citing *Gennari v. Weichert Co. Realtors*, 691

A.2d 350, 367-68 (1997)).

Plaintiffs have proven Klein committed common law fraud. Proof of common law fraud

requires many of the same elements that Plaintiffs proved in Count I. Klein made numerous

misrepresentations about CTT and knew that such representations were false. Klein intended that

Plaintiffs rely on these misrepresentations. He made these misrepresentations in slide decks

shown to Plaintiffs and in conversations with Plaintiffs about investing in CTT. (*See, e.g.*, D.I.

191 at 224:15-225:23, 234:7-239:13 (Adams); PX36 (AV Select); D.I. 191 at 64:5-20, 65:13-

66:14, 70:1-72:14 (Simonian); D.I. 170 ¶ 38 (Smith and Hartman)). Plaintiffs reasonably relied

on these misrepresentations and suffered damages, as their CTT investments ended up being worthless. For these reasons, Plaintiffs have proven Count III.[5]

### D. Count VI: Breach of Contract (Dr. Simonian)

To prove breach of contract under New Jersey law, a plaintiff must prove: (1) the existence of a valid contract between itself and the defendant; (2) that the defendant materially breached the contract; and (3) the plaintiff suffered damages as a result of the breach. *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 421 F. Supp. 2d 831, 833 (D.N.J. 2006) (citing *Coyle v. Englander's*, 488 A.2d 1083 (N.J. Super. Ct. App. Div. 1985)).

Dr. Simonian has proven a breach of contract. Dr. Simonian and Klein executed the "Membership Unit Purchase and Option Agreement" and "Operating Agreement of Cambridge TT LLC (a New Jersey limited liability company)" on August 10, 2015. (D.I. 170 ¶ 32; *see* JX003). It is undisputed that Klein and Dr. Simonian entered into this contract. (D.I. 170 ¶ 32). Neither party argues that the contract is invalid. Dr. Simonian performed his obligation under the Membership Unit Purchase and Option Agreement by furnishing $600,000, which he wired to PNC A/C 5904 on August 10, 2015, for three shares of CTT. (*Id.* ¶ 33).

The Membership Unit Purchase and Option Agreement states, "Seller owns One Hundred (100) units of membership interests in Cambridge TT Limited Liability Company," and, "Seller [Klein] hereby represents and warrants to Purchaser [Dr. Simonian] that all of the following are true, accurate and complete as of the date hereof: (a) Title. Seller is the sole owner[] of the Units…No other person or entity has any legal or equitable claim to ownership of the Units." (JX003-002-003). Klein breached this provision, as there were other prior investors in CTT

---

[5] As the Court has found securities fraud under Section 10(b) of the Securities and Exchange Act and Rule 10b-5, securities fraud under the NJUSA, and common law fraud, it will not reach decisions on negligent misrepresentation (Count IV) and unjust enrichment (Count V).

(including Adams and AV Select), and therefore Klein did not own 100 units of membership interests in CTT. (*See, e.g.*, D.I. 170 ¶ 25; PX96).

The Operating Agreement provides, "A separate Capital Account will be maintained for each member." (JX004-008). It also states, "Losses for any Fiscal Year shall be allocated as follows:. . . to Members, pro rata, based on their relative Non Cash Capital Account Balances…(2) to the Members, pro rata, based on their relative positive Capital Account balances… and (3) to the Members, pro rata, in accordance with their respective Percentage Interests." (JX004-011). Klein never provided Dr. Simonian with a Capital Account, nor did he allocate any fiscal year losses with Dr. Simonian. (*See* D.I. 191 at 104:11-18; 110:2-9). This was a breach of the Operating Agreement. The Operating Agreement also states, "If the Company proposes to issue any New Units at a valuation equal to or less than $200,000 per Unit, the Company shall first issue to Simonian a portion of such New Units equal to a fraction, the numerator of which is the number of Units held by Simonian and the denominator of which is the aggregate number of Units held by all of the Members collectively." (JX004-007). This provision of the agreement was breached with the issuance of Smith and Hartman's shares. Klein sold shares to Smith and Hartman at a valuation equal to $200,000 (D.I. 193 at 598:5-24), but Klein did not inform Dr. Simonian of the issuance of the new shares or issue Dr. Simonian a portion of such "New Units" (D.I. 191 at 104:23-105:6).

Dr. Simonian has established that Klein materially breached both the Membership Unit Purchase and Option Agreement and the Operating Agreement. Dr. Simonian, as previously discussed, suffered damages as a result of the breach. Dr. Simonian has proven that Klein is liable for breach of contract.

## IV. DAMAGES

Each Plaintiff seeks his or its entire CTT investment losses, plus pre-judgment interest. (D.I. 170 at 79). Despite the numerous counts, Plaintiffs seek only to recover the amount of his or its investment once. (D.I. 195-1 at 11 n.7).

"Out-of-pocket losses are measured by the difference between the fair value of all that the seller received and the fair value of what he would have received had there been no fraudulent conduct." *In re Daimlerchrysler*, 294 F. Supp. 2d at 626 (citing *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128, 155 (1972)). Here, Klein received the value of each Plaintiffs' investment. And, had there been no fraudulent conduct, if Klein had not made the misrepresentations and Plaintiffs had not relied on them, Klein would have received no investment funds from Plaintiffs. Therefore, Plaintiffs are each entitled to his or its entire CTT investment loss: Adams is awarded $581,250; AV Select is awarded $450,000; Dr. Simonian is awarded $600,000; Hartman is awarded $300,000, and Smith is awarded $100,000.

Plaintiffs seeks punitive damages on Count III (common law fraud). Under New Jersey law, punitive damages may be awarded if the plaintiff proves "that the harm suffered was the result of the defendant's acts or omissions, and such acts or omissions were actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions." N.J. Stat. Ann. § 2A:15-5.12 (West 2021). In other words, a court may award punitive damages "as punishment or deterrence for particularly egregious conduct." *Nappe v. Anschelewitz, Barr, Ansell & Bonello*, 97 N.J. 37, 49 (1984). "The award of damages is left to the sound discretion of the trier of fact." *Petric & Assocs., Inc. v. CCA Civ., Inc.*, 2020 WL 3041418, at *17 (N.J. Super. Ct. App. Div. June 8, 2020).

Here, the award of punitive damages is appropriate. Plaintiffs have proven that they suffered harm as a result of Klein's misrepresentations and that Klein acted with willful

disregard of the fact that Plaintiffs might be harmed. Klein's conduct was "particularly egregious," as he knowingly misrepresented the state of CTT, convinced Plaintiffs to invest, and then used Plaintiffs' investment funds as his personal funds. Klein's conduct was that of a true fraudster: he blatantly lied to Plaintiffs in order to secure their investment into CTT and then he used Plaintiffs' investments to benefit himself. To punish such behavior and to deter future malicious conduct, I award each Plaintiff punitive damages in the amount of their investment in CTT.

## V. CONCLUSION

Plaintiffs have proven securities fraud under Section 10(b) and Rule 10b-5 (Count I), a violation of N.J.S.A. § 49:3-71(a)(2) (Count II), and common law fraud (Count III). As the Court finds in favor of Plaintiffs on these Counts, it did not reach a decision on negligent misrepresentation (Count IV) or unjust enrichment (Count V). Dr. Simonian has also proven breach of contract (Count VI).

Plaintiffs are awarded damages in the full amount of their investments. Punitive damages, under Count III, are awarded to each Plaintiff in the amount of their investments. In the alternative, on Count VI, Dr. Simonian is awarded the full amount of his $600,000 investment, but no punitive damages.

Plaintiffs should prepare a form of judgment that includes prejudgment interest through the day after they file the proposed form of judgment.  Plaintiffs should submit a separate statement explaining the starting date for each calculation, the interest rate(s) applied, and the source of law for determining the appropriate rates.  These documents are due within seven business days of the filing of this memorandum opinion.